Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice Pending*)
Geoff B. McCarrell, Esq. (*Pro Hac Vice Pending*)
**LAW OFFICE OF SYLVIA A. GOLDSMITH**
Park West Building
20545 Center Ridge Road, Suite 120
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail:  sgoldsmith@sgoldsmithlawoffice.com

*Attorneys for Plaintiffs Richard and Kristin Zabriskie*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| RICHARD and KRISTIN ZABRISKIE, married individuals, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION and FEDERAL HOUSING FINANCE AGENCY as the Conservator of FEDERAL NATIONAL MORTGAGE ASSOCIATION, <br><br> Defendants. | No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL REQUESTED** |

# I.  PRELIMINARY STATEMENT

1.      Plaintiffs Richard and Kristin Zabriskie, mortgage applicants subjected to the repeated violation of and intentional non-compliance with the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq*. (the "FCRA"), bring this action against Defendants Federal National Mortgage Association ("Fannie Mae") and Federal Housing Finance Agency ("FHFA"), as the Conservator of Fannie Mae.

2.      As a well-known colossus in the secondary mortgage loan market, Fannie Mae also silently plays a dominant role in home mortgage loan origination.  While its involvement in the loan origination process is largely unknown to the public, Fannie Mae exerts a tremendous influence on each step of the application process.  Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes; charges lenders, brokers and consumers for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms.  This process enables Fannie Mae to reap significant profits by carrying out a business model based on risk-based pricing and the collection of fees for each loan application run through its automated underwriting system.

3.      However, despite its role as a consumer reporting agency and/or a reseller of credit information in a typical mortgage transaction, Fannie Mae has

deliberately made itself unaccountable to consumers, and intentionally fails to comply with any of the requirements imposed on it by the FCRA.

4.     Fannie Mae's flagrant disregard for the law results from a presumed contention that, as a government-sponsored enterprise, it is somehow exempt from the grave responsibilities imposed by the FCRA on every other company that assembles, disseminates and/or sells consumer credit information.  As such, mortgage applicants like Plaintiffs are harmed because they are denied certain rights guaranteed by the FCRA, including the ability to discover what information may have impacted their loan eligibility, the right to request and/or dispute the information that was considered in connection with their applications, and the right to expect that their credit information was reported with maximum possible accuracy.

## II.  PARTIES

5.     Plaintiffs, Mr. and Mrs. Zabriskie, are married adult individuals who are residents of Gilbert, Maricopa County, Arizona.

6.     Defendant Fannie Mae is a publicly held corporation with a principal place of business located at 3900 Wisconsin Ave., NW Washington, DC 20016-2892, and which regularly conducts business throughout Arizona and in all fifty (50) states in the United States.

7.     Defendant Federal Housing Finance Agency ("FHFA") is an independent federal agency, created under the Housing and Economic Recovery Act of 2008, Pub. L.

No. 110–289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617 *et seq.*).  On September 6, 2008, Fannie Mae was placed under the conservatorship of the FHFA.

8.     Fannie Mae is a "consumer reporting agency" as that term is defined by Section 1681*a*(f) of the FCRA.

### III.  JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1681*p* and 28 U.S.C. § 1337.

10.     Venue in this judicial district is proper because Mr. and Mrs. Zabriskie reside in this judicial district and many of the facts relevant to this Complaint occurred in this judicial district.

### IV.  FACTUAL ALLEGATIONS

#### A.   Fannie Mae and Its Automated Desktop Underwriter System

11.     Fannie Mae is a shareholder-owned for-profit corporation that is publicly traded on the U.S. Stock Exchange.

12.     Fannie Mae is also a government-sponsored enterprise ("GSE") because it was chartered by Congress to provide a secondary market for home mortgages.  In exchange for its agreement to act as a mortgage loan purchaser in the secondary market, Fannie Mae's charter provides it with certain financial advantages and incentives.

13.     Due to federal banking regulations requiring most primary mortgage lenders to maintain minimum capital, many mortgage lenders in the United States sell their loans to Fannie Mae after they originate the loan.

14.     Fannie Mae, together with its "little brother" Freddie Mac, purchase or guarantee more than 75% of all mortgages originated in the United States, depending upon market conditions and consumer trends.

15.     Fannie Mae purchases what are known as "conventional conforming" loans.  These are loans that are not insured or guaranteed by the federal government, are less than $417,000.00, and have certain prescribed risk characteristics.  Fannie Mae publishes its *Selling Guide* which outlines the specific requirements necessary for eligibility for Fannie Mae purchase.

16.     Fannie Mae buys these conventional conforming loans and either bundles them as securities and sells them to investors, or holds the loans in its own portfolios.

17.     Unknown to the public, and due to its status as one of the two (2) dominant secondary market purchasers of mortgages, along with mortgage lenders' interest in assuring the sale of their loans, Fannie Mae has entered into contracts with numerous mortgage lenders throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate.

18.     For the mortgage lenders who have contracts with Fannie Mae and who sell mortgage loans to Fannie Mae in the secondary market, Fannie Mae requires that mortgage brokers and lenders submit residential mortgage applications through its Desktop Underwriter automated underwriting system ("DU") in order to get a quick

approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside DU, and risk-based pricing, before any commitment is made to the prospective borrowers.

19.     For these brokers and lenders, Fannie Mae leases or licenses its DU system for use by the lenders or mortgage loan brokers and charges these lenders or brokers a fee for each mortgage application run through the DU system.

20.     Fannie Mae's DU system is also used in connection with non-conforming loans that Fannie Mae is not permitted to purchase pursuant to its congressional charter. These other types of loans include, but are not limited to: FHA, Jumbo, and sub-prime loans.

21.     Through the DU system, Fannie Mae obtains an applicant's three-file and/or "tri-merge" consumer report from either a reseller of credit information, or one or more of the three (3) major credit repositories, Equifax, Trans Union and Experian, which Fannie Mae sells to the lender or broker.

22.     Fannie Mae's DU system assembles reviews, assesses and evaluates all of the information it obtains from the lender and/or broker, and the consumer reporting agencies and/or resellers, including the consumer reports, and generates its own report, known most frequently as the *Desktop Underwriting Findings* ("DU Findings").

23.     The DU Findings is a detailed report documenting, among other things, the applicant's credit history, credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living, assets, income,

debt-to-income ratio, and employment.  Further, the DU Findings contains findings, conclusions, comments and results reached by Fannie Mae concerning the applicant's credit and his or her "eligibility" for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied.  These DU Findings determinations are made for all types of loans submitted through DU, whether or not Fannie Mae ultimately purchases them in the secondary market.

24.     Upon information and belief, most mortgage brokers and lenders do not disclose all or part of an applicant's DU Findings to the consumers to whom they relate, during the ordinary course of their submission of a mortgage loan application to Fannie Mae.

25.     If Fannie Mae determines that a consumer is ineligible for loan purchase, or may only be approved subject to a change in loan terms, a higher interest rate, the imposition of additional fees, charges, documentation or the satisfaction of certain underwriting conditions based on information contained in the consumer report it obtains, it does not provide the consumer with any notice of the adverse action it has taken, in violation of the FCRA.

26.     Further, despite the fact that it compiles, maintains, issues and sells its DU Findings to lenders and/or brokers on a nationwide basis, Fannie Mae does not provide consumers with disclosures of the files it maintains on them, the sources of the information it reports, summaries of their rights, does not maintain any toll-free

telephone numbers available to consumers and does not investigate any consumer disputes, in further violation of the FCRA.

27.    Fannie Mae has been placed on notice by the Federal Trade Commission, the primary financial regulator first provided with the authority by Congress to interpret the provisions of the FCRA, which long ago emphasized that the FCRA is intended to cover a very broad range of "assembling" or "evaluating" activities that bring many entities within the ambit of the FCRA.  *See 40 Years of Experience With the Fair Credit Reporting Act – An FTC Staff Report With Summary of Interpretations* (July 2011) at pp. 28-32 (specifically citing to FTC Staff Opinion Letter, William Haynes (June 9, 1998), 1998 WL 3423759; *In the Matter of First American Real Estate Solutions, LLC ("Credco")*, FTC File No. 952 3267 (Oct. 28, 1998)).

### B.   Plaintiffs Negotiate a Short Sale of Their Virginia Home

28.    Plaintiffs were the owners of a home in northern Virginia with a loan that was subject to a first mortgage with CitiMortgage, and two (2) Home Equity Lines of Credit with PNC Bank.

29.    In late 2006, Plaintiffs decided to move from Virginia to the Gilbert, Arizona area because Mr. Zabriskie had recently completed a Master's Degree program at Johns Hopkins University, the Zabriskies had recently seen the birth of their third son and could rely on the support of extended family living near Gilbert to help care for the children; and the average cost of living is much less in Arizona, and thus Mrs. Zabriskie could potentially make the transition to a full-time, stay-at-home mother of three (3).

30.     In February 2007, Plaintiffs placed their Virginia home on the market.

31.     Upon receiving a job offer, Mrs. Zabriskie and the kids moved to Arizona so that she could start work, find suitable daycare for the kids, and purchase a home for the family.   Mr. Zabriskie remained in Virginia and continued working and seeing through the sale of the home until he was able to find full-time employment in Arizona.

32.     In June 2007, Plaintiffs purchased their current home in Gilbert.

33.     However, due to economic conditions beyond their control, Plaintiffs were unable to sell their Virginia home as quickly as they had expected, and as a result, Plaintiffs were stuck paying two large monthly mortgage payments for almost a year.

34.     With the unexpectedly low offers that were coming in for the home, Plaintiffs' real estate agent advised them that they would need to slip into default on their mortgage payments for lenders to even consider such offers.

35.     Plaintiffs take great pride in maintaining an excellent credit history, and were current on all of their mortgage payments up to this point, and in fact, had never been late on any payments to any of their creditors before.

36.     As such, Plaintiffs reluctantly allowed their mortgages to slip into delinquency so that they could negotiate a short sale of the home with their lenders.

37.     In April 2008, the short sale of Plaintiffs' Virginia home closed escrow.

38.     Plaintiffs were able to pay off their first lien mortgage in full upon the short sale of their home.  *See* Letter from CitiMortgage to the Zabriskies, dated April 17, 2008 (a copy of which is attached hereto as Exhibit 1).

39.    Plaintiffs' other mortgage accounts were also paid off and closed as a result of the short sale, and subsequently reported to the credit reporting agencies as "paid settlement."  *See* Letters from PNC Bank to Kristin A. Zabriskie, dated May 29, 2008 and June 25, 2008, respectively (copies of which are attached collectively hereto as Exhibit 2).

40.    Pursuant to Fannie Mae's published Desktop Underwriter Guidelines ("DU Guidelines"), Plaintiffs would not be able to qualify for conventional financing for a minimum of two (2) years following this short sale.

### C.   Plaintiffs Are Denied Mortgage Financing By NationsChoice

41.    In May 2012, having waited the mandatory two (2) years, Plaintiffs contacted NationsChoice Mortgage ("NationsChoice") to obtain pre-qualification for refinancing on their current home mortgage loan.

42.    Despite being prequalified in June, NationsChoice told Plaintiffs that they could not approve the financing because their short sale was flagged as a "foreclosure" which, per DU Guidelines, would prevent Plaintiffs from obtaining conventional financing for seven (7) years.  Plaintiffs were confused since their previous home was never in foreclosure at any point.

43.    Plaintiffs became understandably embarrassed, frustrated and angered, especially when NationsChoice representatives treated Plaintiffs as if they were deadbeats because of the apparent foreclosure on their credit record, and as if they were dumb for seemingly not knowing about it.

44.     Plaintiffs corresponded on a daily basis with several representatives from NationsChoice in an effort to clear up the discrepancy and have the loan approved.

45.     In doing so, Plaintiffs contacted both CitiMortgage and PNC to ensure that their previous short sale was being reported accurately to the national credit reporting agencies.

46.     Plaintiffs received response letters from both CitiMortgage and PNC in mid-July 2012 confirming that the mortgage accounts at issue were never reported or identified to the national credit reporting agencies as having been subject to foreclosure, but rather were always reported correspondingly as "paid in full" or "settled in full."

47.     Ultimately, Plaintiffs were shown the door by NationsChoice without being able to secure the financing they were prequalified to receive.

48.     Plaintiffs also lost their application and appraisal fees with the denial.

49.     Although extremely disappointed and dumbfounded with NationsChoice's unforeseen decision, Plaintiffs were nonetheless determined to set the record straight quickly as they stood to decrease their mortgage payment by approximately $500.00 per month through the refinance.

### D.     Plaintiffs' Uncover The False Foreclosure Notation In DU Findings

50.     Plaintiffs received and reviewed a copy of the DU Findings pertaining to them that NationsChoice had obtained from Fannie Mae, and had relied upon in denying Plaintiffs' application.

11

51.     These DU Findings correctly noted a potential short sale in its *Risk/Eligibility* section:

7    The credit report has identified an account that may have been subject to a preforeclosure sale. The preforeclosure sale must have been completed two or more years from the credit report date, and the loan casefile must comply with all other requirements specific to preforeclosure sales as specified in the Fannie Mae Selling Guide.

| Borrower | Creditor | Account Number |
|---|---|---|
| RICHARD C ZABRISKIE | PNC BANK | ██████████ |
| RICHARD C ZABRISKIE | PNC BANK | ██████████ |

52.     *See* DU Findings Report, dated July 3, 2012 (redacted excerpts attached hereto as Exhibit 3) at page 2 of 7.  These DU Findings further note that so long as the short sale was "completed two or more years from the credit report date" the loan could still be approved.  *Id.*

53.     However, the DU Findings reported that the proposed loan was not eligible for delivery to Fannie Mae because of a foreclosure:

3    Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years, or a foreclosure that was reported within the last seven years. This loan is ineligible for delivery to Fannie Mae.

| Borrower | Creditor | FC Type | Account Number | Date Reported |
|---|---|---|---|---|
| RICHARD C ZABRISKIE | PNC BANK | Foreclosure | ██████████ | 07/08 |
| RICHARD C ZABRISKIE | PNC BANK | Foreclosure | ██████████ | 07/08 |

*See* Exhibit 3 at page 1 of 7.  This resulted in a "Refer with Caution" recommendation which amounts to a credit denial per Fannie Mae's *Selling Guide*.

54.     NationsChoice also shared with Plaintiffs excerpts from a tri-merge credit report accessed in connection with Plaintiffs' credit application which confirmed that,

despite Plaintiffs' short sale (and the delinquent mortgage payments immediately preceding same), Plaintiffs' credit scores remained in the 700s, which would otherwise allow them to obtain conventional mortgage financing.

55.     The tri-merge credit report further confirmed that none of Plaintiffs' creditors were reporting Plaintiffs as having been through a foreclosure.

56.     Plaintiffs now began to understand that their inability to obtain conventional mortgage financing was a result of Fannie Mae's reading (or misreading) of Plaintiffs' accurate credit report information.

### E.   Plaintiffs Are Denied Mortgage Financing By Amerisave

57.     Mrs. Zabriskie, who has worked in the area of loan origination her entire eighteen (18) year career, and who knows what criteria generally meets loan approval, took it upon herself to research into the issue to try and find a quick solution.

58.     Mrs. Zabriskie contacted numerous lenders and brokers who could provide no advice.

59.     Eventually, on or around July 19, 2012, Mrs. Zabriskie was assured by a representative of Amerisave Mortgage Corporation ("Amerisave") that he knew of the specific problem that Plaintiffs were going through and that his company could help with the approval of the financing through a "manual underwriting" process.

60.     Relying on these representations, Plaintiffs applied and were prequalified for conventional mortgage loan refinancing with Amerisave.

61.     However, after obtaining and relying upon a DU Findings report it purchased from Defendant Fannie Mae, which again falsely stated that Plaintiffs' previous mortgage accounts were coded as subject to a foreclosure, Amerisave indicated to Plaintiffs that their application process had hit a snag.

62.     Over the course of the next few months, Plaintiffs worked tirelessly with Amerisave to ultimately gain approval for the loan despite the negative DU Findings report from Fannie Mae.  As part of this process, Plaintiffs paid extra money for Amerisave to attempt a "Rapid Recheck" with one or more credit reporting agency.  *See Email* from Amerisave representative to Mrs. Zabriskie, dated October 5, 2012 (a copy of which is attached hereto as Exhibit 4).

63.     On or around October 5, 2012, despite all of the additional efforts made and documentation clearly evidencing the short sale in the hands of Amerisave, Plaintiffs received a final determination that their loan application with Amerisave had in fact been denied.  *See Statement of Credit Denial, Termination or Change*, dated October 5, 2012 (a copy of which is attached hereto as Exhibit 5).

64.     Amerisave also shared with Plaintiffs excerpts from a tri-merge credit report accessed in connection with Plaintiffs' credit application which confirmed that, despite Plaintiffs' short sale (and the delinquent mortgage payments immediately preceding same), Plaintiffs' credit scores remained in the 700s, which would otherwise allow them to obtain conventional mortgage financing.  *See* Exhibit 5 at page 2 of 2.

65.   The tri-merge credit report further confirmed that none of Plaintiffs' creditors were reporting Plaintiffs as having been through a foreclosure.

66.   Thus, Plaintiffs were ultimately unable to secure financing with Amerisave, based at least in part on the false information in the DU Findings report.

67.   Plaintiffs were shocked, embarrassed and devastated.

68.   Amerisave representatives were also discouraged by the result, but told Plaintiffs that it was Fannie Mae who was the ultimate decision-maker.

69.   As with NationsChoice previously, Plaintiffs were out the money spent on application and appraisal fees with the denial.

70.   Plaintiffs were especially aggravated and disheartened by the fact that there was seemingly nothing they nor their prospective lenders could do about the "foreclosure" notation that was preventing them from obtaining financing, and that, to date, they could find no evidence of it anywhere on their personal credit reports.

71.   This determination was especially upsetting and maddening for Mrs. Zabriskie, who believed she had found a solution to the problem after expending significant time and energy researching the issue over the previous several months.

**F.   Plaintiffs Are Approved For Refinancing At A Higher Interest Rate**

72.   Completely at a loss for how to proceed after the most recent denial, the search for a solution became an increasing obsession for Mrs. Zabriskie.  She continued researching endlessly, joining in on internet blogs and forums, and calling the credit bureaus and Fannie Mae directly to get to the bottom of the false foreclosure notation.

15

73.     While customer service representatives of Equifax, Experian and Trans Union blamed Fannie Mae, Fannie Mae did not return Mrs. Zabriskie's calls.

74.     In November 2012, the Zabriskies paid upfront fees of nearly $1,200.00 to an attorney who purported to have a fix to the problem from a credit reporting standpoint.  This attempt to solve the problem also failed, and Plaintiffs again spent substantial money without any results to show for it.

75.     As her research continued, Mrs. Zabriskie spoke with a representative of PrimeLending who suggested that the Zabriskies again apply for the financing, but to have the application run through different credit reporting resellers until approved.

76.     In August 2013, over a year after initiating the refinance process, Plaintiffs were finally approved for conventional mortgage financing.

77.     If not for the gumption and perseverance of Mrs. Zabriskie in finding a solution to the problem, the Zabriskies would probably still be without the mortgage financing they rightfully deserve.

78.     However, whereas Amerisave had pre-approved them in July 2012 at an interest rate of **3.5%**, Plaintiffs were now stuck with a rate of **4.375%**.

### G.   DU Wrongly Flags Any Serious Mortgage Delinquency As A Foreclosure

79.     Upon information and belief, the Zabriskies are only two (2) of hundreds of thousands (if not greater numbers) of homeowners who have had a short sale

misidentified by DU as a foreclosure, thereby preventing them from obtaining conventional financing or refinancing.

80. On March 13, 2013, Fannie Mae released a "Desktop Underwriter Clarification" in response to mounting "requests for clarification on how Desktop Underwriter identifies a foreclosure and a pre-foreclosure sale[.]" *See* Desktop Underwriter Clarification (a copy of which is attached hereto as Exhibit 6).

81. In this regard, Fannie Mae described DU's identification of a pre-foreclosure or short sale as follows:

**Preforeclosure Sale Identification**

**Preforeclosure Sale Identification**

A preforeclosure sale or short sale is the sale of a property in lieu of a foreclosure resulting in a payoff of less than the total amount owed, which was pre-approved. At this time, there are no codes provided in the credit report data received by DU that specifically identify a preforeclosure sale.

With DU Version 8.2 in December 2010, DU began issuing a message based on the presence of Remarks Codes E0047 (Settlement accepted on this account), T0140 (Settled for less than full balance), or R0107 (Account legally paid in full for less than the full balance) on a mortgage or HELOC account. However, because those codes can be used on any account for any reason, DU is not able to use those codes to identify a preforeclosure sale with 100% accuracy, so it is not able to fully automate the preforeclosure sale waiting period or eligibility requirements.

When DU issues the preforeclosure sale message the lender must confirm that the preforeclosure sale had been completed two or more years from the credit report date, and must confirm that the loan casefile complies with all other requirements specific to preforeclosure sales as specified in the Fannie Mae *Selling Guide*.

*See* Exhibit 6 at 1 of 3.

82. Per the DU Findings used to deny Plaintiffs their refinance applications, Plaintiffs' previous short sale was specifically identified by DU. *See* Exhibit 3 at page 2 of 7.

83. So long as the pre-foreclosure or short sale was completed more than two (2) years before the current application, that prospective loan is still eligible for purchase by Fannie Mae, and DU will not refer, *i.e.*, deny, the application. *See Selling*

17

*Guide*, Part B, Subpart 3, Chapter 5 (relevant excerpts of the 2011 and 2013 versions of which are attached collectively hereto as Exhibit 7) at 434 and 465, respectively.

84.     In describing DU's identification of a foreclosure, Fannie Mae represents as follows:

**Foreclosure Identification**

When reviewing the credit report data received, DU reviews the manner of payment (MOP) codes and Remarks Codes associated with each tradeline, and the Public Record information to determine if a foreclosure has occurred.

Mortgage accounts, including first liens, second liens, home improvement loans, HELOCs, and mobile home loans, will be identified as subject to a foreclosure if there is a current status code or MOP code of "8" (foreclosure) or "9" (collection or charge-off); or if there is a foreclosure-related Remarks Code present in the credit report data and associated to the tradeline.  If a foreclosure was reported within the seven-year period prior to the report date associated with the tradeline, the loan casefile will receive a Refer with Caution recommendation and will be ineligible for delivery to Fannie Mae as a DU loan.

*See* Exhibit 6 at 1 of 3.

85.     Per this "Desktop Underwriter Clarification," Fannie Mae admits that accounts reported by the original creditor merely as "collection or charge-off" – accounts admittedly not in foreclosure – will be identified by the DU system as having been in foreclosure.

86.     Any prospective loan that DU identifies as having a foreclosure in the previous seven (7) years will automatically be ineligible for purchase by Fannie Mae. *See* Exhibit 7 at 464.

87.     Thus, even though DU correctly identified Plaintiffs' previous short sale, acknowledging that so long as that short sale was more than two (2) years ago, DU also manufactured a non-existent foreclosure for Plaintiffs and referred, *i.e.*, denied, their application accordingly.

88.     This incorrect identification by DU prevented Plaintiffs from obtaining the refinancing for their current home.

### H.  Fannie Mae Acknowledges Deficiency in DU Computer Software

89.     In May 2013, the *Consumer Protection Subcommittee* of the *U.S. Senate Committee on Commerce, Science & Transportation* held a hearing on Capitol Hill to address a variety of problems plaguing the consumer reporting industry.

90.     During this hearing, Senator Bill Nelson, D-Fla., raised serious concerns about the significant and growing numbers of his constituents that had been denied conventional financing due to DU wrongly identifying a foreclosure, in addition to, or instead of, a short sale.

91.     After months of prodding from Senator Nelson, the *Consumer Financial Protection Bureau*, the *National Consumer Reporting Association* and the *National Association of Realtors,* Fannie Mae announced a change to its automated DU system to "fix" the problem:

***Underwriting when Conflicting or Inaccurate Foreclosure Information Provided on DIL or PFS Tradeline***
Fannie Mae has been made aware that there are often inconsistencies in the credit data when DIL and PFS events occur, and in an effort to assist borrowers in obtaining a new loan in an appropriate timeframe, DU will be updated to disregard the foreclosure information on the credit report when instructed to do so by the lender on the online loan application.

When DU identifies a foreclosure on a credit report tradeline that appears to be one that was subject to a DIL or PFS, the lender may instruct DU to disregard the foreclosure information on the credit report by entering "Confirmed CR DIL" or "Confirmed CR PFS" in the Explanation field for question c. in the Declarations section of the online loan application and resubmitting the loan casefile to DU.  When DU sees this indication, the foreclosure information on the credit report tradeline that also has a DIL or PFS Remarks Code will not be used.

*See* Desktop Originator/Desktop Underwriter Release Notes DU Version 9.1 (relevant excerpts of which are attached collectively hereto as Exhibit 8) at 6.

92.     While these changes are expected to take effect the week of November 16, 2013, *see* Exhibit 8 at 1, and hopefully will allow consumers to rightfully obtain conventional financing without any hitches going forward, the Zabriskies have already suffered substantial economic and non-economic harm.

## V.  CAUSES OF ACTION

### FAIR CREDIT REPORTING ACT VIOLATIONS

93.     Plaintiff hereby incorporates by reference all well-pleaded allegations contained in the preceding paragraphs as if fully rewritten herein.

94.     Section 1681*o* of the FCRA provides for civil liability against any CRA that is negligent in failing to comply with any requirement imposed under the Act.

95.     Section 1681*n* of the FCRA imposes civil liability on any CRA "who willfully fails to comply with any requirement" of the Act.  *See* 15 U.S.C. § 1681*n*(a).

### Failure To Adopt And/Or Follow Reasonable Procedures

96.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  *See* 15 U.S.C. § 1681*e*(b).

97.     The DU Findings Report generated by Fannie Mae's DU system is a consumer report as defined by Section 1681*a*(d) of the FCRA.

98.     On numerous occasions over the past two (2) years, Fannie Mae has prepared a consumer report concerning Plaintiffs, and disseminated such report to one

or more third party(s), that failed to assure "maximum possible accuracy" of information pertaining to Plaintiffs.

99.    Fannie Mae willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports it prepared and/or published concerning Plaintiffs, in violation of 15 U.S.C. § 1681$e$(b).

100.    To the contrary, Fannie Mae has affirmatively adopted and follows an unreasonable foreclosure identification procedure that, on its plain terms, knowingly misidentifies non-foreclosures as foreclosures.

101.    As a direct and proximate result of Fannie Mae's willful and/or negligent refusal to follow reasonable procedures as mandated by the FCRA, Plaintiffs have suffered loss and damage including, but not limited to: financial loss, loss of credit opportunity, a justifiable fear to request credit, expenditure of significant time and resources, mental anguish, humiliation, and embarrassment, entitling them to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681$o$.

102.    Fannie Mae's refusal to follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of Plaintiffs.  The injuries suffered by Plaintiffs are attended by circumstances of fraud, malice, retaliation, and willful and wanton misconduct, calling for statutory damages, an assessment of punitive damages, plus attorneys' fees and costs pursuant 15 U.S.C. § 1681$n$.

**WHEREFORE**, Plaintiffs, Richard and Kristin Zabriskie, pray for judgment in their favor and against Defendants Fannie Mae and FHFA, and for the following relief:

A.     An award of actual damages in such amounts as determined by the jury;

B.     Statutory damages pursuant to 15 U.S.C. § 1681*n*;

C.     An assessment of punitive damages against Defendant pursuant to 15 U.S.C. § 1681*n*;

D.     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681*n* and 15 U.S.C. § 1681*o*; and

E.     Such other and further relief as may be just and proper.

## VI.  JURY DEMAND

103.   Plaintiffs hereby demand a trial by jury on all their claims.

DATED: November 4, 2013.                    Respectfully Submitted,

                                              */s/ Paul B. Mengedoth*
                                            Paul B. Mengedoth, Esq.
                                            **MENGEDOTH LAW PLLC**
                                            20909 N. 90th Place., Ste. 211
                                            Scottsdale, AZ 85255

                                            Sylvia A. Goldsmith, Esq. (*Pro Hac Pending*)
                                            Geoff B. McCarrell, Esq. (*Pro Hac Pending*)
                                            **LAW OFFICE OF SYLVIA A. GOLDSMITH**
                                            2639 Wooster Road
                                            Rocky River, OH 44116

                                            *Attorneys for Plaintiffs*

22