1
2
3
4
5
6

**IN THE UNITED STATES DISTRICT COURT**

7

**FOR THE DISTRICT OF ARIZONA**

8
9

Richard and Kristin Zabriskie,

No. CV-13-02260-PHX-SRB

10

Plaintiffs,

**ORDER**

11

v.

12
13
14

Federal National Mortgage Association;
Federal Housing Finance Agency as
conservator for Federal National Mortgage
Association,

Defendants.

15
16

The Court now considers Federal National Mortgage Association's Motion to

17

Dismiss ("Fannie Mae MTD") (Doc. 13) and Defendant Federal Housing Finance

18

Agency's Motion to Dismiss and Memorandum of Points and Authorities ("Conservator

19

MTD") (Doc. 31).

20

**I.      BACKGROUND**

21

The case arises out of Plaintiffs' attempt to refinance their home in 2012. (Doc. 1,

22

Compl. ¶¶ 41-49.) Plaintiffs moved from Virginia to Arizona at some point in 2007. (*See*

23

*id.* ¶¶ 29-32.) In the process of making that move, they listed their home in Virginia for

24

sale in February 2007 and purchased a home in Arizona in June 2007. (*Id.* ¶¶ 30, 32.) In

25

line with the national decline in real estate value that occurred at that time, the value of

26

Plaintiffs' Virginia home fell below the amount that remained outstanding on their

27

mortgage loan before Plaintiffs were able to sell the property. (*See id.* ¶ 33; Doc. 28, Pls.'

28

Opp'n to Fannie Mae's MTD ("Pls.' FM Resp.") at 2.) As a result, Plaintiffs' sold the

home through a short sale. (Compl. ¶¶ 36-37.)[1]

In May 2012, Plaintiffs attempted to refinance the loan they obtained to purchase the home in Arizona. (*See id.* ¶ 41.) One company, NationsChoice, told Plaintiffs that they did not qualify for refinancing because "Desktop Underwriting Findings"—software Defendant Fannie Mae had developed and licensed to NationsChoice—indicated that Plaintiffs' Virginia home had been foreclosed rather than sold through a short sale. (*Id.* ¶¶ 18, 42, 47, 50, 53.)[2] Plaintiffs then sought refinancing from a second company, Amerisave, and were turned down for the same reason even after Amerisave initially "pre-approved" Plaintiffs for refinancing at a rate of 3.5%. (*Id.* ¶¶ 57-66, 78.) Plaintiffs eventually secured refinancing from a third company in August 2013 at a rate of 4.375%. (*Id.* ¶ 78.)

Another court has explained how identical software used by Fannie Mae's sister company, Freddie Mac, works as follows:

> In the mid–1990's, Freddie Mac began using an automatic underwriting system called Loan Prospector to evaluate the credit risk of single-family mortgages. Freddie Mac currently licenses Loan Prospector to approved mortgage lenders, marketing the system as a way for lenders to determine if a loan, given a particular applicant's credit history, would likely meet Freddie Mac's requirements for purchase on the secondary market.
>
> When a consumer applies for a mortgage, the lender or broker electronically submits personal and financial information provided by the applicant, as well as loan parameters, to the Loan Prospector system. Loan Prospector then obtains credit reports for the prospective borrower from the three major credit repositories, Trans Union, Equifax, and Experian. Freddie Mac, in licensing Loan Prospector, requires each lender to enter into a subscription agreement with the three repositories; Loan Prospector uses these lender-specific subscription numbers when obtaining credit reports. After obtaining the credit reports, Loan Prospector processes the information in those reports, as well as the information provided by the consumer, through a proprietary algorithmic formula. The result is a Loan Prospector Report (LP Report) which provides an evaluative summary of the applicant's credit risk, including a credit risk assessment of "accept" or "caution." An "accept" rating indicates that Freddie Mac would likely be willing to purchase the loan on the secondary market without additional analysis. A "caution" rating indicates that the lender, if it later wishes to sell the mortgage to Freddie Mac, must manually underwrite the mortgage

---

[1] The short sale occurred after Plaintiffs had purchased the home in Arizona. (Pls.' FM Resp. at 3 n.3.)

[2] Desktop Underwriter ("DU") is the name of the software.

according to Freddie Mac's guidelines. Freddie Mac's involvement in the application and evaluation process ends when the LP Report is delivered; at that point, the decision of whether to offer a mortgage or not rests with the lender.

Lenders who license Loan Prospector pay a $20 fee each time they use the system. The licensing agreement requires lenders to warrant that they will comply with all applicable laws in using Loan Prospector, that they have a permissible purpose to access the applicants credit reports, and that they will notify the applicant of any adverse action they might take in accordance with the FCRA.

*Weidman v. Fed. Home Loan Mortgage Corp.*, 338 F. Supp. 2d 571, 573 (E.D. Pa. 2004).

Plaintiffs are now suing Fannie Mae and its conservator under the Fair Credit Reporting Act ("FCRA" or "the Act") because they blame Fannie Mae for their initial inability to secure financing and the increased costs they incurred as a result of the delay. (*Id.* ¶¶ 93-102.) Fannie Mae moves to dismiss because it is not a "consumer reporting agency" within the definition of the Act and therefore is not subject to its provisions. (Fannie Mae MTD at 1.) Federal National Mortgage Association argues that it is not liable for Plaintiffs' alleged harm because Fannie Mae is not liable for the harm or, alternatively, because its role as conservator does not make it liable for Fannie Mae's misdeeds. (Conservator MTD at 1.)

## II.    LEGAL STANDARDS AND ANALYSIS

### A.    Rule 12(b)(6) Standard

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011), *cert. denied*, *Blasquez v. Salazar*, 132 S. Ct. 1762 (2012). Courts must consider all well-pleaded factual allegations as true and interpret them in the light most favorable to the plaintiff. *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1207 (9th Cir. 2013). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to dismiss, the non-conclusory

1  'factual content,' and reasonable inferences from that content, must be plausibly

2  suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d

3  962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other

4  words, the complaint must contain enough factual content "to raise a reasonable

5  expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at 556.

6      **B.    "Consumer Reporting Agency"**

7          The parties agree that the only issue the Court must decide to resolve Fannie

8  Mae's Motion is whether Fannie Mae is a "consumer reporting agency" within the

9  definition provided by the FCRA. (*See* Fannie Mae MTD at 1; Pls.' FM Resp. at 7-8.)

10  Plaintiffs allege that Defendants violated the Act by failing to "'follow reasonable

11  procedures to assure maximum possible accuracy of the information concerning the

12  individual about whom the report related.'" (Compl. ¶ 96 (quoting 15 U.S.C. §

13  1681e(b)).) That reporting accuracy provision of the Act applies only to "consumer

14  reporting agencies." *See* 15 U.S.C. § 1681e.

15
16          The term "consumer reporting agency" means any person which, for
          monetary fees, dues, or on a cooperative nonprofit basis, regularly engages
          in whole or in part in the practice of assembling or evaluating consumer
17          credit information or other information on consumers for the purpose of
          furnishing consumer reports to third parties, and which uses any means or
18          facility of interstate commerce for the purpose of preparing or furnishing
          consumer reports.

19
20  15 U.S.C. § 1681a(f).

21          Few courts have considered whether Fannie Mae (or Freddie Mac) is a consumer

22  reporting agency. The parties have cited a string of cases with similar, though not

23  identical, facts from the Eastern District of Pennsylvania to the Court's attention. *See*

24  *Broessel v. Triad Guar. Ins. Corp.*, No. Civ.A. 1:04CV-4M, 2005 WL 2260498 (E.D.

25  Penn. Sept. 15, 2005); *Barnes v. Ditech.com*, No. 03-CV-6471, 2005 WL 913090 (E.D.

26  Penn. Apr. 19, 2005); *Thomas v. Cendant Mortg.*, No. Civ.A. 03-1672, 2004 WL

27  2600772 (E.D. Penn. Nov. 15, 2004); *Crane v. Am. Home Mortg., Corp.*, No. Civ.A.03-

28  5784, 2004 WL 1529165 (E.D. Penn. July 7, 2004); *see also Weidman v. Fed. Home

*Loan Mortg. Corp.*, 338 F. Supp. 2d 571 (E.D. Penn. 2004) (Freddie Mac). Not all of

these cases required the court to determine whether Fannie Mae (or Freddy Mac) acted as a consumer reporting agency through its DU software.[3] However, in the cases where the court was directly confronted with the issue, it determined that Fannie Mae and Freddie Mac were not consumer reporting agencies. In *Thomas*, the court explained that "Fannie Mae did not engage in any affirmative action; it merely allowed Cendant to use its automated program to determine whether a loan to Thomas would be eligible for purchase by Fannie Mae." *See Thomas*, 2004 WL 2600772, at *4. It also noted that "Cendant did not base its adverse lending decision on the unfavorable purchase status accorded to Thomas'[s] application as a result of the automated system." *Id.*[4] The court in *Barnes* did not make a specific finding, but suggested that Fannie Mae was not a consumer reporting agency when it stated that

> Fannie Mae does not provide any information bearing on an individual's credit worthiness. The DU simply applies the Fannie Mae *standard* for assessing credit worthiness to credit information about an individual obtained from other sources.
>
> Fannie Mae did not collect and evaluate Plaintiff's credit information, nor did it direct or recommend whether Defendant should approve Plaintiff's loan application. In fact, Fannie Mae did not engage in any affirmative action on Plaintiff's application for credit.

*Barnes*, 2005 WL 913090, at *4-5.

In *Weidman*, the court determined that even if Freddie Mac was a consumer reporting agency (it made no finding on the issue), it was acting as a "joint user" and therefore was not liable under the Act based on the Federal Trade Commission's interpretation of the Act. *Weidman*, 338 F. Supp. 2d at 574-75. The Federal Trade Commission defined "joint user" as "an entity that shares consumer reports with others who are 'jointly involved in decisions for which there are permissible purposes to obtain

---

[3] The *Crane* court did not address whether Fannie Mae is a consumer reporting agency because the defendant denied that it had used Fannie Mae's software and the issue was not relevant. *See* 2004 WL 1529165, at *2. The *Broessel* court also did not address the issue. *See* 2005 WL 2260498.

[4] This fact distinguishes *Thomas* from the facts alleged in this case. (*See, e.g.*, Compl. ¶ 50 (alleging that NationsChoice relied on the DU findings in denying Plaintiffs' credit application).)

- 5 -

the reports.'" *Id.* at 574 (quoting Appendix, FTC Commentary on the Fair Credit Reporting Act, 16 C.F.R. 600, sec 603(f)(8)). The Court noted that "Freddie Mac is not in the business of collecting and storing the population's consumer credit information for distribution to a variety of users," but rather acts on the lender's request and uses the lender's subscription information to obtain the individual's credit scores from the "big three" credit reporting agencies. *Id.* at 575. It reasoned that this arrangement is more akin to the agent-principal relationship necessary to qualify as a "joint user." *Id.* The Court also rejected the plaintiff's argument that Freddie Mac acted as a "reseller" because it does not purchase credit reports to potentially resell to whoever asked for them, but rather "obtains consumer reports in connection with a specific request from one contracting lender, creates a one-use LP Report [(equivalent to Fannie Mae's UD Report)] associated with that particular request, and allows only the requesting lender to access the LP report." *Id.* at 575-76.

At least one court has rejected the *Weidman* court's discussion concerning "joint users." *See Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 327-28 (D. Conn. 2009). *Adams* did not involve either Fannie Mae or Freddie Mac, but rather two entities that performed background checks for employment purposes. *Id.* at 322. The court rejected the defendants attempt to argue that they were "joint users" in line with *Weidman* because the FTC opinion the *Weidman* court had relied on was merely a "guideline" that was unpersuasive and, in its opinion, contrary to the Act's "ambitious objective." *Id.* at 327. It concluded that there was no "joint user" exception in the Act. *Id.*

Another court has noted that the FTC guideline on which the *Weidman* court relied has since been rescinded, but nevertheless agreed with the determination that Freddie Mac was not a consumer reporting agency because its actions were more akin to those of an agent acting on behalf of a principal (the lender). *See Mattiaccio v. DHA Grp., Inc.*, -- F. Supp. 2d --, Civil Action No. 12-1249 (CKK), 2014 WL 717780, at *6 & n.8 (D.D.C. Feb. 26, 2014).

The Court finds that the FTC guideline concerning "joint users" is unpersuasive

1   because it has been rescinded due to its "staleness" and because "in some respects, the

2   Commentary is in conflict with the law as it has been amended." *See* FTC Statement of

3   General Policy or Interpretation; Commentary on the Fair Credit Reporting Act, 76 Fed.

4   Reg. 44462-01, 44463 (July 26, 2011). The Court also respectfully disagrees with the

5   opinions from the Eastern District of Pennsylvania. Although those cases mentioned the

6   statutory definition of consumer reporting agency, none of them analyzed the facts of the

7   case in light of the clear definition.

8        The Court reads the statutory definition of consumer reporting agency to include

9   five elements: (1) the company must be paid for its work or be working on a "cooperative

10  nonprofit basis," (2) it must be in the business of (that is to say, "regularly") (3)

11  "assembling or evaluating consumer credit information or other information on

12  consumers" (4) "for the purpose of furnishing consumer reports to third parties," and (5)

13  must use interstate commerce to achieve these aims. *See* 15 U.S.C. § 1681a(f). Based on

14  the allegations in the Complaint, Fannie Mae meets all five elements. It is paid for its

15  work through the licensing and broker's fees it collects from lenders that use the DU

16  program. (Compl. ¶ 19.) The software "assembles" and "evaluates" consumer credit

17  information by compiling (i.e., assembling) an individual's credit scores and other

18  information relevant to making lending decisions (such as whether the individual has

19  gone through foreclosure). (*Id.* ¶¶ 21-23.) It compiles that information for the purpose of

20  furnishing a report to a third party (the lenders that use its software). (*Id.* ¶ 23.)[5] Next,

21  Fannie Mae "regularly" participates in this business by licensing its software to a large

22  number of lenders. (*Id.* ¶¶ 17-19.) Finally, Fannie Mae uses a "means" of interstate

23  commerce by using the internet to compile its data and transmit it across the country.

24  (*Id.*) The Court therefore finds that Fannie Mae acts as a "consumer reporting agency" as

25

26

27      [5] The fact that DU Findings are couched in terms of an analysis of whether Fannie
    Mae would purchase a given loan and not a directive to the lender is irrelevant. The big
28  three traditional credit reporting agencies fit the definition of consumer reporting agency
    even though they merely provide a number to lenders that the lender—not the credit
    reporting agency—uses to make a credit decision.

1  the term is defined in the Act when it licenses its Desktop Underwriter software.[6]

2      This finding is in line with the purpose of the Act. As several Circuit Courts of
3  Appeal have noted, Congress enacted the FCRA in recognition of the large impact a
4  credit report can have on a person's life by affecting her access to employment and credit.
5  *See, e.g.*, *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153-54 (9th Cir. 2009);
6  *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 981-82 (7th Cir. 2004);
7  *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). To
8  protect consumer's interests, Congress enacted the FCRA "to ensure fair and accurate
9  credit reporting, promote efficiency in the banking system, and protect consumer
10 privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). To that end, Congress
11 embodied in the language of the statute its finding that "[t]here is a need to insure that
12 consumer reporting agencies exercise their grave responsibilities with fairness,
13 impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

14     Fannie Mae's conduct in this case allegedly led to the exact type of harm the Act
15 was meant to remedy: a company (in this case, a government-sponsored entity) provided
16 false information to lenders that, at least in part, made adverse credit decisions based on
17 that inaccurate information. Although Plaintiffs were not prevented from purchasing a
18 home or obtaining an employment due to the error, they have allegedly lost thousands of
19 dollars due to what they suggest was a coding error in the DU software that caused short
20 sales to display as foreclosures. (Compl. ¶¶ 79-92.) Whether Plaintiffs can prove that
21 Defendant violated the Act is a question for a future day, but there is little room for doubt
22 that Fannie Mae's actions fall within the scope of the Act's protection.

23     **C.    Conservator Liability**

24     Plaintiff also seeks to hold Fannie Mae's conservator, the Federal Housing
25 Finance Agency ("FHFA") liable for Fannie Mae's actions. (*See* Compl. ¶¶ 1, 7 & Prayer
26 for Relief.) FHFA argues that the claims against it should be dismissed because Plaintiff

27 _____

28     [6] The Court emphasizes the limited scope of this finding. The Court does not find
   that Fannie Mae is at all times acting as a consumer reporting agency.

has pled no facts that explain why it would be liable for Fannie Mae's actions and that the nature of its conservatorship in fact does not make it liable for Fannie Mae's actions. (Conservator MTD at 2.) In response, Plaintiffs "agree that FHFA played no substantive role with respect to the allegations of Plaintiffs' Complaint. Plaintiffs certainly did not intend to create the impression that they were seeking a liability determination or damage assessment against FHFA in its individual capacity." (Doc. 33, Resp. to Conservator MTD at 2.) Plaintiffs consent to the dismissal of FHFA and request that the Court "specifically recognize FHFA's delegation [of litigation responsibility] to make clear that FHFA has no standing to intervene or otherwise object to future adjudication of this case." (*Id.* at 3.) The Court sees no reason to so specify and dismisses FHFA from this case.

## III.    CONCLUSION

The Court denies Fannie Mae's Motion to Dismiss because the allegations in the Complaint establish that it was acting as a "consumer reporting agency" and is therefore subject to the Fair Credit Reporting Act. The Court dismisses Fannie Mae's conservator, the Federal Housing Finance Agency, based on Plaintiffs' consent.

**IT IS ORDERED** denying Federal National Mortgage Association's Motion to Dismiss (Doc. 13).

**IT IS FURTHER ORDERED** granting Defendant Federal Housing Finance Agency's Motion to Dismiss and Memorandum of Points and Authorities (Doc. 31).

Dated this 17th day of April, 2014.

Susan R. Bolton
United States District Judge