Gregory J. Marshall (ASB #019886)
Erica J. Stutman (ASB #029664)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
gmarshall@swlaw.com
estutman@swlaw.com

Michael B. Miller (*pro hac vice*)
Joanna M. Zdanys (*pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900
mbmiller@mofo.com
jzdanys@mofo.com

Attorneys for Defendant Federal National
Mortgage Association

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard and Kristin Zabriskie,<br><br>  Plaintiffs,<br><br>v.<br><br>Federal National Mortgage Association,<br><br>  Defendant. | No. CV-13-02260-PHX-SRB<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (THE "UF") |

**Fannie Mae's Role in the Secondary Mortgage Market**

1. Fannie Mae is a government-sponsored enterprise chartered by Congress in 1938 to make home ownership more accessible for low- and middle-income Americans. Fannie Mae's public mission is to provide liquidity and stability in the mortgage market. (12 U.S.C. §§ 1716-17; Declaration of Cyndi Danko, ¶¶ 3-4, attached hereto as Exhibit A (the "Danko Dec.".)

2. Fannie Mae fulfills this mission by purchasing loans from mortgage lenders who issue mortgages to individuals in the primary mortgage market and guaranteeing mortgage-related securities comprised of those loans. (Danko Dec. ¶¶ 3-4.)

3. Fannie Mae thus becomes responsible for the credit risk of loans made in the primary market by lenders directly to homeowners. (Danko Dec. ¶¶ 3-4.)

4. These transactions in the secondary market free up the lenders' capital so that they can make more loans to prospective homeowners in the primary market. The net effect is to increase credit availability for prospective homeowners. (Danko Dec. ¶¶ 3-4.)

5. Fannie Mae is not obligated to buy any particular loan—the decision of whether to commit its capital to particular loans remains solely in its discretion, and neither a lender nor a borrower have any right to force Fannie Mae to set its underwriting standards in any particular way. (Danko Dec. ¶ 6.)

6. Fannie Mae's risk tolerances – that is, the criteria that determine the types of loans that may be sold to Fannie Mae and on what terms – is critical to Fannie Mae successfully achieving its public mission. Those risk tolerances are determined by Fannie Mae in consultation with FHFA. (Danko Dec. ¶ 6.)

7. By its charter, Fannie Mae operates exclusively in the secondary mortgage market and engages in business activities authorized by its Charter. 12 U.S.C. § 1719(a)(2)(B).

- 1 -

**Fannie Mae's Guidelines Govern Whether Fannie Mae Will Purchase a Loan from a Lender.**

8. To help lenders identify the loans Fannie Mae will agree to purchase before a lender actually delivers a loan for purchase, Fannie Mae has developed a comprehensive set of guidelines and requirements to govern whether it will buy a particular loan from a lender. (Danko Dec. ¶ 7.)

9. These guidelines and requirements are set forth in an approximately 1300-page document known as "The Selling Guide," which is publicly available, including for free on the internet and from a variety of other sources. (Danko Dec. ¶¶ 8, 9; Ex. A1; Ex. A2.)

10. These guidelines and requirements represent Fannie Mae's credit risk policy and other loan purchasing criteria—that is, whether Fannie Mae will be willing to take the credit risk for a particular loan by purchasing or guaranteeing it (and thereby bearing the risk of borrower non-payment). (Danko Dec. ¶¶ 8, 9; Ex. A1; Ex. A2.)

11. Lenders can evaluate loan applications directly against the requirements of the Selling Guide. This sort of direct review of a loan against the Selling Guide's requirements is often referred to as "manual underwriting." (Danko Dec. ¶ 10.)

12. The Selling Guide informs lenders of Fannie Mae's credit risk policies and helps lenders to determine on their own whether Fannie Mae will buy a loan. Fannie Mae believes that increasing awareness of which loans Fannie Mae will be willing to buy provides certainty to lenders and encourages the making of more mortgage loans. (Danko Dec. ¶¶ 9, 10.)

13. Lenders must submit an application and be approved before selling loans to Fannie Mae. Lenders that are approved to sell loans to Fannie Mae license DU through a separate process. (Ex. A1 at FMZA-00008021-25; Ex. A2 at FMZA-00009285-89.)

**Desktop Underwriter Allows Lenders to Determine Automatically Whether Fannie Mae Will Purchase a Loan.**

14. To make it even easier for approved lenders to determine whether a particular loan will be purchased by Fannie Mae, Fannie Mae created a software application in 1995 called "Desktop Underwriter," or "DU." (Danko Dec. ¶ 11.)

15. DU is a software application that Fannie Mae licenses to approved lenders for their own use that is essentially an automated version of the Selling Guide. (Danko Dec. ¶¶ 11, 12.)

16. Rather than perform a manual review of a borrower's loan application and credit information against the Selling Guide requirements, lenders that license DU can obtain information about borrowers and enter it into DU to determine—before a loan is made—whether Fannie Mae will buy the loan from them, and to do so by using a software application rather than manually underwriting the loan. (Danko Dec. ¶ 12.)

17. Using DU, a lender can generate "DU Findings," which indicates whether a prospective loan will be eligible for purchase by Fannie Mae and whether Fannie Mae will purchase the loan if it is delivered to it. (Danko Dec. ¶ 12.)

18. If the loan application information entered into DU by the lender falls *within* the Selling Guide's guidelines, the DU Findings include a recommendation of "Approve/Eligible." This means that if the lender delivers the loan to Fannie Mae, Fannie Mae will purchase it as a DU loan. (Danko Dec. ¶ ¶ 12, 13.)

19. By contrast, if the loan application information the lender obtains and enters into DU indicates a credit risk outside the underwriting criteria in the Selling Guide, the DU Findings include a "recommendation" of "Refer with Caution." This means that, *based on the data entered into the DU application*, Fannie Mae will not purchase the loan. If the lender chooses to originate the loan anyway, Fannie Mae may still buy it if the lender follows the manual underwriting process. (Danko Dec. ¶ ¶ 12, 13.)

- 3 -

20. Not all loans eligible for purchase by Fannie Mae can be underwritten using the DU software application. Because DU is an automated process, there are limits on what it can do—it is not intended to be, and never will be, a complete substitute for manual application of the Selling Guide for loans that cannot be underwritten through the automatic application of rules to data. (Danko Dec. ¶ 14.)

21. However, to the extent possible and consistent with Fannie Mae's credit risk standards, lenders can use the DU automated software application to determine whether a particular loan satisfies the requirements of the Selling Guide. (Danko Dec. ¶ 14)

**The Process for Determining Whether Fannie Mae will Approve a Loan for Purchase**

22. A lender using the DU software application engages in a multi-step process. (Danko Dec. ¶ 15.)

23. Fannie Mae-approved lenders subscribe to DU by entering into a Software Subscription Agreement with Fannie Mae that sets forth the respective roles of Fannie Mae (the licensor) and a lender (the licensee). (Danko Dec. ¶ 15(a); Ex. A3; ECF No. 27-1.)

24. The DU application itself is accessed through a user interface on www.FannieMae.com or through an integrated third-party or proprietary loan origination system. (Danko Dec. ¶ 15(a).)

25. Prior to June 2015, lenders paid to become DU licensees, via a subscription fee and an additional fee for every case file the lender opened in the DU system. Lenders did not pay for each DU Findings they created—they could create as many as they chose with respect to each file. (*Id.* ¶¶ 15(a), 15(e).)

26. The lender (not Fannie Mae) collects information directly from the prospective borrower. This includes information about the borrower (such as information relating to income, existing assets and debts, etc.) and the property that is the subject of the loan. (Danko Dec. ¶ 15(b).)

- 4 -

1  27.  Fannie Mae is not involved in this process—it has no contact with the borrowers as
2       part of this process and does not assemble any information about them. (*Id.*
3       ¶ 15(b).)
4  28.  The lender (not Fannie Mae) obtains a consumer report on the borrower from an
5       approved third-party consumer reporting agency (not Fannie Mae) that takes data
6       from the three national large credit bureaus (Equifax, TransUnion and Experian)
7       and then "merges" that information into a single report—often referred to as a "tri-
8       merge report." (Danko Dec. ¶15(c).)
9  29.  The lender must have its own agreement to purchase tri-merge reports from an
10      eligible consumer reporting agency. The lender pays the consumer reporting
11      agency directly. It pays none of that money to Fannie Mae. (Danko Dec. ¶15(c).)
12 30.  Because DU is an automated software application, it uses a machine-readable, data
13      version of the tri-merge report, not the easy-to-read version that consumers can
14      request from a consumer reporting agency or the print version. (Danko Dec. ¶¶
15      15(c) and 15(e).)
16 31.  After entering all required information and obtaining a tri-merge report, the lender
17      can underwrite the loan casefile through DU. The lender does so by causing DU to
18      generate the DU Findings. (Danko Dec. ¶ 15(e).)
19 32.  DU provides a recommendation based on an automated application of the Selling
20      Guide requirements to the data provided by the lender. (Danko Dec. ¶ 15(e).)
21 33.  When the loan casefile is underwritten through DU, the rules coded into the DU
22      application are applied against the information and other data in the loan casefile
23      (including the data in the tri-merge consumer report) to reach an overall indication
24      as to whether Fannie Mae will buy the loan if the loan is delivered to it. (Danko
25      Dec. ¶ 15(e).)
26 34.  The software generates a series of messages and text that is placed into the DU
27      Findings based on the presence or absence of data points in the information
28      provided by the lender. It is a purely data-driven process. (Danko Dec. ¶ 15(e).)

- 5 -

35. It is the software application itself that generates the DU Findings.  (Danko Dec. ¶ 15(e).)

36. No individual or entity at Fannie Mae evaluates any consumer credit or other information or is otherwise involved in this process (other than as authors of its own credit risk policy and creators of the computer code that comprises the software application).  (Danko Dec. ¶ 15(e).)

37. None of the data about the specific borrower used to generate the recommendation is provided by Fannie Mae—it instead all comes from the lender-provided data in the loan application and the tri-merge report. (Danko Dec. ¶ 16.)

38. At the point when a lender chooses to deliver a loan for purchase, it can notify Fannie Mae of the DU file number.  (Danko Dec. ¶ 15(f).)

39. If it does so, and if the DU Findings previously generated by the lender returned an "Approve" recommendation, the lender gets a limited waiver of the usual representations and warranties that it would otherwise be required to make upon delivery of the loan. Essentially, this waiver permits a lender to deliver the loan without having to represent and warrant that the loan meets the Selling Guide criteria.  At the point of delivery, the DU "Approve" recommendation substitutes for this otherwise required representation and warranty.  (Danko Dec. ¶¶ 17-19, 21; Ex. A1 at FMZA-00008041-45; Ex. A2 at FMZA-00009305-09.)

40. In situations where the Selling Guide requirements cannot be applied in an automated manner, DU informs the lender that it remains free to "manually underwrite" the subject loan.  (Danko Dec. ¶ 16; Ex. A7 at FM000063; Ex. A8 at FM000096; Ex. A9 at FMZA-00011887.)

41. When a lender manually underwrites a loan, the lender must represent and warrant that the mortgage loan complies with the requirements of the Selling Guide with regard to the mortgage loan's eligibility for delivery to Fannie Mae in order for Fannie Mae to purchase the loan.  (Danko Dec. ¶ 18; Ex. A1 at FMZA-00008033-41; Ex. A2 at FMZA-00009297-305.)

- 6 -

**Treatment of Foreclosures and Short Sale Transactions, and Other Derogatory Credit Events**

42. The DU software depends entirely on the data provided by the lenders and consumer reporting agencies. (Danko Dec. ¶ 25.)

43. One important risk consideration the Selling Guide requires lenders to assess when evaluating whether Fannie Mae will purchase a particular loan is the presence of "significant derogatory events" in a borrower's credit history. A previous foreclosure is an example of one such event. When a potential borrower has experienced a foreclosure, Fannie Mae's Selling Guide has prescribed a waiting period of seven years from the foreclosure before a lender may sell that borrower's loan to Fannie Mae. (Danko Dec. ¶¶ 21-23; Ex. A1 at FMZA-00008467; Ex. A2 at FMZA-00009741.)

44. When a loan is manually underwritten, the lender, who is in direct contact with the borrower and who can obtain whatever data and information it likes from the borrower, is required to determine whether a prior mortgage transaction resulted in foreclosure. It can do so in any number of ways—speaking with the borrower, reviewing court papers or correspondence from the prior lender or entity that serviced the loan, reviewing transaction documents, etc. (Danko Dec. ¶¶ 10, 23, 25, 27, 33.)

45. During the relevant time period, the Selling Guide provided that DU would identify the presence of a foreclosure by analyzing the "Manner of Payment" ("MOP") Code rating, which is a field in a borrower's credit report obtained by a lender. (Danko Dec. ¶¶ 25-28.)

46. The MOP Code is a field on the tri-merge report that identifies whether the account is current or past due—it is a rating system established by the credit reporting industry, not Fannie Mae. (Danko Dec. ¶ 26.)

47. The Selling Guide provided that where the tri-merge report obtained by the lender includes a mortgage tradeline reported with a MOP Code of "8" or "9," DU will

- 7 -

|   |   |   |
|---|---|---|
| 1 | | identify a foreclosure, and the loan will be "Referred with Caution." (Danko Dec. |
| 2 | | ¶¶ 26-28.) |
| 3 | 48. | This treatment is dictated by Fannie Mae's credit risk policy. Fannie Mae's policy |
| 4 | | is to refuse to allow lenders to rely solely on DU to determine whether a loan |
| 5 | | issued to borrowers who have mortgage trade lines with these MOP Codes would |
| 6 | | be eligible for sale to Fannie Mae. (Danko Dec. ¶¶ 27, 31.) |
| 7 | 49. | Credit reports do not include a specific indicator of whether a short sale has taken |
| 8 | | place in the borrower's credit history. No such code exists. Thus, DU cannot |
| 9 | | identify with certainty whether a short sale has taken place. (Danko Dec. ¶¶ 26, |
| 10 | | 30; Ex. A4; Ex. B2.) |

**Plaintiffs' Efforts to Refinance Their Existing Mortgage**

50. Lenders working with the plaintiffs obtained at least eight DU Findings in late 2012 through the summer of 2013. Five of those DU Findings resulted in an "Approve/Eligible" recommendation; three resulted in a "Refer with Caution" recommendation. Exhibit B1 to the Miller Declaration summarizes these eight DU results. (Danko Dec. ¶ 37; Ex. A6 at FM000031; Ex. A7 at FM000068; Ex. A8 at FM000101; Ex. A9 at FMZA-00011892; Ex. A10 at FM000139; Ex. A11 at FM000176; Ex. A12 at FM000215; Ex. A13 at FM000239.)

51. Each of the three DU Findings with a Refer with Caution recommendation included the following statement: "Desktop Underwriter has identified a deed-in-lieu of foreclosure that was reported within the last two years or a foreclosure that was reported within the last seven years. This loan is ineligible for delivery to Fannie Mae." Each of these DU Findings also included the following statement, immediately following a list of the tradelines that "Desktop Underwriter has identified" as a "FORECLOSURE":

> This loan casefile is ineligible for delivery as a DU loan because it received a Refer with Caution/IV recommendation. However, any loan casefile that receives a Refer with Caution/IV recommendation

- 8 -

|   |   |   |
|---|---|---|
|   |   | may be manually underwritten in accordance with the Fannie Mae Selling guide.  Refer to the Selling Guide for additional information. (Danko Dec. ¶ 37; Ex. A7 at FM000063; Ex. A8 at FM000096; Ex. A9 at FMZA00011887.) |
|   | 52. | In each of the DU Findings that the Zabriskies' lenders generated that included a recommendation of "Refer with Caution," the tri-merge report obtained by the lender included one or more mortgage tradelines reported with a MOP Code of "9." (Danko Dec. ¶ 37; Ex. A7 at FM000044-45; Ex. A8 at FM000074; Ex. A9 at FMZA-00011857.) |
|   | 53. | In each of the DU Findings that the Zabriskies' lenders generated that included a recommendation of "Approved," the tri-merge report obtained by the lender did not include any mortgage tradelines reported with a MOP Code of "9."  Instead, these tri-merge reports reported these accounts (the very same accounts that were reported with a MOP code of "9" in other tri-merge reports) with a variety of MOP Codes, including "Unrated," "Current," and "5" (which stands for "120-150 Days Late"). (Danko ¶ 37; Ex. A6 at FM000004-26; Ex. A10 at FM000105-33; Ex. A11 at FM000143-71; Ex. A12 at FM000180-209; Ex. A13 at FM000219-234.) |
|   | 54. | Plaintiffs' lenders knew that their previous home was not the subject of foreclosure proceedings, and informed Plaintiffs of this knowledge. (Ex. B2; Ex. B3 at 65:16-24, 68:18-69:6, 89:11-16, 99:10-20, 113:20-114:4, 209:10-22; Ex. B4; Ex. B5; Ex. B6; Ex. B7, Ex. B8, Ex. B9; Ex. B10; ECF No. 28 at 3:8-10, 4:22-23.) |
|   | 55. | Plaintiffs' lenders decided not to enter into re-finance transactions with them because they could not sell those loans to Fannie Mae as DU loans, and they were unwilling to manually underwrite a loan to Plaintiffs. (Ex. B2; Ex. B3 at 65:16-24, 68:18-69:6, 89:11-16, 99:10-20, 113:20-114:4, 209:10-22; Ex. B4; Ex. B5; Ex. B6; Ex. B7; Ex. B8; Ex. B9; Ex. B10; ECF No. 28 at 3:8-10 and 4:22-23.) |

DATED this 12th day of October, 2015.

                                              SNELL & WILMER L.L.P.

By:    *s/Gregory J. Marshall*
       Gregory J. Marshall
       Erica J. Stutman
       One Arizona Center
       400 E. Van Buren, Suite 1900
       Phoenix, Arizona 85004-2202

MORRISON & FOERSTER LLP

Michael B. Miller (*pro hac vice*)
Joanna M. Zdanys (*pro hac vice*)
250 West 55th Street
New York, New York 10019-9601

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2015, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul B. Mengedoth, Esq.
Mengedoth Law PLLC
20909 N 90th St., Ste. 211
Scottsdale, AZ 85255

Sylvia A Goldsmith, Esq.
Goldsmith & Associates, LLC
20545 Center Ridge Road, Ste. 120
Rocky River, OH 44116

*Attorneys for Plaintiffs*

Michael B. Miller, Esq.
Joanna M. Zdanys, Esq.
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019-9601

   *s/Debbie Shuta*
22701652