Paul B. Mengedoth (#018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Telephone: (480) 778-9100
Facsimile: (480) 778-9101
E-mail: paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice*)
**GOLDSMITH & ASSOCIATES, LLC**
Park West Building
20545 Center Ridge Road, Suite 120
Rocky River, OH 44116
Telephone: (440) 934-3025
Facsimile: (440) 934-3026
E-mail: goldsmith@goldsmithlawyers.com

*Attorneys for Plaintiffs Richard and Kristin Zabriskie*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Richard and Kristin Zabriskie, ) | |
| ) | |
| Plaintiffs, ) | CASE NO. CV-13-02260-PHX-SRB |
| ) | |
| v.  ) | **PLAINTIFFS' TRIAL** |
| ) | **MEMORANDUM** |
| Federal National Mortgage Association, ) | |
| *et al.* ) | |
| ) | |
| Defendants. ) | |

Plaintiffs, Richard and Kristin Zabriskie, bring this action against Defendant, Federal National Mortgage Association ("Fannie Mae"), for violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, and for their Trial Memorandum, state as follows:

## INTRODUCTION

In 2012, Fannie Mae, through its proprietary and confidential Desktop Underwriter system, issued several Desktop Underwriter Findings reports that it sold to lenders and brokers in connection with the Zabriskies' attempts to refinance their mortgage. Fannie Mae does not have *any* procedures designed to assure the "maximum possible accuracy" of the information included in these consumer reports, and, as such, Fannie Mae reported to the Zabriskies' prospective lenders that the Zabriskies had a foreclosure on a previous mortgage account even though that representation is simply not true.  Per the adverse action notices provided to the Zabriskies by their prospective lenders, the Zabriskies refinance applications were denied because of this false foreclosure information, and the Zabriskies have suffered considerable economic and non-economic harm as a result.

## SUMMARY OF FACTS

Fannie Mae is a behemoth in the mortgage secondary market. Charted by Congress in the 1930s, Fannie Mae was created to purchase and guarantee home loans in order to allow lenders to provide more capital to potential homeowners. Fannie Mae has been fulfilling this role ever since.

In furtherance of its chartered goal, in 1995 Fannie Mae developed and launched its proprietary Desktop Underwriter system in order to assist lenders in considering whether to approve a particular loan applicant for a mortgage.  At that juncture, Fannie Mae began injecting information into the decision-making process of the primary mortgage lenders.

Through the Desktop Underwriter system, which lenders pay for on a per applicant basis, Fannie Mae sends Desktop Underwriter Findings reports to lenders through a secure internet portal.  These Desktop Underwriter Findings reports provide an evaluation of everything from home value information to the applicant's financial reserves in combination with the applicant's credit history. Through proprietary

calculations that are *not* publicly available,[1] Fannie Mae reports to the lender not only Fannie Mae's assessment of the credit risk of the applicant (by stating whether that applicant is "eligible" for financing) but also a bottom-line "Recommendation" as to whether the loan should be made by the lender. If Fannie Mae reports a "Refer with Caution," that is a *de facto* automatic denial.

As part of Fannie Mae's underwriting requirements, consumers who have had a foreclosure in the past seven years automatically receive a "Refer with Caution" recommendation. Consumers that have had a short sale within the past two years are automatically denied financing as well. These waiting periods are not at issue in this case. No one is purporting to force Fannie Mae to take on what it feels to be unacceptable credit risks. Rather, its Fannie Mae's failure to assure maximum possible accuracy when it reports to lenders whether an applicant has had a short sale or a foreclosure that gives rise to the claims at issue here.

In 2007, the Zabriskies decided to move to Gilbert, Arizona to take advantage of a lower cost of living and potentially more lucrative career opportunities. When Mrs. Zabriskie received a job offer in Arizona, the Zabriskies purchased a home and Mrs. Zabriskie moved there with her children. Mr. Zabriskie remained in Virginia to take care of the family's home until it sold. Due to economic reasons beyond their control, the Zabriskies were unable to sell their Virginian home as quickly as they had hoped. Stuck with paying two mortgage payments and with no suitable offers coming in, their real estate agent advised them to go through a short sale. In April 2008, the short sale of the Virginia home closed escrow and the subject mortgage with PNC Bank was paid (albeit settled for less than the full amount). Undeniably, there was never any foreclosure proceedings of any kind related to that previous PNC mortgage.

Fast forward to 2012, four years after their short sale, and the Zabriskies seek to refinance their Arizona home to take advantage of lower interest rates. Plaintiffs sought

---

[1] Any documents and/or testimony that have even remotely touched upon these calculations have been designated as "Confidential" by Fannie Mae.

3

1 refinancing through NationsChoice Mortgage ("NationsChoice"), going so far as paying 2 an application fee and for an appraisal of their home as part of the application process. 3 Based on their preliminary conversation with NationsChoice, the Zabriskies were 4 confident they would be approved for the loan. They quickly learned there was a very 5 significant problem: NationsChoice could not approve the Zabriskies for refinancing 6 because they had a foreclosure in the previous seven (7) years.

7 The Zabriskies were confused to say the least. No matter how much they insisted 8 they did not go through a foreclosure with their Virginia home, NationsChoice refused 9 to believe them. In fact, the Zabriskies felt humiliated and degraded by the insinuation 10 that they were lying about their short sale, or that they somehow knowingly or 11 unknowingly had wasted NationsChoice's time by applying for a loan without 12 understanding their own previous mortgage situation.

13 The Zabriskies desperately sought an answer as to why NationsChoice would be 14 so insistent that the Zabriskies had a foreclosure. Justifiably thinking that maybe there 15 was simply a mistake on their traditional credit bureau reports, the Zabriskies started out 16 on a wild goose chase to isolate the source of the false information. The Zabriskies 17 lodged disputes with the Big Three credit bureaus, Experian, Equifax and/or Trans 18 Union, and also contacted both PNC Bank and Citimortgage (the second lien holder on 19 the Virginia mortgage) to ensure that they were providing the correct information about 20 the previous loan.

21 Hopeful that their first attempt to refinance was a fluke and relying on the 22 assurances of Amerisave Mortgage Corporation ("Amerisave") that it could get the 23 Zabriskies approved, the Zabriskies submitted a formal application with Amerisave. 24 Despite additional efforts, including research by Mrs. Zabriskie and paying for a "rapid 25 recheck," Amerisave also denied the Zabriskies financing in October 2012. Amerisave 26 listed "foreclosure" on the Statement of Denial as the sole reason why it could not 27 approve the Zabriskies' loan. The Zabriskies were exacerbated and devastated.

28

What the Zabriskies did not know, and what was completely beyond their control, was that each time they applied for financing, Fannie Mae conducted an evaluation of the Zabriskies' credit report data and wrongly identified the Zabriskies' short sale as a foreclosure. Specifically, Fannie Mae considered the raw credit data about the previous PNC mortgage account as reported by the Big Three credit bureaus via a tri-merge reseller, and then included its unique characterization of that data as a "foreclosure" on the Desktop Underwriter Findings reports it sold to both NationsChoice and Amerisave. While Fannie Mae's characterization in this regard may be consistent with Fannie Mae's underlying credit risk policy to resolve any possible doubt about any possible negative item in a the raw credit data *against* making the loan, this policy completely foregoes any consideration for the *accuracy* of the representations Fannie Mae is making in its Desktop Underwriter Findings reports.

Knowing full well that this was a widespread problem that affected tens of thousands of consumers, Fannie Mae continued to interpret certain credit data (or inconsistencies in certain credit data) as a foreclosure even where none existed. As a result, the Zabriskies, who otherwise were qualified for the requested refinancing, were prevented from obtaining it because of Fannie Mae's injection of objectively false information into the Zabriskies' loan application process.

## **THE FAIR CREDIT REPORTING ACT**

**I.      PURPOSE OF THE FAIR CREDIT REPORTING ACT.**

The Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, was the product of Congressional concern over abuses in the consumer reporting industry. *See Guimond v. Trans Union Credit Information Co.*, 45 F3d 1329, 1333 (9th Cir. 1995). Congress specifically found and uniquely inserted a specific statement of Congressional purpose directly at the forefront of the statute under the heading entitled "Accuracy and Fairness of Credit Reporting":

5

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

15 U.S.C. § 1681(a)(1). Furthermore, Congress stated there was "a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4). The legislative history of the FCRA indicates that it was crafted to protect consumers from the transmission of inaccurate information about them and to establish consumer reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner. "These consumer oriented objectives support a liberal construction of the FCRA." *Guimond*, 45 F3d at 1333, *citing Kates v. Croker National Bank*, 776 F2d 1396, 1397 (9th Cir. 1985).

To achieve these objectives, Congress imposed strict requirements on consumer reporting agencies including, inter alia, the requirement that consumer reporting agencies "follow reasonable procedures to assure maximum possible accuracy" each time they prepare a consumer report. *See* 15 U.S.C. § 1681e(b). This was done not only to protect consumers, like the Zabriskies, from having false information circulated about them (which could potentially impede their ability to obtain financing), but also because the integrity of the banking system is dependent on decisions being made upon accurate information. *See* 15 U.S.C. § 1681(a).

## II. CIVIL LIABILITY UNDER THE FCRA.

Any person who negligently fails to comply with any requirement under the FCRA is liable for actual damages, costs, and attorneys' fees. *See* 15 U.S.C. § 1681o(a). In addition, punitive damages may be awarded if any person willfully fails to comply. *See* 15 U.S.C. § 1681n. Plaintiffs assert claims here under both § 1681o and § 1681n.

The general negligence standard applies to claims pursuant to § 1681o. The standard is what a reasonably prudent person would do under the circumstances.

1 *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F2d 509, 513 (5th Cir. 1982). The term "actual damages" in § 1681o includes emotional distress and humiliation. *Guimond*, 45 F3d at 1333. Neither a denial of credit nor transmission of a credit report to a third party is required for liability. *Id.*

A consumer may recover punitive damages if the defendant acted willfully. "Willful" means that defendant acted knowingly or in *reckless disregard* of a consumer's rights under the FCRA. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007). "Reckless disregard" means an action entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, *supra*, 551 U.S. at 69, 127 S. Ct. at 2215 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). A consumer need not prove malice or evil motive. *See Reynolds v. Hartford Financial Services*, 435 F.3d 1081, 1098 (9th Cir 2006), *rev'd on other grounds*, *Safeco*, *supra*; *Dalton v. Capital Associated Indus.*, 257 F.3d 409, 418 (4th Cir. 2001); *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998); *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226-27 (3rd Cir. 1997).

### III. PLAINTIFF'S CLAIMS FOR RELIEF.

#### A. Failure to Assure Maximum Possible Accuracy.

A primary goal of the FCRA is to assure accuracy of the information in consumer reports that are used throughout our economy in making decisions whether to provide loans, services, employment, housing and insurance. To achieve this goal, the FCRA requires that whenever a credit reporting agency prepares a credit report "it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *See* 15 U.S.C. § 1681e(b). Notably, this standard does not govern Fannie Mae's underwriting requirements or its internal procedures for identifying which loans it will buy. Rather, the statute requires that if Fannie Mae choses to provide consumer report information to assist lenders in evaluating a consumer' eligibility for credit, then it must follow procedures reasonably

7

designed to assure the maximum possible accuracy of the information it provides. *See* 15 U.S.C. § 1681e(b); *Guimond*, *supra*, 45 F.3d at 1333; *Rothery v. Trans Union LLC*, 2006 WL1720498 (D. Or. April 6, 2006); *Konter v. CSC Credit Serv., Inc.*, 606 F.Supp.2d 960 (W.D. Wis. 2009).

A consumer makes a *prima facie* case for violation of Section 1681e(b) by presenting evidence tending to show that a consumer reporting agency prepared a consumer report containing inaccurate information. *See Guimond*, 45 F3d at 1333. Plaintiffs claim that Fannie Mae repeatedly violated Section 1681e(b) by preparing Desktop Underwriter Findings that were inaccurate by stating the Zabriskies had a foreclosure in connection with their previous PNC Bank mortgage when they did not.

Once the consumer has established her *prima facia* case, the burden then *shifts* to the consumer reporting agency to prove that it actually followed reasonable procedures to assure maximum possible accuracy of the information included in that report. *See Baker v. Trans Union L.L.C. (Baker III)*, 2010 WL 2104622 (D. Ariz. May 25, 2010); *Valentine v. First Advantage SafeRent, Inc. (Valentine I)*, 2008 WL 4367353 (C.D. Cal. Sept. 23, 2008).

Plaintiffs never had a foreclosure but Fannie Mae transmitted DU Findings reports that stated just that multiple times. The burden is now on Fannie Mae to show by a preponderance of the evidence that it followed reasonable procedures not to underwrite a loan, but to assure the maximum possible accuracy of the information reported to lenders about Plaintiffs creditworthiness, credit standing, credit capacity, character and general reputation.

## CONCLUSION

Fannie Mae reported to lenders that the Zabriskies had a foreclosure. It did this multiple times to multiple lenders with absolutely no concern for the accuracy of this misstatement of information. Consequently, lenders were unwilling to extend credit to the Zabriskies, and for over a year, the Zabriskies were forced to deal with both the economic and noneconomic fallout from this recklessly-inaccurate reporting.

DATED this 22nd day of February, 2016.

                        Respectfully Submitted,

                        */s/ Sylvia A. Goldsmith*
Sylvia A Goldsmith (*Pro Hac Vice*)
**GOLDSMITH & ASSOCIATES, LLC**
Park West Building
20545 Center Ridge Rd., Suite 120
Rocky River, OH 44116
Telephone: (440) 934-3025
Facsimile: (440) 934-3026
E-mail: goldsmith@goldsmithlawyers.com

Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Telephone: (480) 778-9100
Facsimile: (480) 778-9101
E-mail:  paul@mengedothlaw.com

*Attorneys for Plaintiffs
Richard and Kristin Zabriskie*

9

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing *Plaintiffs' Trial Memorandum* is being filed electronically with the United States District Court for the District of Arizona, on this 22nd day of February, 2016. Notice of this filing will be transmitted to counsel of record by operation of the Court's electronic filing system.

        __/s/ Sylvia A. Goldsmith____
        Sylvia A. Goldsmith, Esq.
        **GOLDSMITH & ASSOCIATES, LLC**
        Attorney for Plaintiffs