Gregory J. Marshall (ASB #019886)
Erica J. Stutman (ASB #029664)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
gmarshall@swlaw.com
estutman@swlaw.com

Michael B. Miller (*pro hac vice*)
MBMiller@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900

Angela E. Kleine (*pro hac vice*)
Ben Patterson (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:   415.268.7000
Facsimile:   415.268.7522
akleine@mofo.com
bpatterson@mofo.com

Attorneys for Defendant
Federal National Mortgage Association

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard And Kristin Zabriskie,<br><br>              Plaintiffs,<br><br>         v.<br><br>Federal National Mortgage Association And Federal Housing Finance Agency As The Conservator Of Federal National Mortgage Association,<br><br>              Defendants. | Case No.   CV-13-02260-PHX-SRB<br><br>**DEFENDANT FEDERAL NATIONAL MORTGAGE ASSOCIATION'S TRIAL MEMORANDUM OF LAW** |

## I.    PRELIMINARY STATEMENT

Fannie Mae is not a "consumer reporting agency" under the Fair Credit Reporting Act ("FCRA") and does not prepare "consumer reports."  These conclusions alone are dispositive of Plaintiffs' claim that Fannie Mae violated 15 U.S.C. § 1681e(b) for "willfully and/or negligently" violating the FCRA.

It is lenders using the Desktop Underwriter® ("DU") software—not Fannie Mae—that obtain consumer reports from third parties, input loan application information and other data into the software, and use the DU software to generate the DU Findings that are the subject of Plaintiffs' claim.  Moreover, nothing Fannie Mae does or that the lender does using the DU software application is performed "for the purpose of furnishing consumer reports to third parties."  Rather, DU Findings are generated to inform the lenders whether Fannie Mae will buy the loan on the secondary market as a "DU Loan," which means the lender gets a limited waiver of certain of the representations and warranties to Fannie Mae that the lender would otherwise be required to make when selling the loan to Fannie Mae.

Furthermore, and putting aside whether the FCRA could possibly be applied to Fannie Mae, Plaintiffs cannot demonstrate causation.  Plaintiffs' alleged injuries, by their own admission, were caused by Fannie Mae's unwillingness to buy their loan as a DU loan (a decision that is well beyond the purview of the FCRA), and their lenders' subsequent refusal to manually underwrite the loan (which at least one of Plaintiffs' lenders allegedly promised to do).  Plaintiffs cannot show that Fannie Mae caused them any cognizable harm under the FCRA.  Finally, Plaintiffs cannot show that there was any genuine inaccuracy within the context of the DU system or that Fannie Mae's procedures were unreasonable, as the FCRA requires.

Nor can Plaintiffs show under any circumstances that Fannie Mae "willfully" violated the FCRA under the stringent Supreme Court standard for willfulness.  Not only were there no prior appellate court decisions finding that Fannie Mae acted as a consumer reporting agency by licensing DU (which is required in these circumstances to show

1

1    willfulness), but the legal authority that does exist was all in Fannie Mae's favor.

2    Accordingly, no willfulness finding can be made.

3         Finally, relying on proposed expert testimony that should be excluded, Plaintiffs

4    seek damages for loss of enjoyment of life which are not credible, and they seek a level of

5    emotional distress damages that are simply implausible.  And because no willful violation

6    can be found, punitive damages cannot be awarded.

7         For all of these reasons, Fannie Mae respectfully submits that the Court and/or jury

8    should find in its favor and deny Plaintiffs recovery.

9    **II.    FACTUAL BACKGROUND**

10        Fannie Mae's public mission is to make it easier for lenders to make mortgage

11   loans to consumers and for consumers to obtain mortgage loans from lenders.  Fannie

12   Mae accomplishes this mission by providing liquidity and stability in the secondary

13   mortgage market.  It does so by purchasing loans and guaranteeing mortgage-backed

14   securities, thereby increasing credit availability in the primary mortgage market.  Fannie

15   Mae's role is to operate in the secondary mortgage market by buying mortgage loans from

16   lenders, thereby becoming responsible for the credit risk of those mortgage loans that

17   lenders made directly to homeowners in the primary market.  All of this is done pursuant

18   to Fannie Mae's Congressionally-mandated charter.

19        Fannie Mae's risk tolerances—*i.e.*, the criteria that Fannie Mae has formulated to

20   determine the types of loans that may be sold to Fannie Mae and on what terms—is

21   critical to Fannie Mae successfully achieving its public mission.

22        **A.    Fannie Mae's Selling Guide and Desktop Underwriter**

23        Fannie Mae is not obligated to buy any particular loan.  The decision of whether to

24   commit its risk capital to particular loans remains solely in the discretion of Fannie Mae,

25   and neither a lender nor a borrower have any right to require Fannie Mae to set its loan

26   and underwriting standards in any particular way.

27        Fannie Mae has collected its guidelines and requirements in a document known as

28   "The Selling Guide."  Fannie Mae buys from lenders only loans that meet eligibility

1   criteria outlined in the Selling Guide.  Application of the principles in the Selling Guide

2   permit a lender to know before it makes the loan to the borrower whether or not a

3   particular loan will be eligible and approved for purchase by Fannie Mae, if the lender

4   decides to make the loan.

5       If a loan satisfies the Selling Guide requirements, a lender can "deliver" that loan

6   to Fannie Mae for purchase.  In doing so, the lender is required to make a series of

7   representations and warranties to Fannie Mae concerning the loan being sold.  If a loan

8   defaults, and Fannie Mae determines that the lender's representations and warranties are

9   false, Fannie Mae may require the lender to re-purchase the loan.  This is significant for

10  the lender, because if a loan is re-purchased it means that the lender—not Fannie Mae—

11  suffers the loss.

12      Desktop Underwriter ("DU") is a software application that is essentially an

13  automated version of Fannie Mae's Selling Guide.  Rather than perform a manual review

14  of a borrower's loan application and credit information to determine whether the

15  requirements in the Selling Guide are met, lenders that license DU from Fannie Mae can

16  enter data and information into the licensed software application to generate "DU

17  Underwriting Findings" (the "DU Findings").  These DU Findings indicate whether a

18  prospective loan will be eligible for sale to Fannie Mae on the secondary market.  Thus,

19  DU permits mortgage lenders to determine—before a loan is made—whether Fannie Mae

20  is likely to buy the loan from them, and to do so by using a software application rather

21  than having to apply the manual underwriting guidelines.

22      Significantly, when a lender delivers a loan to Fannie Mae for which the lender

23  uses the DU software application, Fannie Mae provides the lender with a partial waiver of

24  the representations and warranties that the lender would otherwise be required to make.

25  This reduces the risk to the lender that, if a loan were to default, Fannie Mae could force

26  the lender to re-purchase the loan due to a violation of the lenders' representations and

27  warranties to Fannie Mae.

28

1    The DU Findings does not require a lender to approve or reject any particular loan.

2    Instead, the lender always makes that decision for itself.  Nor does the Selling Guide

3    require a lender to approve or reject any particular loan.  Again, the lending decision

4    always remains with the lender.  All that the Selling Guide and DU do is provide the

5    lender with information as to *Fannie Mae's future conduct*—that is, will Fannie Mae

6    agree to purchase the loan and, if so, with or without the requirement that the lender make

7    certain specified representations and warranties at delivery.

8    If the loan application information that the lenders enter into DU falls within the

9    Selling Guide's guidelines, the lender can obtain a DU Findings of "Approved/Eligible"

10    by using the software application.  This means that if the lender delivers the loan to

11    Fannie Mae, Fannie Mae would purchase it as a "DU loan," with the lender getting a

12    limited waiver of the representations and warranties.  By contrast, if the loan application

13    information, as entered into DU by the lender, presents a credit risk that falls outside the

14    guidelines for purchase by Fannie Mae, the DU Findings will reflect a "recommendation"

15    that the loan be "Referred with Caution."  This means that, based on the data entered into

16    the DU software, the loan does not satisfy Fannie Mae's credit risk standards or mortgage

17    eligibility criteria for loans underwritten through DU.  If the lender chooses to originate

18    the loan anyway, Fannie Mae may still buy it if the lender follows the manual

19    underwriting process to determine that the loan satisfies all relevant Selling Guide criteria.

20            **B.    How Desktop Underwriter Works**

21    In order to use DU, a Fannie Mae-approved lender must subscribe to DU by

22    entering into a Software Subscription Agreement.  This license provides the lender with

23    access to the software application, which a lender can access through a user interface on

24    www.FannieMae.com, or through an integrated third party or proprietary loan origination

25    system.  A lender collects information directly from the prospective borrower, including

26    information about the borrower personally (such as information relating to income,

27    existing assets and debts, and the property that is the subject of the loan).

28

4

A lender is always the one to obtain the borrower's consumer report.  The software application itself contains no credit report or other information about any consumer.  A lender must purchase from an approved third-party consumer reporting agency a consumer report on the borrower that takes data from the three large national credit bureaus (Equifax, TransUnion, and Experian) and then "merges" that data into a single report, often referred to as a "tri-merge report."  Fannie Mae does not order any such consumer reports from the consumer reporting agencies, does not assemble any consumer credit information, has no contact with the borrower as part of this process, and is not otherwise involved in this process.

After entering all required information and obtaining a consumer report, the lender can underwrite the loan casefile using the DU software application.  When the loan casefile is underwritten through DU, the rules coded into the DU application are applied against the information and other data in the loan casefile (including the data in the tri-merge report) to reach an overall indication as to whether and under what circumstances Fannie Mae will buy the loan if the loan is delivered to it.  It is the lender using the software application itself that generates the DU Findings.  No individual or entity at Fannie Mae evaluates any consumer credit or other information or is otherwise involved in this process (other than, of course, as creators and licensors of the computer code that comprises the software application).

The lender using the DU software application generates a recommendation "message" based on an automated application of the Selling Guide requirements coded into the software regarding whether Fannie Mae will purchase the subject loan if the lender were to decide to make the loan and submit it to Fannie Mae for purchase.  None of the information about the specific borrower used to generate the recommendation is provided by Fannie Mae.  Instead, that information all comes from the lender-provided data in the loan application and the tri-merge report that is obtained by the lender.  In those situations where the Selling Guide requirements cannot be applied in an automated

manner, DU generates a message noting that the lender remains free to "manually underwrite" the subject loan.

The net result of submitting a loan application through DU for automated underwriting or manually underwriting the loan through direct application of the Selling Guide criteria is the same.  One important consequence of using DU, however, is that it provides a lender who delivers a DU approved loan to Fannie Mae with a limited waiver of the lender's representation and warranty obligations.  By contrast, when a lender manually underwrites a loan, the lender must represent and warrant that the mortgage loan complies with the requirements of the Selling Guide with regard to the mortgage loan's eligibility for delivery to Fannie Mae in order for Fannie Mae to purchase the loan.

## III.    FANNIE MAE DID NOT BECOME A CONSUMER REPORTING AGENCY BY LICENSING DU TO LENDERS.

As addressed in Fannie Mae's motion for summary judgment, Fannie Mae is not a consumer reporting agency ("CRA") as defined under the FCRA because DU does not provide DU Findings "for the purpose of furnishing consumer reports to third parties" and Fannie Mae's licensing of DU software does not constitute "assembling or evaluating" consumer credit information.

### A.    Fannie Mae Does Not Assemble or Evaluate Consumer Credit Information.

A "consumer reporting agency" is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C. § 1681a(f).

In light of this definition, the Federal Trade Commission ("FTC") and court decisions have consistently concluded that a company that creates a loan underwriting software or other program is not a CRA by virtue of providing the software to a lender.

6

1   *See, e.g.*, *McCalmont v. Fannie Mae*, No. 13-cv-2107-HRH, 2014 U.S. Dist. LEXIS

2   99368, at *12-13 (D. Ariz. July 21, 2014); *Thomas v. Cendant Mortgage*, No. 03-cv-1672,

3   2004 WL 2600772, at *4 (E.D. Pa. Nov. 15, 2004); *Barnes v. DiTech.com*, No. 03-cv-

4   6471, 2005 WL 913090, at *4 (E.D. Pa. Apr. 19, 2005); *Advisory Opinion to Cast* (Oct.

5   27, 1997); Federal Trade Commission, *40 Years of Experience with the Fair Credit

6   Reporting Act: An FTC Staff Report with Summary of Interpretations*, July 2011 ("40

7   Years Report") at 29 (expressly exempting sale of software products from definition of

8   consumer reporting agency).  The reasons for that repeated conclusion are applicable here.

9          The lenders are the ones that engage in the conduct on which Plaintiffs rely, not

10  Fannie Mae.  It is the lenders, *not Fannie Mae*, that use the DU software.  And it is the

11  lenders using the DU software, *not Fannie Mae*, who obtain consumer reports from third

12  parties, input loan application information and other data into the software,[1] and generate

13  the DU Findings.  And the lender, using the DU software application, *not Fannie Mae*,

14  generates DU Findings, which indicate whether the proposed loan would meet Fannie

15  Mae's Selling Guide requirements for sale to Fannie Mae on the secondary market.

16          **B.      DU Does Not Provide DU Findings for the Purpose of Furnishing

17                    Consumer Reports to Third Parties.**

18          In addition, an entity cannot be a CRA under the FCRA unless it engages in the

19  challenged conduct "for the purpose of furnishing consumer reports to third parties."

20  Even if Fannie Mae could be deemed to be the entity "assembling or evaluating" the

21  consumer credit information at issue here, there is no dispute that Fannie Mae is not doing

22  so "for the purpose of furnishing consumer reports to third parties."  Indeed, Plaintiffs

23  concede that the purpose of the DU Findings is for lenders to determine whether a

24  particular loan is eligible for sale to Fannie Mae and whether, as a result, the lender will

25

26

27          [1] The DU software contains no consumer credit information.  It is the lenders who
    provide the consumer credit information for the application's use, not Fannie Mae.

28

                                                                                              7

get a limited waiver of the usual representations and warranties that it would otherwise be required to make upon delivery.

The FTC's interpretation of this definitional phrase regarding "purpose," as addressed in the 40 Years Report, is instructive:

> Consummation of Transaction. A creditor does not become a CRA by communicating consumer report information about a loan applicant to an entity that must participate in the transaction in order for it to be completed (e.g., if the creditor communicates with an actual or potential loan insurer or guarantor to determine whether the entity would issue its insurance or guaranty to the holder of an obligation). In these circumstances, where the transactions are mutually dependent upon one another, the creditor's purpose is to use the report information to consummate the loan transaction for which the consumer applied.

(*Id.* at 30.)  While this statement is not entirely on all fours, the illustration is very close to Plaintiffs' theory of the case.  Fannie Mae is essentially a "potential loan insurer or guarantor" of loans made in the primary mortgage market, and Plaintiffs contend that the making of the loan and Fannie Mae's purchase are "transactions [that] are mutually dependent upon one another."  Indeed, a fair restatement of Plaintiffs' theory is that Fannie Mae "must participate in the [mortgage loan] transaction in order for it to be completed."  The FTC focuses on the "creditor" because the treatment of the "potential loan insurer or guarantor" is an *a fortiori* case.  If the creditor's communication to the "potential loan insurer or guarantor" is not "for the purpose of furnishing consumer reports to third parties," then the response from that entity cannot qualify either.

Instead, the established purpose of DU is to provide lenders with a tool that furthers Fannie Mae's statutory purpose of providing liquidity and stability to the primary mortgage market—that is, enabling lenders to determine whether a particular loan meets the Selling Guide's credit policy and whether they will be able to obtain the limited waiver of representations and warranties that otherwise would be required.  This is especially so given that Fannie Mae could not have had as its "purpose" the "furnishing of credit reports to third parties" because it had no credit report information to provide to lenders that the lenders had not already obtained from others and provided first to Fannie

1   Mae itself.  It is the lender that furnishes that information to DU, not the other way

2   around.  No information is in the DU software application that the lender did not put there.

3   The context as a whole is telling—the notion that Fannie Mae could have had the purpose

4   of furnishing credit information is implausible when Fannie Mae had no credit

5   information to furnish.

6       Because Plaintiffs cannot demonstrate the required "purpose" element nor the

7   required "assembling or evaluating" element of the definition, Plaintiffs' claim must fail.

8   Fannie Mae is not a consumer reporting agency.

9       **C.    Other FCRA Provisions Confirm that Fannie Mae Is Not a CRA.**

10      As addressed in Fannie Mae's motion for summary judgment, another section of

11  the FCRA and its legislative history shows Congressional intent that Fannie Mae is not a

12  consumer reporting agency.  15 U.S.C. § 1681g(g) demonstrates that Congress knew of

13  Fannie Mae's automated underwriting system and specifically addressed it in the FCRA,

14  without imposing any requirements on Fannie Mae or identifying Fannie Mae as a

15  consumer reporting agency that provides scores to lenders.

16      The structure of Section 1681g(g) shows that Congress made a distinction between

17  credit scores provided by consumer reporting agencies and information provided by

18  enterprise-developed automated underwriting systems.  This distinction would have been

19  unnecessary if a lender's use of DU could make an enterprise a consumer reporting

20  agency.  If that were the case, lenders would have had to disclose any report from the

21  automated underwriting system, because it would have been "obtained from a consumer

22  reporting agency." 15 U.S.C. § 1681g(g)(1)(A)(i).  The statute should not be interpreted in

23  a manner that would make Section 1681g(g)(1)(B) superfluous.  *Bosley Med. Inst., Inc. v.*

24  *Kremer*, 403 F.3d 672, 681 (9th Cir. 2005).

25      **D.    Fannie Mae Does Not Become a CRA by Acting as the Lender's
        Limited Agent.**

26

27      At most, Fannie Mae acts as the lender's limited agent when the lender uses DU to

28  generate DU Findings.  *See Weidman v. Freddie Mac*, 338 F. Supp. 2d 571, 574-75 (E.D.

9

1  Pa. 2004).  Like Plaintiffs here, the plaintiff in *Weidman* argued that Freddie Mac was a

2  consumer reporting agency because of its DU equivalent (Loan Prospector), which

3  Freddie Mac licensed to lenders in much the same way that Fannie Mae licenses DU.  The

4  Eastern District of Pennsylvania observed that Freddie Mac was "acting much like an

5  employee who obtains a credit report, reviews it, and passes it along with an evaluation to

6  his employer," and concluded that Freddie Mac was not a consumer reporting agency.  *Id.*

7  at 575.  Similarly here, Fannie Mae's licensing of DU to lenders does not convert it into a

8  consumer reporting agency under the FCRA.  Even putting aside the FTC's various

9  formulations of the "limited agent" or "joint use" doctrine,[2] as a limited agent of the

10  lender Fannie Mae was not acting as a consumer reporting agency.

## IV.  PLAINTIFFS CANNOT PROVE ANY FCRA VIOLATION AGAINST FANNIE MAE.

13  Plaintiffs claim that Fannie Mae "willfully and/or negligently failed to follow

14  reasonable procedures to assure maximum possible accuracy of the consumer reports it

15  prepared and/or published concerning Plaintiffs, in violation of 15 U.S.C. § 1681e(b)."

16  (Complaint ¶ 99.)  In order to prove a violation of 15 U.S.C. § 1681e(b), Plaintiffs must

17  prove the following:  (1) Fannie Mae is a consumer reporting agency, (2) the DU Findings

18  are consumer reports, (3) inaccurate information was included in the DU Findings about

19  Plaintiffs, (4) that inaccuracy was due to Fannie Mae's failure to follow reasonable

20  procedures to assure maximum possible accuracy, (5) Plaintiffs suffered injury, and

21  (6) Plaintiffs' injury was caused by the inclusion of the inaccurate information.  15 U.S.C.

22  § 1681e(b); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995).

23  A mere inaccuracy occurring despite reasonable procedures does not give rise to liability.

24  *Id.*

26  [2] The FCRA elsewhere relies on agency principles to make clear that an entity's act as an agent of a principal, even one concededly covered by the FCRA, do not themselves thereby become subject to the requirements of the FCRA.  *See, e.g.*, 40 Years Report at 30.

Plaintiffs rely on section 1681o, alleging that Fannie Mae was "negligent in failing to comply" with the FCRA, and section 1681n of the FCRA, which "imposes civil liability on any CRA 'who willfully fails to comply with any requirement' of the Act." (Complaint ¶¶ 94-95 (citing 15 U.S.C. § 1681n(a)).)  Among other things, a negligence claim requires a showing of "actual damages sustained by the consumer as a result of the failure" to comply, 15 U.S.C. § 1681o, and a claim for willful violation requires a showing that Fannie Mae acted contrary to "clearly established" legal authority.  *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 69-70 (2007); 15 U.S.C. § 1681n.

### A.     Plaintiffs Cannot Prove Causation.

In order to show that an inaccuracy in DU Findings "caused" Plaintiffs' asserted damages, Plaintiffs must establish that but-for the alleged inaccuracy, Plaintiffs would not have suffered those damages.[3] *Burrage v. United States*, 134 S. Ct. 881, 889 (2014); *Safeco*, 551 U.S. at 49.  Yet Plaintiffs' alleged harm resulted from Plaintiffs' lenders deciding not to enter into re-finance transactions with them because the lenders could not sell those loans to Fannie Mae as "DU loans" and the lenders were unwilling to perform manual underwriting.  The purpose of the DU Findings is to allow the lender to determine whether Fannie Mae will buy a loan—which Fannie Mae is not required to do—based on its risk tolerances without requiring the lender to make representations that the mortgage loan complies with the requirements of the Selling Guide.  Fannie Mae's refusal to buy the proposed Plaintiffs' loans as a "DU loan"—and instead requiring that the lender manually underwrite the loan in order for Fannie Mae to buy it—does not result in any legal harm cognizable under the FCRA.  To be sure, Plaintiffs wish that Fannie Mae had set its risk tolerances differently, and buy loans reflecting their particular credit profile.

---

[3] Plaintiffs cannot show causation under any standard.  Their alleged injuries were caused exclusively and only by the fact that Fannie Mae would not purchase their loan as a DU loan (which has nothing to do with any information allegedly provided in the DU Findings), and the resulting refusal of the lenders to make the loan to Plaintiffs as anything other than a DU loan.  The provision of consumer credit information—accurate or not—has nothing to do with the causal chain and had no impact on it.

1    But that is not enough.  Fannie Mae is permitted to set its risk tolerances however it sees

2    fit to successfully achieve its public mission.

3            Furthermore, Plaintiffs cannot show any causal link between the purported

4    inaccuracies alleged in the DU Findings and their alleged harm.  Indeed, Plaintiffs'

5    lenders knew that Plaintiffs' previous home was not the subject of foreclosure

6    proceedings, and informed Plaintiffs of this knowledge.  This clarifies that the lenders did

7    not deny Plaintiffs' loan applications because they believed Plaintiffs had a prior

8    foreclosure, but rather because the loans did not qualify as "DU Loans" and would have

9    required manual underwriting.  It is worth noting that the first people who told Amerisave

10   that the DU Findings would identify the existence of a foreclosure were Plaintiffs

11   themselves.  They did so because they wanted to obtain an agreement from Amerisave

12   (and allegedly did) to manually underwrite their loan.  There is simply no causation that

13   Plaintiffs can show between any alleged unreasonable procedures by Fannie Mae and

14   Plaintiffs' alleged harm.

15           Whatever information Plaintiffs might allege that Fannie Mae communicated to the

16   lenders (and Fannie Mae's position is that it communicated no such information and that

17   the credit report and other consumer report data was communicated by the lender to DU,

18   not the other way around), the record is clear that the lenders declined to make a loan to

19   Plaintiffs because Fannie Mae would not agree to purchase the loan.  That is not a harm

20   caused by any violation of the FCRA.

21           **B.     There Is No Inaccuracy.**

22           Plaintiffs' case relies on an interpretation of the DU Findings that ignores how

23   lenders actually use and understand DU Findings.  Within the context of lenders' use of

24   DU and the Selling Guide, the DU Findings that indicated that DU had identified a

25   "foreclosure" in the credit report data did so solely as an explanation of why the DU

26   Findings indicated that the loan could not be treated as a DU loan.  In this sense, there was

27   no inaccuracy; they were exactly what DU was supposed to have generated and were in

28   fact the explanation of the "Refer with Caution" recommendation included in the DU

12

1  Findings.   In other words, there was no inaccuracy because all of the DU users were
2  informed up front of DU's rules in this situation—that the DU software application would
3  identify the existence of a foreclosure whenever the credit report obtained by the lender
4  showed a mortgage trade line with a Manner of Payment code of "8" or "9."

5      Selling Guide Section B3-5.3-09 states:  "Mortgage accounts, including first liens,
6  second liens, home improvements loans, HELOCs and mobile home loans, will be
7  identified as a foreclosure if there is a current status or manner of payment/MOP code of
8  '8' (foreclosure) or '9' (collection or charge-off); or if there is a foreclosure-related
9  Remarks Code present in the credit report data and associated to the tradeline."

10     DU was programmed to automatically trigger the following message to be included
11  in the DU Findings when there is a MOP code of 8 or 9:  "Desktop Underwriter has
12  identified a deed-in-lieu of foreclosure that was reported within the last two years or a
13  foreclosure that was reported within the last seven years."  The DU Findings message also
14  includes:  "This loan casefile is ineligible for delivery as a DU loan because it received a
15  Refer with Caution/IV recommendation.  However, any loan casefile that receives a Refer
16  with Caution/IV recommendation may be manually underwritten in accordance with the
17  Fannie Mae Selling guide.  Refer to the Selling Guide for additional information."  This
18  message was accurate and the lenders understood what it meant.

19     For example, even before Amerisave, one of the lenders Plaintiffs sought
20  refinancing from, ran Plaintiffs' application through DU, Plaintiffs had already told them
21  that (1) they had a short sale and not a foreclosure, and (2) DU was going to generate a
22  "foreclosure" message requiring manual underwriting.  That is why Plaintiffs sought
23  assurances that Amerisave could manually underwrite loans before they had Amerisave
24  run their application through DU.  Amerisave nevertheless denied their refinancing—not
25  because of any inaccuracy in the DU Findings, but rather with full knowledge of the short
26  sale before they even generated any DU Findings.  Therefore, not only was there no
27  inaccuracy, but this further demonstrates the utter lack of causation between DU and
28  Plaintiffs' alleged harm.

13

1    Courts have noted the FCRA "distinction between 'accurate information' and

2    'maximum possible accuracy.'" *Wagner v. TRW, Inc.*, 139 F.3d 898, 1998 WL 127812, at

3    *1 (5th Cir. Mar. 4, 1998) (per curiam) (affirming summary judgment for defendant).

4    "The Federal Trade Commission guidelines implementing this section make it clear that

5    '[t]he section does not require error free consumer reports.'" *Smith v. Auto Mashers*, 85

6    F. Supp. 2d 638, 640-41 (W.D. Va. 2000) (quoting 16 C.F.R. Part 600, 391).  Rather, "[i]f

7    a consumer reporting agency accurately transcribes, stores, and communicates consumer

8    information received from a source that it reasonably believes to be reputable, and which

9    is credible on its face, the agency does not violate this section simply by reporting an item

10   of information that turns out to be inaccurate." *Id.* at 641; *see also* 40 Years Report at 67.

11   "Mere imprecision does not render information inaccurate." *Toliver v. Experian*

12   *Info. Solutions, Inc.*, 973 F. Supp. 2d 707, 715 (S.D. Tex. 2013).  In *Toliver*, for example,

13   the court rejected plaintiff's arguments that use of certain codes to report the status of her

14   account was inaccurate, concluding that because "these codes are well-defined and the

15   definitions known and accessible to those in the credit reporting industry, it would be

16   unreasonable to conclude that the codes are misleading." *Id.* at 719; *see id.* at 717-18

17   ("That the models may treat the '0C' code as identifying a factoring company account

18   does not make the code itself, which is clearly defined to include debt buyers like LVNV,

19   inaccurate or misleading.").

20   The Seventh Circuit's recent decision in *Childress v. Experian Information*

21   *Solutions, Inc.*, 790 F.3d 745 (7th Cir. 2015) succinctly analyzes the section 1681e(b)

22   requirement:  the "Fair Credit Reporting Act requires only that the procedures adopted by

23   credit-reporting agencies be 'reasonable' in relation to the goal of accurate credit

24   reporting." *Id.* at 747.  The plaintiff there argued that the CRA "should monitor all

25   dismissals of bankruptcy petitions and investigate to determine whether they were

26   dismissed at the request of the petitioner," but the court cited testimony by a LexisNexis

27   representative "that the variance in bankruptcy docket entries from bankruptcy court to

28   bankruptcy court is so great—and there are 94 bankruptcy courts—that Lexis has been

unable to develop reliable computer algorithms for determining the basis on which a particular bankruptcy case has been dismissed." *Id.* The Seventh Circuit affirmed summary judgment and rejected plaintiff's proposal as "unreasonable," finding that it "would put an enormous burden on the consumer credit-reporting agencies," and "it was the plaintiff's burden to establish the reasonableness of her proposed procedure." *Id.*

Here, recipients of DU Findings were informed of what a notation of "Foreclosure" meant on DU Findings, and therefore, were not misled. Fannie Mae's Selling Guide provided that the DU software application would identify the presence of a foreclosure by examining the "MOP Code" rating in the tri-merge report obtained by the lender. The MOP Code is a field on the consumer report that identifies whether the account is current or past due. There is no dispute here that the Plaintiffs' credit reports included a MOP code of "9," and that DU accurately identified that data.

The credit reporting industry has not created a specific MOP code that identifies short sales and Fannie Mae has no ability to mandate that they do so. Credit reports do not include a specific indicator of whether a short sale has taken place in the borrower's credit history. Because no such code exists, DU cannot identify with certainty whether a short sale has taken place.

## C.     Fannie Mae's Procedures Were Reasonable.

While Fannie Mae is not a consumer reporting agency, it nevertheless has reasonable procedures in place to assure maximum possible accuracy within the context of the DU system. Because the DU Findings output depends entirely on the information provided by the lender and CRA's, including the credit reports the lender requests, DU only accepts credit reports from approved CRA's that must represent that they follow FCRA requirements. Fannie Mae's reliance on those approved CRA's to provide accurate credit report information was reasonable. Again, there is not allegation here that the relevant credit reports did not include a MOP Code of "9."

In addition, because credit reports do not include a specific indicator of whether a short sale has taken place in the borrower's credit history, there is uncertainty regarding

whether a short sale has taken place.  Indeed, Fannie Mae's experience was that short sales were not reported consistently on tri-merge reports.  This underscores Fannie Mae's belief that it could not rely on credit reporting in order to predict with reasonable certainty whether or not a short sale existed with respect to a particular mortgage tradeline.  Fannie Mae therefore made the risk judgment that a lender should manually underwrite a loan where the tri-merge report included a mortgage tradeline reported with a current MOP Code of "8" or "9" because the lender could work directly with the borrower to verify what happened.

Because Fannie Mae has no interaction with the borrower, it was a reasonable procedure to respond to the short sale uncertainty by asking the lender—the entity that has the relationship with the borrower—to determine the situation and to manually underwrite the loan under the Selling Guide using the information the lender obtained from the borrower.  It was reasonable and prudent for DU to treat a MOP code "9" as a "foreclosure" in light of this uncertainty and generate a "refer with caution," asking the lender to manually underwrite the loan.

The accuracy and reasonableness of Fannie Mae's procedure is highlighted for Plaintiffs by comparing the output for credit reports with a MOP Code of "9" versus other codes.  In each of the DU Findings that Plaintiffs' lenders generated that included a recommendation of "Refer with Caution," the tri-merge report obtained by the lender included one or more mortgage tradelines with a MOP Code of "9."  In contrast, for each of the DU Findings that the Plaintiffs' lenders generated that included a recommendation of "Approved," the tri-merge reports reported these accounts (the very same accounts that were reported with a MOP code of "9" in other tri-merge reports) with a variety of MOP Codes, including "Unrated," "Current," and "5" (which stands for "120-150 Days Late").  Thus, the MOP Code was accurately translated.  Fannie Mae's reasonable procedures ensured that these MOP codes were properly translated to generate the correct message within the context of the DU system and to accurately set forth what DU had identified.

### D.    Plaintiffs' Negligence Claim Fails.

For the reasons discussed above, Plaintiffs also cannot show that Fannie Mae "negligently" violated the FCRA.  Plaintiffs cannot show any actual damages caused by Fannie Mae, which is required under the FCRA statute to support a negligence claim. 15 U.S.C. § 1681o.  Plaintiffs allege actual damages resulting from paying higher monthly payments than would have been available had Plaintiffs refinanced their loan a year earlier.  But these alleged actual damages resulted from the lenders deciding not to enter a loan transaction with them because Fannie Mae would not agree to purchase the loan absent a manual underwrite.  Fannie Mae's experience was that short sales were not reported consistently, and Fannie Mae made the risk judgment that it could not permit the limited waiver of representations and warranties where the tri-merge report included a mortgage tradeline with a current MOP Code of "8" or "9."  In that situation, because the lender could work directly with the borrower to verify what happened, Fannie Mae required manual underwriting.

No matter what was contained in the DU Findings, application of Fannie Mae's credit risk policy meant that Fannie Mae would not purchase the Zabriskies' loans as DU loans so long as their credit reports included a prior mortgage account with a MOP Code of "9."  The DU Findings was irrelevant to the inevitability and inexorability of this simple fact.  But Fannie Mae's unwillingness to buy the loan from the Zabriskies' lenders as a DU loan—not any consumer credit information included in the DU Findings—is precisely what led to what the Zabriskies allege was their injury.

This is not a FCRA injury or a harm that can be remedied by the FCRA.  It is not an injury or harm that was caused by a FCRA violation.

### E.    Plaintiffs Cannot Show a Willful Violation.

Plaintiffs cannot meet their burden of showing that Fannie Mae acted contrary to "clearly established" legal authority, as is required to prove a FCRA willfulness claim. *Safeco*, 551 U.S. at 69-70; 15 U.S.C. § 1681n.  It was objectively reasonable for Fannie Mae to believe it was not a consumer reporting agency subject to the FCRA because the

17

applicable legal authority prior to this suit held that it and similar companies licensing software were not a CRA.  *See, e.g., Thomas*, 2004 WL 2600772, at *4; *Barnes*, 2005 WL 913090, at *4.  Indeed, with the exception of this instant case, Fannie Mae is unaware of any other court concluding that it has acted as a consumer reporting agency.  *See McCalmont*, 2014 U.S. Dist. LEXIS 99368, at *12-13.

Under the Supreme Court's *Safeco* decision and its progeny, no willful noncompliance finding can be made.  The Supreme Court cautioned that, before making a finding that conduct willfully violated the FCRA, the prescription of that conduct must be clearly articulated in statutory language, appellate authority, or other authoritative guidance.  *See Safeco*, 551 U.S. at 69-70.  Here, because there is no appellate authority Plaintiffs can cite, nor contrary statutory language or authoritative guidance, there was no "clearly established" legal authority that Fannie Mae failed to follow.  *See, e.g., Long v. Tommy Hilfiger U.S.A.*, 671 F.3d 371, 377 (3d Cir. 2012) (affirming dismissal of willfulness claims because "there was no guidance from the federal courts of appeal" on the issue, FTC "Business Alerts" were not authoritative guidance, and "subjective bad faith or intent of the defendant is irrelevant when there is an objectively reasonable interpretation of the statute" allowing the conduct); *Berry v. Schulman*, 807 F.3d 600, 615 (4th Cir. 2015) ("the Supreme Court has made clear that where 'the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation . . . a defendant who merely adopts one such interpretation' cannot be held liable as a willful violator." (quoting *Safeco*, 551 U.S. at 70 n.20)).  In fact, this is not even a case where Plaintiffs can cite a single contrary district court opinion.  Rather, all of the prior district court authority is in Fannie Mae's favor.  Thus, Plaintiffs cannot offer any evidence showing that Fannie Mae willfully violated the FCRA.[4]

---

[4] As addressed in Defendants' *Daubert* motion seeking to exclude testimony by Evan Hendricks, his purported expert conclusions that Fannie Mae acted "unreasonably" or that its conduct was "reckless" or "inadequate" should be excluded as impermissible legal conclusions, among other reasons.

1

**V.     PLAINTIFFS' PROPOSED DAMAGES ARE NOT RECOVERABLE, UNSUPPORTED, AND INFLATED.**

2

3          Assuming the trial reaches a damages phase, the overwhelming percentage of

4    Plaintiffs' sought damages are not recoverable and/or extremely inflated.  As addressed in

5    Defendants' *Daubert* motion to exclude certain proffered testimony by Stan V. Smith,

6    Plaintiffs' alleged damages of $12,139 for the value of time allegedly spent by Kristin

7    Zabriskie attempting to secure refinancing and litigating this lawsuit, and $206,488 for

8    Kristin Zabriskie and $86,457 for Richard Zabriskie for reduction in value of life (or loss

9    of enjoyment) damages should not be awarded.  These amounts are not supported by

10   *Daubert* sufficient methodologies and are not the subject of proper expert testimony here.

11         The FCRA permits the recovery of "actual damages."  15 U.S.C. § 1681o.

12   Spending time to litigate a lawsuit and spending time to seek refinancing—particularly

13   where, as here, no income was foregone as a result and there were no out-of-pocket

14   losses—does not fit that statutory description.  *See, e.g.*, *Campbell v. Experian Info.*

15   *Solutions, Inc.*, No. 08-4217-CV-C-NKL, 2009 U.S. Dist. LEXIS 106045, at *20 (W.D.

16   Mo. Nov. 13, 2009) (holding that plaintiff could not seek "compensation for the time

17   spent reviewing credit reports, researching those reports, making phone calls, lodging

18   disputes, and sending letters and faxes"); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d

19   469, 474 (2d Cir. 1995) (expenses incurred "to notify [a defendant] of inaccurate credit

20   information . . . cannot be compensable as 'actual damages' for a violation of the

21   FCRA").  In addition, the hundreds of hours claimed by Plaintiffs as having been spent

22   seeking to refinance and on this litigation are not credible or recoverable.  The level at

23   which Plaintiffs seek future emotional distress damages is also implausible—Plaintiffs

24   have not suffered some permanent injury to their loss of enjoyment of life here, as would

25   a plaintiff in a personal injury action.  On the contrary, if they prevail at trial, they will be

26   awarded any actual monetary damages necessary to make them whole, and would suffer

27   no future harm at all.

28

19

1      Plaintiffs also cannot recover loss of enjoyment of life damages ("hedonic

2   damages") because this case does not involve physical injury or death.  *See, e.g.*,

3   *Anastasion v. Credit Serv. of Logan*, No. 2:08-CV-180 TS, 2011 U.S. Dist. LEXIS

4   116271, at *3 (D. Utah Oct. 5, 2011) (concluding that "hedonic damages are used to

5   approximate the loss of the value of life, and therefore are used in cases involving death or

6   injury," and excluding testimony of Dr. Smith on that basis).  This basis for damages,

7   which represents the largest amount sought by Plaintiffs, is an improper overreach.

8   **VI.    PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES.**

9      Without a finding of willfulness, which as explained above is inapplicable,

10   Plaintiffs cannot seek punitive damages under the FCRA.  Plaintiffs may seek "actual

11   damages sustained . . . as a result of the failure" to comply if they can prove a negligent

12   violation, but the statute only allows punitive damages if there was a willful violation.

13   *See* 15 U.S.C. § 1681n (willfulness section, mentioning "punitive damages as the court

14   may allow"); *cf.* 15 U.S.C. § 1681o.

15      Plaintiffs have the burden of proving by clear and convincing evidence that

16   punitive damages should be awarded, and if so, the amount of any such damages.  *See,*

17   *e.g.*, *Heston v. Taser Int'l, Inc.*, 431 F. App'x 586, 589 (9th Cir. 2011); *Bachrach v.*

18   *Covenant Transp. Inc.*, No. 13-16363, 2016 WL 191983, at *3 (9th Cir. Jan. 14, 2016).

19   Punitive damages are simply inappropriate here.  This is not a situation where Fannie Mae

20   needs to be punished for its willful noncompliance with clearly established legal authority.

21   Rather, it was objectively reasonable for Fannie Mae to believe it was not a consumer

22   reporting agency subject to the FCRA.  No court or regulatory entity has ever held to the

23   contrary.  Nor has any court anywhere in the country ever labeled Fannie Mae a CRA

24   before this case.  And the only final judgment ever entered on the issue of whether Fannie

25   Mae is a CRA determined that it was not as a matter of law.  *See McCalmont*, 2014 U.S.

26   Dist. LEXIS 99368, at *12-13.

27      No message of deterrence needs to be sent.  The short sale coding issue was an

28   industry wide issue, and Fannie Mae made a reasonable and prudent judgment to deal

20

1    with the uncertainty and risk by treating a MOP code "9" as a "foreclosure" and

2    generating a "refer with caution" asking for manual underwriting.  When this issue finally

3    came to light, Fannie Mae proactively addressed it through DU software updates made in

4    late 2013, which post-date Plaintiffs' alleged injuries and pre-date this suit.  In 2013,

5    Fannie Mae re-coded portions of the DU software application to enable lenders in such

6    situations to potentially resolve the conflicting information using DU.  In such cases, the

7    lender has the option of obtaining information directly from the borrower or another

8    source that confirms to the lender's satisfaction that the relevant tradeline represents a

9    short sale and not a foreclosure.  The lender can then enter that confirmation into DU and,

10   where the Selling Guide's other requirements as coded-into DU are met, DU will generate

11   an "Approve" recommendation.  The loan can then be delivered as a DU loan by the

12   lender without manual underwriting.  These kinds of proactive efforts to address the issue

13   undercut any notion that Fannie Mae is deserving of punishment through punitive

14   damages.

1    Dated: February 22, 2016          By:  /s/ Michael B. Miller

2                                          Michael B. Miller (*pro hac vice*)
                                           MORRISON & FOERSTER LLP
3                                          250 West 55th Street
                                           New York, NY  10019-9601
4                                          Telephone: 212.468.8000
                                           Facsimile: 212.468.7900
5                                          MBMiller@mofo.com

6                                          Angela E. Kleine (*pro hac vice*)
                                           Ben Patterson (*pro hac vice*)
7                                          Morrison & Foerster LLP
                                           425 Market Street
8                                          San Francisco, California  94105-2482
                                           Telephone: 415.268.7000
9                                          Facsimile: 415.268.7522
                                           akleine@mofo.com
10                                         bpatterson@mofo.com

11                                         Gregory J. Marshall (ASB #019886)
                                           Erica J. Stutman (ASB #029664)
12                                         SNELL & WILMER L.L.P.
                                           One Arizona Center
13                                         400 E. Van Buren, Suite 1900
                                           Phoenix, Arizona  85004-2202
14                                         Telephone:  602.382.6000
                                           Facsimile:  602.382.6070
15                                         gmarshall@swlaw.com
                                           estutman@swlaw.com
16
                                           Attorneys for Defendant
17                                         FEDERAL NATIONAL MORTGAGE
                                           ASSOCIATION
18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

Paul B. Mengedoth, Esq.
Mengedoth Law PLLC
20909 N. 90th St., Ste. 211
Scottsdale, AZ  85255

Sylvia A. Goldsmith, Esq.
Goldsmith & Associates, LLC
20545 Center Ridge Road, Ste. 120
Rocky River, OH  44116

*Attorneys for Plaintiffs*

_____
Robin L. Sexton

3621948