1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard and Kristin Zabriskie,<br><br>                    Plaintiff,<br><br>v.<br><br>Federal National Mortgage Association and Federal Housing Finance Agency as the Conservator of Federal National Mortgage Association,<br><br>                    Defendants. | No. CV-13-02260-PHX-SRB<br><br>JOINT PRETRIAL ORDER |

        Pursuant to the Scheduling Order previously entered, the following is the Joint

Proposed Pretrial Order to be considered at the Final Pretrial Conference set for February

29, 2016, before Judge Susan Bolton.

**A.     TRIAL COUNSEL FOR THE PARTIES.**

**Plaintiffs:**

Sylvia Antalis Goldsmith (pro hac vice)
Goldsmith & Associates LLC
20545 Center Ridge Rd., Ste. 120
Rocky River, OH 44116
Telephone:  (440) 934-3025
Facsimile:  (440) 934-3026
goldsmith@goldsmithlawyers.com

Paul B Mengedoth (#018507)
Mengedoth Law PLLC
20909 N 90th St., Ste. 211
Scottsdale, AZ 85255

Telephone:  (480) 778-9100
Facsimile:  (480) 778-9101
paul@mengedothlaw.com

**Defendant:**
Gregory J. Marshall (#019886)
Erica J. Stutman (#029664)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
gmarshall@swlaw.com
estutman@swlaw.com

Michael B. Miller (*pro hac vice*)
MBMiller@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY  10019-9601
Telephone: 212.468.8000
Facsimile: 212.468.7900

Angela E. Kleine (*pro hac vice*)
Ben Patterson (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:    415.268.7000
Facsimile:    415.268.7522
akleine@mofo.com
bpatterson@mofo.com

## B.    STATEMENT OF JURISDICTION/VENUE.

This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1681*p* and 28 U.S.C. § 1337.

Venue is proper because Plaintiffs reside in this judicial district and many of the facts at issue occurred in this judicial district.

## C.    NATURE OF ACTION.

This case involves a single Count brought pursuant to the Fair Credit Reporting

Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.  Plaintiffs seek actual, statutory and punitive damages as a result of what they allege are both negligent and willful violations of the reasonable procedure section of the FCRA, 15 U.S.C. § 1681e(b), pursuant to the liability sections of the FCRA, 15 U.S.C. §§ 1681 n and o.

**D.     JURY/NON JURY.**

Plaintiffs have demanded a jury trial of all issues and Defendant accepts Plaintiffs' demand for a jury trial.

**E.     CONTENTIONS OF THE PARTIES.**

**Plaintiffs:**

With respect to Count One of the Complaint, Plaintiffs have the initial burden of proof.  In order to make out a prima facie case under 15 U.S.C. § 1681e(b), Plaintiffs must present evidence tending to show the following:

(1)     Defendant, a [consumer] reporting agency;

(2)     prepared a [consumer] report;

(3)     containing inaccurate information.

*See* 15 U.S.C. § 1681e(b); *Guimond v. Trans Union Credit Info. Co.*, 45 F3d 1329, 1333 (9th Cir. 1995); *Baker v. Trans Union LLC*, 2010 WL 2104622 (D. Ariz. May 25, 2010).

The questions of whether Fannie Mae satisfies the statutory definition of a "consumer reporting agency" under 15 U.S.C. § 1681a(f) in its operation of its Desktop Underwriter system, and whether the subject Desktop Underwriter Findings report satisfies the statutory definition of a "consumer report" under 15 U.S.C. § 1681a(d), are legal determinations to be made and directed by the Court.

The burden then shifts to Fannie Mae to prove its affirmative defense that it followed reasonable procedures to assure maximum possible accuracy of the information it circulated about Plaintiffs.  In order to do so, Fannie Mae has the burden of proving the following:

(1)     that Fannie Mae has procedures to assure maximum possible accuracy;

(2)     those procedures are reasonably designed to prevent inaccuracies; and

(3)    Fannie Mae followed those procedures with respect to each report it

prepared about the Zabriskies.

*See* 15 U.S.C. § 1681e(b); *Guimond v. Trans Union Credit Info. Co.*, 45 F3d 1329, 1333

(9th Cir. 1995); *Rothery v. Trans Union LLC*, 2006 WL1720498 (D. Or. April 6, 2006);

*Konter v. CSC Credit Serv., Inc.*, 606 F.Supp.2d 960 (W.D. Wis. 2009).

In order to recover actual damages under 15 U.S.C. § 1681o, Plaintiffs must show

that:  (1) Defendant's conduct was negligent; (2) Plaintiffs were injured, and

(3) Defendant's negligence caused that injury.  See 15 U.S.C. § 1681o. The Ninth Circuit

has specifically directed that recovery in this regard includes "any actual damages" and

encompasses "recovery for emotional distress and humiliation."  *Guimond, supra*, 45 F.3d

at 1333 (citing *Johnson v. Department of Treasury, I.R.S.*, 700 F.2d 971, 984 (5th Cir.

1983).  Such damages need not involve "physical injury or out of pocket expenses."  *See*

*Levine v. World Fin. Network*, 437 F.3d 1118, 1124 (11th Cir. 2006) (citing *Bakker v.*

*McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998)).  *See also Stevenson v. TRW Inc.*, 987

F.2d 288, 296 (5th Cir. 1993); *Cousin v. Trans Union Corp.,* 246 F.3d 359, 369 (5th Cir.

2001) (citing *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir.

1983) ("Actual damages [under the FCRA] include humiliation or mental distress, even if

the consumer has suffered no out-of-pocket losses.").  *See Philbin*, *supra*, 437 F.3d at 963,

n.3.

In order to recover under 15 U.S.C. 1681n, Plaintiffs have the burden of showing

that Defendant's actions were willful; willful under the FCRA means that Defendant acted

(or failed to act) in reckless disregard of a requirement of the FCRA.  *See* 15 U.S.C.

§ 1681n; *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007).  Upon proof of

willfulness, Plaintiffs are entitled to recover:  (1) the greater of their actual damages or

statutory damages of not less than $100 and not more than $1,000, and such amount of

punitive damages as the court may allow.  See 15 U.S.C. § 1681n(a)(1)(A) and (2).

**Defendant:**

Plaintiffs first bear the burden of establishing that Fannie Mae is a "consumer reporting agency" (CRA). To do that, they must show that Fannie Mae, as opposed to some other entity, did each of the following: (1) received fees in order to (2) regularly engage in assembling or evaluating consumer credit information (3) for the purpose of furnishing consumer reports to third parties. 15 U.S.C.A. §§ 1681a(d), (f). In order to find that Fannie Mae is a CRA, Plaintiffs must also show that it was acting as anything other than within the scope of its authority as an agent for the lenders in connection with the DU Findings issued about Plaintiffs' refinance applications.

Plaintiffs must also show that DU Findings about the Plaintiffs' mortgage refinance applications were "consumer reports"—that the DU Findings constitute communications of information by a CRA bearing on Plaintiffs' credit worthiness, credit standing, or credit capacity, and that the DU Findings used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the their eligibility for credit. *Id.*

Even if the jury were to find that Fannie Mae meets the definition of a CRA and DU Findings are "consumer reports" under the facts presented in this case, Plaintiffs must establish a compensable violation of the statute. Plaintiffs misstate the standard they will have to meet in order to do that. Plaintiffs bear the burden of proving that Defendant willfully or negligently failed to follow reasonable procedures for maximum possibly accuracy in any reports about Plaintiffs. 15 U.S.C.A. §§ 1681e(b); 1681n, 1681o; *Guimond v. Trans Union Credit Info. Co.*, 45 F3d 1329, 1333 (9th Cir. 1995); *Rothery v. Trans Union LLC*, 2006 WL1720498 (D. Or. April 6, 2006) (explaining that *Guimond* can be is subject to "different interpretations" regarding its holding on burden of proof of reasonable procedures, and concluding that plaintiffs in FCRA cases "bear the burden of proof at all times"); *Dalton v. Capital Assoc. Indus., Inc.*, 257 F3d 409, 416 (4th Cir. 2001) (same); *Saenz v. Trans Union, LLC*, 621 F. Supp. 2d 1074, 1080 (D. Or. 2007) (same); *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996) (defining "reasonable procedures"). Reasonable procedures are those that a reasonably prudent person would undertake under the circumstances. *See id.*

Plaintiffs must then establish actual damages, consisting of actual out-of-pocket monetary loss, and/or legally compensable emotional distress.  15 U.S.C.A. §§ 1681n, o; 3A Fed. Jury Prac. & Instr. § 153:70 (6th ed.).  Plaintiffs must also establish that any such actual damages was actually caused by Fannie Mae, as opposed to actions by Plaintiffs themselves or their mortgage lenders or brokers.  *See id.*

Finally, if the jury finds that Plaintiffs have established a violation of the FCRA that caused them actual damages, Defendant may defeat the claim based on Plaintiffs' failure to mitigate their damages.  To do that, it must prove (1) that Plaintiffs failed to use reasonable efforts to avoid or reduce damages; and (2) the amount by which damages would have been avoided or reduced.  *See* Instruction 5.3, Ninth Circuit Manual of Model Jury Instructions – Civil (2007 ed.).

**F.      STIPULATIONS AND UNDISPUTED FACTS.**

Stipulations:

1.      Demonstratives, illustrations, and other items that are not to be admitted as exhibits need not be identified on this pretrial order, but should be shown to opposing counsel at least 72 hours before a party intends to introduce the item at trial so that objections can be addressed prior to introduction.

**G.      PLAINTIFFS CONTENTIONS OF DISPUTED FACT.**

1.      Fannie Mae is a "consumer reporting agency" as that term is defined in 15 U.S.C. § 1681a(f).

2.      DU Findings reports generated from the Desktop Underwriter system owned, operated, maintained, managed and controlled in every aspect by Fannie Mae, are "consumer reports" as that term is defined in 15 U.S. C. § 1681a(d).

3.      On at least two (2) occasions in 2012, Fannie Mae's Desktop Underwriter system generated a DU Findings report that stated that the Zabriskies had had a FORECLOSURE in connection with a previous PNC mortgage account when that statement was false.

4.      Because of a false FORECLOSURE statement on a DU Findings report,

Nations Choice Mortgage denied Plaintiffs' application to refinance their home on July 24, 2012.

5.      Because of a false FORECLOSURE statement on a DU Findings report, Amerisave Mortgage Corporation denied Plaintiffs' application to refinance their home on October 5, 2012.

6.      Plaintiffs have suffered actual damages because of Fannie Mae's repeated representations to Plaintiffs' prospective lenders that the Zabriskies had a FORECLOSURE on their former PNC mortgage when that representation is simply not true.

7.      Because of these two (2) failed refinance attempts in 2012, both of which were caused by a false FORECLOSURE statement in DU Findings reports, Plaintiffs were forced to pay higher interest on their home loan than they were legitimately qualified and pre-approved for by both Nations Choice Mortgage and Amerisave Mortgage Corporation.

8.      Plaintiffs have suffered great mental and emotional stress and distress because of Fannie Mae's repeated representations to Plaintiffs' prospective lenders that the Zabriskies had a FORECLOSURE on their former PNC mortgage when that representation is simply not true.

**H.      DEFENDANT'S CONTENTIONS OF DISPUTED FACT**

1.      Fannie Mae is a government-sponsored enterprise chartered by Congress in 1938 to make home ownership more accessible for low- and middle-income Americans. Fannie Mae's public mission is to provide liquidity and stability in the mortgage market.

2.      By its charter, Fannie Mae operates exclusively in the secondary mortgage market and engages in business activities authorized by its Charter, 12 U.S.C. § 1719(a)(2)(B).

3.      Fannie Mae fulfills its mission by purchasing loans from mortgage lenders who issue mortgages to individuals in the primary mortgage market and guaranteeing mortgage-related securities comprised of those loans.

4.      By purchasing loans from mortgage lenders who issue mortgages to individuals in the primary mortgage market and guaranteeing mortgage-related securities comprised of such loans, Fannie Mae becomes responsible for the credit risk of loans made in the primary market by lenders directly to homeowners.

5.      Fannie Mae's transactions in the secondary market free up the lenders' capital so that they can make more loans to prospective homeowners in the primary market, with the net effect of increasing credit availability for prospective homeowners.

6.      Fannie Mae is not obligated to buy any particular loan—the decision of whether to commit its capital to particular loans remains solely in its discretion, and neither a lender nor a borrower have any right to force Fannie Mae to set its underwriting standards in any particular way or to authorize Fannie Mae to purchase a loan from a lender.

7.      Fannie Mae's risk tolerances – that is, the criteria that determine the types of loans that may be sold to Fannie Mae and on what terms – are critical to Fannie Mae successfully achieving its public mission, and these risk tolerances are determined by Fannie Mae in consultation with FHFA.

8.      To help lenders identify the loans Fannie Mae will agree to purchase before a lender actually delivers a loan for purchase, Fannie Mae has developed a comprehensive set of guidelines and requirements to govern whether it will buy a particular loan from a lender.

9.      These guidelines and requirements are set forth in an approximately 1300-page document known as "The Selling Guide," which is publicly available, including for free on the internet and from a variety of other sources.

10.     These guidelines and requirements represent Fannie Mae's credit risk policy and other loan purchasing criteria—that is, whether Fannie Mae will be willing to take the credit risk for a particular loan by purchasing or guaranteeing it (and thereby bearing the risk of borrower non-payment).

11.     Lenders can evaluate loan applications directly against the requirements of

the Selling Guide.  This sort of direct review of a loan against the Selling Guide's requirements is often referred to as "manual underwriting."

12.     The Selling Guide informs lenders of Fannie Mae's credit risk policies and helps lenders to determine on their own whether Fannie Mae will buy a loan.  Fannie Mae believes that increasing awareness of which loans Fannie Mae will be willing to buy provides certainty to lenders and encourages the making of more mortgage loans.

13.     Lenders must submit an application and be approved before selling loans to Fannie Mae.

14.     Lenders who sell a loan to Fannie Mae using a manual underwriting process are required to make a series of representations and warranties upon delivery of the loan to Fannie Mae, including representations and warranties that relate to the underwriting of the loan.

15.     To make it even easier for approved lenders to determine whether a particular loan will be purchased by Fannie Mae, Fannie Mae created a software application in 1995 called "Desktop Underwriter," or "DU."

16.     Lenders that are approved to sell loans to Fannie Mae can but are not required to license the DU software application.

17.     To the extent possible and consistent with Fannie Mae's credit risk standards, lenders can use the DU automated software application to determine whether a particular loan satisfies the requirements of the Selling Guide.

18.     Rather than perform a manual review of a borrower's loan application and credit information against the Selling Guide requirements, lenders that license DU can obtain information about borrowers and enter it into DU to determine—before a loan is made—whether Fannie Mae will buy the loan from them, and to do so by using a software application rather than manually underwriting the loan.

19.     The lender (not Fannie Mae) collects information directly from the prospective borrower. This includes information about the borrower (such as information relating to income, existing assets and debts, etc.) and the property that is the subject of

the loan.  Fannie Mae is not involved in the process of collecting information from a prospective borrower —it has no contact with the borrowers as part of this process and does not assemble any information about them.

20.     Desktop Underwriter uses a machine-readable, data version of the tri- merge report, not the easy-to-read version that consumers can request from a consumer reporting agency or the print version.  Lenders and consumer reporting agencies provide the data that DU relies on.

21.     If the loan application information entered into DU by the lender falls within the Selling Guide's guidelines, the DU Findings include a recommendation of "Approve/Eligible," meaning that if the lender delivers the loan to Fannie Mae, Fannie Mae will purchase it as a DU loan and will grant the lender a limited waiver of certain representations and warranties that the lender would otherwise be required to make at delivery.

22.     Because DU is an automated software application, it uses a machine-readable, data version of the tri-merge report, not the easy-to-read version that consumers can request from a consumer reporting agency or the print version.

23.     DU provides a recommendation based on an automated application of the applicable Selling Guide requirements to the data provided by the lender.

24.     The DU software depends entirely on the data provided by the lenders and consumer reporting agencies.

25.     Not all loans eligible for purchase by Fannie Mae can be underwritten using the DU software application; because DU is an automated process, there are limits on what it can do—it is not intended to be, and never will be, a complete substitute for manual application of the Selling Guide for loans that cannot be underwritten through the automatic application of rules to data.

26.     Fannie Mae-approved lenders subscribe to DU by entering into a Software Subscription Agreement with Fannie Mae that sets forth the respective roles of Fannie Mae (the licensor) and a lender (the licensee).

27.     The DU application itself is accessed through a user interface on www.FannieMae.com or through an integrated third-party or proprietary loan origination system.

28.     The lender obtains a consumer report on the prospective borrower from an approved third-party consumer reporting agency that takes data from the three national large credit bureaus (Equifax, TransUnion and Experian) and then "merges" that information into a single report—often referred to as a "tri-merge report."

29.     The lender must have its own agreement to purchase tri-merge reports from an eligible consumer reporting agency.

30.     The lender pays the consumer reporting agency directly, and pays none of that money to Fannie Mae.

31.     After entering all required information and obtaining a tri-merge report, the lender can underwrite the loan casefile through DU; the lender does so by causing DU to generate the DU Findings.

32.     When the loan casefile is underwritten through DU, the rules coded into the DU application are applied against the information and other data in the loan casefile (including the data in the tri-merge consumer report) to reach an overall indication as to whether Fannie Mae will buy the loan if the loan is delivered to it.

33.     The software generates a series of messages and text that is placed into the DU Findings based on the presence or absence of data points in the information provided by the lender.  It is a purely data-driven process.

34.     It is the software application itself that generates the DU Findings. The DU Findings are generated by the lender to inform lenders whether a loan is eligible for delivery to Fannie Mae, with a waiver of the representations and warranties that otherwise would be required upon delivery.

35.     None of the data about the specific borrower used to generate the recommendation is provided by Fannie Mae—it instead all comes from the lender-provided data in the loan application and the tri-merge report.

36.     At the point when a lender chooses to deliver a loan for purchase, it can notify Fannie Mae of the DU file number.

37.     If a lender chooses to deliver a loan for purchase and notifies Fannie Mae of the DU file number, and if the DU Findings previously generated by the lender returned an "Approve" recommendation, the lender gets a limited waiver of the usual representations and warranties that it would otherwise be required to make upon delivery of the loan.

38.     Essentially, this waiver permits a lender to deliver the loan without having to represent and warrant that the loan meets the Selling Guide criteria; at the point of delivery, the DU "Approve" recommendation substitutes for this otherwise required representation and warranty.

39.     In situations where the Selling Guide requirements cannot be applied in an automated manner, DU informs the lender that it remains free to "manually underwrite" the subject loan.

40.     When a lender manually underwrites a loan, the lender must represent and warrant that the mortgage loan complies with the requirements of the Selling Guide with regard to the mortgage loan's eligibility for delivery to Fannie Mae in order for Fannie Mae to purchase the loan.

41.     One consideration the Selling Guide requires lenders to assess when evaluating whether Fannie Mae will purchase a particular loan is the presence of "significant derogatory events" in a borrower's credit history.

42.     A previous foreclosure and a preforeclosure or "short sale" are examples of such "significant derogatory events" in a borrower's credit history.

43.     When a potential borrower has experienced a foreclosure, Fannie Mae's Selling Guide has prescribed a waiting period of seven years from the foreclosure before a lender may sell that borrower's loan to Fannie Mae.

44.     When a loan is manually underwritten, the lender, who is in direct contact with the borrower and who can obtain whatever data and information it likes from the

borrower, is required to determine whether a prior mortgage transaction resulted in foreclosure.  It can do so in any number of ways—speaking with the borrower, reviewing court papers or correspondence from the prior lender or entity that serviced the loan, reviewing transaction documents, etc.

45.     During the relevant time period, the Selling Guide provided that DU would identify the presence of a foreclosure by analyzing the "Manner of Payment" ("MOP") Code rating, which is a field in a borrower's credit report obtained by a lender.

46.     The MOP Code is a field on the tri-merge report that identifies whether the account is current or past due—it is a rating system established by the credit reporting industry, not Fannie Mae.

47.     The Selling Guide provided that where the tri-merge report obtained by the lender includes a mortgage tradeline reported with a MOP Code of "8" or "9," DU will identify a foreclosure, and the loan will be "Referred with Caution."

48.     DU's identification of a foreclosure and indication that the loan will be "Referred with Cation" when a tri-merge report includes a mortgage tradeline reported with a MOP Code of 8" or "9" was dictated by Fannie Mae's credit risk policy, which was to refuse to allow lenders to rely solely on DU to determine whether a loan issued to borrowers who have mortgage trade lines with these MOP Codes would be eligible for sale to Fannie Mae.  The standards used by DU to identify a foreclosure are published in the Selling Guide.

49.     Credit reports do not include a specific indicator of whether a short sale has taken place in the borrower's credit history, as no such code exists; thus, DU cannot identify with certainty whether a short sale has taken place.

50.     Lenders working with the plaintiffs obtained at least eight DU Findings in late 2012 through the summer of 2013, five of which resulted in an "Approve/Eligible" recommendation, and three that resulted in a "Refer with Caution" recommendation.

51.     Each of the three DU Findings with a Refer with Caution recommendation included the following statement:  "Desktop Underwriter has identified a deed-in-lieu of

foreclosure that was reported within the last two years or a foreclosure that was reported within the last seven years.  This loan is ineligible for delivery to Fannie Mae."

52.     Each of these three DU Findings also included the following statement, immediately following a list of the tradelines that "Desktop Underwriter has identified" as a "FORECLOSURE": This loan casefile is ineligible for delivery as a DU loan because it received a Refer with Caution/IV recommendation.  However, any loan casefile that receives a Refer with Caution/IV recommendation may be manually underwritten in accordance with the Fannie Mae Selling guide.  Refer to the Selling Guide for additional information.

53.     In each of the DU Findings that the Zabriskies' lenders generated that included a recommendation of "Refer with Caution," the tri-merge report obtained by the lender included one or more mortgage tradelines reported with a MOP Code of "9."

54.     In each of the DU Findings that the Zabriskies' lenders generated that included a recommendation of "Approved," the tri-merge report obtained by the lender did not include any mortgage tradelines reported with a MOP Code of "9."  Instead, these tri-merge reports reported these accounts (the very same accounts that were reported with a MOP code of "9" in other tri-merge reports) with a variety of MOP Codes, including "Unrated," "Current," and "5" (which stands for "120-150 Days Late").

55.     Plaintiffs' lenders knew that their previous home was not the subject of foreclosure proceedings. Plaintiffs knew their lenders had this information.

56.     Plaintiffs' lenders decided not to enter into re-finance transactions with them because they could not sell those loans to Fannie Mae as DU loans, and they were unwilling to manually underwrite a loan to Plaintiffs.

57.     The Zabriskies submitted a refinance application to Nations Choice (formerly Fisher Financial Group) for a conventional mortgage in the amount of $322,200 at a fixed interest rate of 3.625% for a 30-year term.  Case File No. 1080320922 was generated.

58.     The viewable credit report from Credit Plus that was part of this file shows

two PNC Bank accounts that are reported with an "R9" rating via Experian.  Both carry an identical "Remark" that states in pertinent part: "Account Paid For Less Than Full Balance; Charged Off Account."

59.     The Zabriskies did not obtain refinancing through Nations Choice so they submitted an application with Amerisave Mortgage Company ("Amerisave").  Case File No. 10800748826 was generated.  The refinancing was for a conventional mortgage in the amount of $320,000 at a fixed interest rate of 3.5% for a 30-year term.

60.     Case File No. 10800748826 contained a print-out of the viewable credit report as provided by Credco.  The viewable credit report from Credco shows a single PNC Bank account reported with an "M-9" rating via Experian.  This account includes the following comment: "Creditor Settled For Less Than Amount Due."

61.     Other than their mortgage, Plaintiffs had more than $50,000 of outstanding debt during the period they sought to refinance their mortgage.

62.     In July, 2012, Amerisave assured Kristin Zabriskie it could manually underwrite the loan if the DU Findings did not recommend that the loan would be eligible for purchase by Fannie Mae.

63.     Plaintiffs ultimately secured refinancing from PrimeLending in August 2013.

64.     In each of the DU Findings that the Zabriskies' lenders generated that included a recommendation of "Refer with Caution," the tri-merge report obtained by the lender included one or more mortgage tradelines reported with a MOP Code of "9."

65.     No court or jury has ever determined that Fannie Mae is a consumer reporting agency under the FCRA, and none of its regulators have either.

66.     Although Fannie Mae is not a consumer reporting agency, the DU Findings accurately reflected the principles of the Selling Guide and what Fannie Mae "identified" in the credit report information obtained by the lenders and used by them in DU.  Fannie Mae's procedures also were reasonable within the meaning of the Fair Credit Reporting Act and assured maximum possible accuracy of the information in the DU Findings in this

situation.

67.     The DU Findings relating to Plaintiffs did not contain any inaccuracies.

68.     Any information deemed to have been provided by Fannie Mae was not the cause of any harm to Plaintiffs.

**I.     ISSUES OF LAW IN CONTROVERSY.**

1.     Whether Fannie Mae is a "consumer reporting agency."

2.     Whether the DU Findings are "consumer reports."

3.     Whether Fannie Mae was negligent with respect to any duty to comply with 15 U.S.C. § 1681e(b).

4.     Whether Fannie Mae "willfully" violated the FCRA.

5.     Reasonable procedures:

   a.  Plaintiff: Whether, upon proof by Plaintiffs of their prima facie case, the burden shifts to Defendant to prove its affirmative defense that it "followed reasonable procedures to assure maximum possible accuracy" of the information it reported about Plaintiffs via its DU Findings reports.

   b.  Defendant: Whether Plaintiffs must prove as part of their prima facie case that Fannie Mae failed to follow reasonable procedures to assure maximum possible accuracy of the information reported about Plaintiffs in the DU Findings.

**J.     SEPARATE TRIAL ISSUES.**

**<u>Plaintiffs</u>:**

Plaintiffs believe the issue of attorneys' fees and costs should be bifurcated.  The FCRA entitles Plaintiffs to an award of their reasonable attorneys' fees and costs if they succeed in establishing that Defendant willfully and/or negligently violated any requirement of the FCRA.  *See* 15 U.S.C. § 1681n and o.  As the possibility of an award of attorneys' fees and costs cannot even arise until after a jury determination is made on the issue of liability, it is both advisable and feasible to bifurcate the issue of attorneys'

fees as to not confuse the jury and prejudice Plaintiffs.  Therefore, Plaintiffs ask the Court to bifurcate the issue of attorneys' fees and costs from the liability issues set for trial.

**Defendant:**

Defendant does not believe the issue of attorneys' fees and costs needs to be "bifurcated" because attorneys' fees and costs are not a trial issue to be presented to the jury, but rather are governed by the procedural rules; a prevailing party may file with the Court a bill of costs and/or a motion seeking an award of attorneys' fees within 14 days after final judgment. *See* LRCiv 54.1-54.2.

Defendant requests that evidence or argument of Fannie Mae's financial condition or other evidence relating to punitive damages should not be permissible unless the Court first determines Plaintiffs have made a prima facie case for punitive damages.

**K.   WITNESSES.**

**Plaintiffs:**

The following is a list of witnesses Plaintiffs **will** call at trial:

1. Kristin Zabriskie  – in person

a.   Summary of Intended Testimony:   Plaintiff will testify about her personal background. She will testify regarding her claims for relief, including the information Fannie Mae included in its Desktop Underwriter Findings report(s) about Plaintiffs, their attempts to correct the false and derogatory information being circulated about them, and Plaintiffs' efforts and experiences in trying to obtain mortgage financing during the relevant timeframe. She will testify regarding the exhibits she offers.   She will testify regarding the economic and non-economic damages Plaintiffs have suffered.

2. Richard (Cary) Zabriskie (Plaintiff) – in person

a.   Summary of Intended Testimony:  Plaintiff will testify about his personal background. He will testify regarding the economic and non-economic damages Plaintiffs have suffered, including the impact this ordeal has had on his wife, his marriage, and his family as whole, from a personal as well as a a financial standpoint.

3. Parshelle Brimhall – in person.

a.      Summary of Intended Testimony:  Ms. Brimhall will testify as to her personal observations as to the mental, emotional and physical impact this ordeal has had on Plaintiffs, namely her sister, Kristin Zabriskie.

4. Cyndi Danko – in person

a.      Summary of Intended Testimony: Ms. Danko is Fannie Mae's corporate designee.  She will testify as to Fannie Mae's Desktop Underwriter system, *i.e.*, how the system works, the fees generated from same, and how the system creates Desktop Underwriter Findings reports.  She will testify regarding the exhibits offered.  She will also testify as to the particulars of the various Desktop Underwriter Findings that were created as to Plaintiffs in the relevant timeframe.

5. Experian Information Solutions, Inc. (Mary Methvin) – via deposition

a.      Summary of Intended Testimony:  A corporate representative may testify as to the information contained in Plaintiffs' Experian credit report at all times relevant hereto, specifically that no foreclosure appears in Plaintiffs' credit history as reported by Experian.  The witness may also testify as to documents produced pursuant to a third party subpoena by Experian Information Solutions, Inc.

6. Evan D. Hendricks – in person

a.      Summary of Intended Testimony:  Mr. Hendricks is an expert witness. He will testify as to context regarding the consumer reporting industry, as well as the history, nature and purpose of credit reports and credit scores, the Fair Credit Reporting Act, and other matters addressed in his report and deposition. He will testify regarding the adequacy of Fannie Mae's practices and procedures to assure maximum possible accuracy within such context.

7. Stan V. Smith, PhD – in person

a.      Summary of Intended Testimony:  Dr. Smith is an expert witness.  He will testify as to the economic and non-economic losses suffered by Plaintiffs, and other matters addressed in his report and deposition.

The following is a list of witnesses Plaintiffs **may** call at trial:

1.  Nations Choice Mortgage (Ron Goetz) – in person

a.      Summary of Intended Testimony:   Mr. Goetz may testify as to documents produced pursuant to a third party subpoena by Nations Choice Mortgage. The witness may also testify as to Plaintiffs' application for mortgage financing, including the obtaining of one or more Desktop Underwriter Findings reports, and the subsequent denial of same in or around July 2012.

2.  Amerisave Mortgage Corporation (representative) – in person

a.      Summary of Intended Testimony:  A corporate representative may testify as to documents produced pursuant to a third party subpoena by Amerisave Mortgae Corpoation.  The witness may also testify as to Plaintiffs' application for mortgage financing, including the obtaining of one or more Desktop Underwriter Findings reports, and the subsequent denial of same in or around October 2012.

4.  Judith Landis (FNMA Corporate Designee) – via deposition

a.      Summary of Intended Testimony:  Ms. Landis is Fannie Mae's corporate designee.  She may testify as to Fannie Mae's role as a government-sponsored entity. She may also testify about the fees generated by and costs associated with operation of Fannie Mae's Desktop Underwriter system.

5.  Plaintiffs reserve the right to call any witness on Defendant's Witness List.

**Defendant:**

**Witnesses likely to be called at trial:**

1.      Cyndi Danko

a.      Summary of Intended Testimony:  Ms. Danko is expected to testify about Fannie Mae's legislative and business purposes and its position in the mortgage

industry, Fannie Mae's credit risk policies, the software application products Desktop Underwriter ("DU") and Desktop Originator ("DO"), the DU Findings, Fannie Mae's Selling Guide, the Selling Guide and DU's treatment of foreclosure and pre-foreclosure derogatory events, and Fannie Mae's credit risk policies.

2.      Jude Landis

a.      Summary of Intended Testimony: Ms. Landis is expected to testify about Fannie Mae's legislative and business purposes and its position in the mortgage industry, Fannie Mae's credit risk policies, and DU.

3.      Kristin Zabriskie

a.      Summary of Intended Testimony:  Kristin Zabriskie is expected to testify about her attempts to refinance, including her communications with the prospective lenders/brokers, her credit history, her familiarity with the mortgage industry, her requests for changes to her credit report, and her alleged damages.

4.      Richard Zabriskie

a.      Summary of Intended Testimony:  Richard Zabriskie is expected to testify about his and Kristin's attempts to refinance, his credit history, and his alleged damages.

5.      Evan Barnett

a.      Summary of Intended Testimony:  Mr. Barnett is an expert witness and is expected to testify as described below in Part L.

**Witnesses unlikely to be called at trial:**

1.      Representative of Equifax Information Services, LLC

a.      Summary of Intended Testimony:  If called, the representative is expected to testify about the manner in which Equifax receives information regarding real estate mortgage loans from furnishers of mortgage account information, and the manner in which Equifax then reports such information in credit reports and consumer disclosures, including without limitation how Equifax's electronic systems interpret the furnisher input values into corresponding Equifax output codes.

1       2.     Representative of Trans Union, LLC

2            a.     Summary of Intended Testimony: If called, the representative is

3  expected to testify about the manner in which Trans Union receives information regarding

4  real estate mortgage loans from furnishers of mortgage account information, and the

5  manner in which Trans Union then reports such information in credit reports and

6  consumer disclosures, including without limitation how Trans Union's electronic systems

7  interpret the furnisher input values into corresponding Trans Union output codes.

8       3.     Representative of NationsChoice Mortgage

9            a.     Summary of Intended Testimony: If called, the representative is

10  expected to testify about Plaintiffs' credit application(s) and attempts to refinance with

11  NationsChoice, communications with Plaintiffs, communications between NationsChoice

12  and credit reporting agencies, NationsChoice's use of DO, and NationsChoice's credit

13  decision(s).

14       4.     Representative of Amerisave Mortgage Corporation

15            a.     Summary of Intended Testimony: If called, the representative is

16  expected to testify about Plaintiffs' credit application(s) and attempts to refinance with

17  Amerisave, communications with Plaintiffs, communications between Amerisave and

18  credit reporting agencies, Amerisave's use of DU, and Amerisave's credit decision(s).

19       5.     Defendant reserves the right to call any witness on Plaintiff's Witness List.

20  **L.    EXPERTS.**

21  **Plaintiffs:**

22       (1)     Evan D. Hendricks:  Mr. Hendricks is one of the foremost experts in the

23  nation on the Fair Credit Reporting Act and privacy.  This case centers are maintaining the

24  accuracy of consumer credit information, the FCRA's provisions to assure such accuracy,

25  and the problems that result when false information is released.  Mr. Hendricks' testimony

26  is highly reliable and directly relevant in helping the jury understand these issues.  It is

27  based on more than 25 years of research and work in the fields of credit reporting and

28  privacy, along with review of thousands of pages of materials not available to the general

1   public.  As such, Mr. Hendricks has been found qualified as an expert witness on these

2   issues by State and Federal courts across the country.  He has also routinely been retained

3   and/or consulted as an expert or asked to provide testimony by the Federal Trade

4   Commission ("FTC"), the Social Security Administration and Congress on numerous

5   occasions regarding credit reporting and privacy issues.

6           (2)     Stan V. Smith, Ph.D.:  Dr. Smith is a renowned economist who has been

7   qualified to testify in State and Federal courts nationwide over 1,000 times.  His

8   qualifications as an expert to provide helpful direction to the jury as to the hard economic

9   losses at issue here is above reproach.  In this regard, he is expected to testify as to the

10  additional cost to the Zabriskies of not being able to secure refinancing at the terms

11  offered because of the false information circulated about them by Fannie Mae.

12  Additionally, Dr. Smith will provide helpful testimony as to how to place an economic

13  value on the non-economic injuries suffered by Plaintiffs such as time lost and reduction

14  in value and enjoyment of life.

15  **Defendant:**

16          1.      Evan Barnett.

17                  a.      Summary of Proposed Testimony: Mr. Barnett is expected to testify

18  about certain aspects of the credit reporting industry and the business practices of Fannie

19  Mae as they relate to the Plaintiffs' allegations.  He will also testify about the operation of

20  the credit reporting industry, including FCRA compliance issues and issues relating to the

21  manner in which the specific underlying derogatory credit event (preforeclosure sales or

22  short sales) are treated throughout the credit reporting process. He will also testify about

23  how Fannie Mae's conduct did not cause any harm to Plaintiffs.  If Evan Hendricks is

24  permitted by the Court to testify at trial, Mr. Barnett will provide rebuttal testimony in

25  response to Mr. Hendricks' testimony.

26                  b.      Summary of Qualifications: Mr. Barnett has more than 35 years of

27  business and professional experience in a variety of management positions, with at least

28  15 years directly related to managing a consumer reporting agency.  His most recent

position was President of the background screening businesses of CoreLogic, Inc., a leading provider of consumer, financial and property information, analytics and services to business and government. He also had indirect management responsibility of the other divisions of CoreLogic, including CoreLogic Credco – the nation's largest provider of tri-merge consumer reports.  The businesses over which he had direct and indirect involvement while at CoreLogic included businesses in which CoreLogic was acting as a consumer reporting agency and selling consumer reports, and included businesses that were covered by the FCRA.  He is thus extremely familiar with the provisions of the FCRA, including how they impact day-to-day business activities and conduct and how institutions in the consumer reporting industry (including furnishers, the nationwide credit bureaus, and other consumer reporting agencies) comply with the FCRA.  Mr. Barnett has also been active in industry organizations throughout his career in the screening industry, and was a member of the Consumer Data Industry Association, which is a trade association comprised of entities in the credit reporting industry, including CoreLogic, the three major nationwide credit bureaus (Equifax, Experian, and TransUnion) and other consumer reporting agencies.

**M.      EXHIBITS AND DEPOSITIONS.**

*See attached Exhibit Lists and Deposition Designation Charts.*

Plaintiff:  On February 8, 2016, the parties exchanged preliminary Exhibit Lists. On or around February 16, 2016, Defendant served Plaintiffs with Fannie Mae's updated Preliminary Exhibit List.  Plaintiffs reviewed same, and served their objections to Fannie Mae's Exhibit List later that same day.  After 6 pm (MST) yesterday, February 21, 2016, Fannie Mae served Plaintiffs with a new updated Preliminary Exhibit List which is substantially different than either previous version, with a number of proposed exhibits added, others subtracted, and the entire previous numbering system completely rearranged.  As Plaintiffs have been precluded from having ample opportunity to review this new updated Exhibit List with sufficient time to make appropriate objections by the filing of this Joint Proposed Pretrial Order, they have no choice but to object to each and

every exhibit on Defendant's current Exhibit List pursuant to Fed.R.Civ.Pro. 26(a)(3)(A)(iii), 26 (a)(3)(B), and 37(c).

Defendant:  Rather than wasting the Court's time recounting the ways in which Plaintiffs' recitation above is incorrect or how Plaintiffs' conduct stalled the parties' progress on finalizing the pre-trial documentations, Defendant states that it has no problem if Plaintiffs finalize their objections to Defendants' exhibits over the next week before the Pretrial Conference.

## N.	MOTIONS IN LIMINE AND REQUESTED EVIDENTIARY RULINGS.

**Plaintiffs' Motions *in Limine*:**

1.	Plaintiffs' Motion *In Limine* #1 To Exclude Reference To Attorneys' Fees And Costs, And Motion To Bifurcate Issue For Later Date [Doc. 135].

2.	Plaintiffs' Motion *In Limine* #2 To Exclude Tri-Merge Credit Reports [Doc. 136]

3.	Plaintiffs' Motion *In Limine* #3 To Exclude Testimony Of Evan T. Barnett [Doc. 137]

4.	Plaintiffs' Motion *In Limine* #4 To Exclude Evidence Surrounding Certain Proposed Exhibits That Have Not Properly Been Disclosed, Or That Are Otherwise Inadmissible [Doc. 138]

5.	Plaintiffs' Motion *in Limine* #5 to Exclude Expert Opinion Testimony of Fannie Mae Fact Witnesses [Doc. 139]

**Plaintiffs' Objections to Defendant's Anticipated Testimony and/or Exhibits:**

Defendant has identified a number of potential exhibits that Plaintiffs believe have no basis for admission under the Federal Rules of Evidence.  Plaintiffs have filed two (2) separate motions *in limine* addressing the specific objections as to these documents.  *See* Plaintiffs' Motion *In Limine* #2 To Exclude Tri-Merge Credit Reports [Doc. 136] and Plaintiffs' Motion *In Limine* #4 To Exclude Evidence Surrounding Certain Proposed Exhibits That Have Not Properly Been Disclosed, Or That Are Otherwise Inadmissible

[Doc. 138].  Additionally, Plaintiffs have lodged objections to the specific potential exhibits identified on Defendant's Proposed Exhibit List.

With respect to witnesses, Plaintiffs also object to any testimony of Evan Barnett, a purported "expert" witness who Defendant seeks to offer expert testimony as to the legal question of whether Fannie Mae is a "consumer reporting agency" under 15 U.S.C. § 1681a(f), whether DU Findings reports are "consumer reports" under 15 U.S.C. § 1681a(d), and generally whether Fannie Mae should be subject to the FCRA in general. Plaintiffs' object to Mr. Barnett being allowed to offer any testimony at trial and have filed a motion in limine in this regard as well.  *See* Plaintiffs' Motion In Limine #3 To Exclude Testimony Of Evan T. Barnett [Doc. 137].

**Defendant's Motions *in Limine*:**

1.    Federal National Mortgage Association's Motion *In Limine* No. 1 to Exclude Evidence of Defendant's Financial Condition [Doc. 140].

2.    Federal National Mortgage Association's Motion *In Limine* No. 2 to Exclude the Testimony of Stan V. Smith [Doc. 141].

3.    Federal National Mortgage Association's Motion *In Limine* No. 3 to Exclude the Testimony of Evan D. Hendricks [Doc. 142].

4.    Federal National Mortgage Association's Motion *In Limine* No. 4 to Exclude Testimony of Mary Methvin [Doc. 143].

5.    Federal National Mortgage Association's Motion *In Limine* No. 5 to Exclude Evidence of DU Findings Regarding Non-Parties [Doc. 144].

**Defendant's Objections to Plaintiffs' Anticipated Testimony:**

As set forth in detail in its motions in limine, Fannie Mae objects to (1) any testimony by Evan Hendricks pursuant to Federal Rule of Evidence 702; (2) testimony of Stan Smith relating to Plaintiffs' "loss of enjoyment of life" and the value of time allegedly spent by Kristin Zabriskie attempting to secure mortgage refinancing and working on this lawsuit, pursuant to Federal Rule of Evidence 702; and (3) testimony by

1  Mary Methvin regarding Experian's internal credit reporting procedures and treatment of

2  foreclosures in internal Experian documents and Experian credit reports, pursuant to

3  Federal Rules of Evidence 401 and 403.

4       Fannie Mae has also separately identified objections to certain portions of

5  Plaintiffs' deposition designations of Cyndi Danko, Judith Landis, Mary Methvin, and

6  Shawn Parshelle Brimhall.  Among other objections noted in the deposition designation

7  charts, Fannie Mae objects to Plaintiffs' attempt to introduce as evidence certain sections

8  of the designated deposition testimony in which Mary Methvin purports to testify as a

9  Rule 30(b)(6) witness despite her lack of personal knowledge.

10 **O.    PROBABLE LENGTH OF TRIAL.**

11       Plaintiffs anticipate the length of trial to require between five and eight trial days.

12 Defendant anticipates the probable length of trial to be four to five trial days.

13 **P.    TRIAL DATE.**

14       The trial has been scheduled to commence on March 8, 2016.

15

16 **Q.    PROPOSED JOINT STATEMENT OF THE CASE**

17       The plaintiffs in this case, Kristin and Richard Zabriskie, are a married couple who

18 live in Gilbert, Arizona.

19       The defendant is Federal National Mortgage Association, commonly known as

20 Fannie Mae. Fannie Mae does not make loans to consumers. Rather, Fannie Mae

21 purchases home loans, also called mortgages, made by lenders.  Fannie Mae's criteria for

22 purchasing loans are set forth in written guidelines called the Selling Guide, which is

23 publicly available. Fannie Mae has also developed Desktop Underwriter – or DU – which

24 lenders can use to determine automatically if Fannie Mae will purchase a prospective

25 loan, and the terms on which it will do so.

26       In 2012, the Zabriskies applied to refinance their mortgage.  The Zabriskies claim

27 they were unable to do so because of false information in a "DU Findings" report

28 provided to their prospective lenders by Fannie Mae.   The Zabriskies contend that Fannie

1   Mae is a "consumer reporting agency," and that the DU Findings are "consumer reports,"

2   within the meaning of the Fair Credit Reporting Act.  Whenever a consumer reporting

3   agency prepares a consumer report, the Fair Credit Reporting Act requires it to follow

4   reasonable procedures to assure the maximum possible accuracy of the information

5   concerning the individual about whom the report relates.  It is Plaintiffs' position that

6   Fannie Mae failed to follow reasonable procedures to assure the maximum possible

7   accuracy of the information in the DU Findings by stating that the Zabriskies had a

8   foreclosure when they did not. Plaintiffs claim that they could not get approval for their

9   refinance because of this false foreclosure information, and they have suffered both

10  financial and emotional distress damages as a result.

11          Fannie Mae disputes that it is a "consumer reporting agency" or that the "DU

12  Findings" constitute a consumer report.  Instead, they contend that DU is a software

13  application used by lenders who generate the DU Findings on their own, after the lenders

14  obtain consumer credit information about the borrower from other sources, but not from

15  Fannie Mae.  Fannie Mae also contends that the purpose of DU is to permit a lender to

16  determine whether Fannie Mae will buy the loan from the lender, and on what terms, not

17  to provide consumer credit information.  Fannie Mae denies that information in the DU

18  Findings was inaccurate and contends that its procedures were reasonable.  Fannie Mae

19  also contends that the lenders did not deny the Zabriskies' refinance applications because

20  of any inaccurate information contained on the DU Findings, but instead because Fannie

21  Mae's credit risk policy prevented Fannie Mae from agreeing to purchase the loans from

22  the lenders unless the lenders did a more thorough underwriting process.  The lenders

23  would not refinance the Plaintiffs' loans without this agreement.  Fannie Mae contends

24  that the Zabriskies did not sustain any injury as a result of the information in the DU

25  Findings that Plaintiffs claim was inaccurate, and that Plaintiffs' claims for damages is

26  inflated and overstated.

27

28

**FOR A JURY TRIAL**

**Q-2.   STIPULATED PROPOSED STATEMENT OF THE CASE, JURY INSTRUCTIONS, VOIR DIRE QUESTIONS, JUROR QUESTIONNAIRES, IF ANY, FORMS OF VERDICT, AND TRIAL MEMORANDUM OF LAW** shall be shall be filed with this proposed order.  Instructions which are not agreed upon shall include citation to authority and be filed and served on each party by the date of the Pretrial Conference. Brief objections (not to exceed one page per instruction) shall be filed and served by the date of the Pretrial Conference.

Plaintiff:  Plaintiffs' objections to Defendant's special and modified jury instructions, eleven (11) special and three (3) modified which were only presented to Plaintiffs for first review after 8 pm yesterday, February 21, 2016, will be served on Defendant before the Pretrial Conference on February 29, 2016, in accordance with this Court's standing order.

Defendant:  As explained more fully in the Joint Jury Instructions, Plaintiffs' contentions are erroneous.  Again, rather than wasting the Court's time detailing Plaintiffs' inaccurate representations, Defendant does not oppose Plaintiffs' request for additional time to file their objections.

**R.    MISCELLANEOUS.**

Joint Requests:

1.      The parties believe that a number of matters addressed in this Joint Proposed Pretrial Order and accompanying documentation will need to be supplemented and/or revised in the event the Court grants all or a portion of either Defendant's motion for summary judgment and/or Plaintiffs' motion for partial summary judgment.  The parties will work cooperatively to accomplish this additional work as expeditiously as possible.

Defendant's Requests:

1.      Fannie Mae requests that documents introduced during trial which were marked as confidential shall be sealed rather than included in the public record.

Plaintiffs intend to object to this request that exhibits at trial must be sealed.

2.      Due to the personal and health-related family commitments of one Fannie Mae witness who also is on Plaintiffs' witness list, Fannie Mae would like to discuss at the pretrial conference a scheduling issue related to that witness's trial testimony.

Plaintiffs do not object to this request to discuss at the pretrial conference whether an appropriate schedule could be determined to accommodate Fannie Mae's witness.

3.      Fannie Mae contends that, as a matter of law, it is not a "consumer reporting agency" and the DU Findings about Plaintiffs' applications are not "consumer reports" as defined by the FCRA.  In light of the Court's orders and current procedural posture of this action, Defendants have submitted various documents as exhibits to this JPTO that provide instruction regarding whether, under the facts of this case, Fannie Mae and the DU Findings meet the applicable statutory definitions.  By providing these proposed documents, Fannie Mae does not accept or contend that these are properly factual issues to be decided by a jury, or waive any arguments regarding these issues.

## S.      MODIFICATION OF ORDER.

**The Court may modify the Final Pretrial Order as it deems just and proper to prevent manifest injustice or for good cause shown at the trial of the action or prior thereto upon good faith application of counsel for either party or motion of the Court**.

Dated this 1st day of March, 2016.

_____
Susan R. Bolton
United States District Judge

APPROVED AS TO FORM AND CONTENT

DATED this 22nd day of February, 2016.


By: _/s/ Gregory J. Marshall_____

    Gregory J. Marshall (ASB #019886)
    Erica J. Stutman (ASB #029664)
    SNELL & WILMER L.L.P.
    One Arizona Center
    400 E. Van Buren, Suite 1900
    Phoenix, Arizona  85004-2202

    Michael B. Miller (pro hac vice)
    MORRISON & FOERSTER LLP
    250 West 55th Street
    New York, NY  10019-9601

    Angela E. Kleine (*pro hac vice*)
    Ben Patterson (*pro hac vice*)
    Morrison & Foerster LLP
    425 Market Street
    San Francisco, California  94105-2482

    *Attorneys for Defendant*
    *FEDERAL NATIONAL MORTGAGE*
    *ASSOCIATION*

By: _/s/ Paul B. Mengedoth_____

    Paul B. Mengedoth (018507)
    MENGEDOTH LAW PLLC
    20909 N. 90th Place, Suite 211
    Scottsdale, AZ 85255

    Sylvia A Goldsmith (Pro Hac Vice)
    GOLDSMITH & ASSOCIATES, LLC
    20545 Center Ridge Rd., Suite 120
    Rocky River, OH 44116

    *Attorneys for Plaintiffs Richard and*
    *Kristin Zabriskie*