UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Richard and Kristin Zabriskie, )
                               )
            Plaintiffs,        )
                               ) **CV13-02260-PHX-SRB**
                               ) Phoenix, Arizona
        vs.                    ) February 29, 2016
                               ) 10:01 a.m.
Federal National Mortgage      )
Association and Federal        )
Housing Finance Agency As The  )
Conservator Of Federal         )
National Mortgage Association, )
                               )
            Defendant.         )
_____)

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

PRETRIAL CONFERENCE

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

```
 1                    A P P E A R A N C E S

 2      For the Plaintiffs:

 3              GOLDSMITH & ASSOCIATES LLC
                By:  Sylvia Antalis Goldsmith, Esq.
 4              20545 Center Ridge Road, Suite 120
                Rocky River, OH  44116
 5
                MENGEDOTH LAW PLLC
 6              By:  Paul B. Mengedoth, Esq.
                20909 North 90th Street, Suite 211
 7              Scottsdale, AZ  85255

 8

 9      For the Defendant Federal National Mortgage Association:

10              SNELL & WILMER LLP - Phoenix, AZ
                By:  Gregory J. Marshall, Esq.
11                   Erica J. Stutman, Esq.
                One Arizona Center
12              400 East Van Buren
                Phoenix, AZ  85004-2202
13
                MORRISON & FOERSTER LLP - NEW YORK, NY
14              By:  Michael B. Miller, Esq.
                250 W. 55th Street, 24th Floor
15              New York, NY  10019-9601

16              MORRISON & FOERSTER LLP - San Francisco
                By:  Ben Patterson, Esq.
17                   Angela E. Kleine, Esq.
                425 Market Street
18              San Francisco, CA  94105-2482

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1              P R O C E E D I N G S

2       (Called to the order of court at 10:01 a.m.).

3              THE COURT:  Good morning.  Please sit down.

4              THE CLERK:  Civil case 13-2260.  Richard Zabriskie

5    and others v. Federal National Mortgage Association and

6    others.  Time set for pretrial conference.

7              Counsel, please announce your presence for the

8    record.

9              MR. MENGEDOTH:  Good morning, Your Honor.  Paul

10   Mengedoth and Sylvia Goldsmith on behalf of the plaintiffs.

11             MR. MARSHALL:  Good morning, Judge.  Greg Marshall

12   and Erica Stutman on behalf of Fannie Mae and also with us is

13   Mr. Miller, Mike Miller, Angela Kleine, and Ben Patterson.

14             THE COURT:  This is the time set for our Final

15   Pretrial Conference and I will start with the bad news.

16             The bad news is that I am presently in a criminal

17   trial that will not be concluded by March 8th.  I don't know

18   exactly when it will be concluded.  It is scheduled to go for

19   three more weeks.  But based on what the lawyers have said, it

20   may conclude by the end of next week or the beginning of the

21   week following.

22             So we are scheduled with the jury to go through March

23   18th, but I think we may finish a little bit sooner, so we

24   will have to talk about what you want to do about our

25   unavailability on March 8th in a little bit, but first, I want

1    to talk to you about what has changed in light of the Court's

2    ruling on summary judgment, what motions in limine are no

3    longer at issue because of that ruling, whether or not the

4    trial -- the estimated length of the trial has been reduced as

5    a result of the ruling, and possibly ruling on other motions

6    in limine.

7         And then when we know those things, we can talk about

8    when we might be able to try the case or whether you would

9    like for me to find another judge who might be available to

10   try the case.

11        So I want to go through the pending motions in limine

12   and get your agreement or disagreement as to which ones are no

13   longer relevant.

14        First, I just wanted to mention that without regard

15   to the summary judgment ruling, plaintiffs had filed their

16   Motion in Limine No. 1 to exclude reference to attorneys' fees

17   and costs and to bifurcate the issue for a later date which

18   I'm showing it as unopposed.

19        Attorneys' fees and costs are not a trial issue.

20   They're a court issue.  They would never have been a trial

21   issue in any event, so I don't think that requires any further

22   discussion.

23        Plaintiff's Motion in Limine No. 3 asked to exclude

24   the testimony of Evan Barnett.  And I understand that Evan

25   Barnett was or is a defense expert that was going to talk

 1   about whether or not Fannie Mae qualifies as a credit

 2   reporting agency.

 3          And is there any reason why this is not moot at this

 4   point?

 5          MR. MILLER:  It's -- Mike Miller for Fannie Mae.

 6          Mr. Barnett was going to describe certain aspects of

 7   the consumer reporting, the credit reporting industry.  One of

 8   the things that related to was whether Fannie Mae was a CRA,

 9   but it also relates to the issue of accuracy and reasonable

10   procedures which is still in the case.

11          So his testimony is likely to be shorter than it

12   otherwise would have been, but he is still testifying as to

13   issues that are relevant in the case.

14          THE COURT:  And with that limitation, is the

15   plaintiff still urging the motion with respect to Mr. Barnett?

16          MS. GOLDLSMITH:  Excuse me, Your Honor.

17          Yes.  In our motion we do put the primary emphasis on

18   his offering a legal opinion.  But referring you to page 7 of

19   our motion, we did comment that there were two additional

20   areas that we thought that he might be still sought to offer

21   testimony and we do not believe that he has any qualifications

22   whatsoever.

23          I think we would also add, we're unclear as to where

24   this argument is coming from or where this position is coming

25   from that he is going to talk about "reasonableness."  The

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

1   only opinion that he's offered is that they accurately

2   followed their own Selling Guide.  We don't see the relevance

3   of that.

4           And so to that extent, we would continue to press our

5   motion that his testimony here is not appropriate.

6           THE COURT:  I noticed that on page 7 when you

7   referred to what you thought might be some additional opinions

8   that he might have that you referenced, things that he said in

9   his deposition, and I want to be clear about how I approach

10  the scope of the opinions that an expert is permitted to offer

11  at trial.

12          That scope is limited by the opinions that were

13  proffered in their expert report.

14          During a deposition you could ask the expert's

15  opinion about anything.  And whether he was qualified or not,

16  he might well offer an opinion, but that does not make that

17  opinion one for which he's proffered by the party who has

18  retained him.

19          And so when I look -- and I'm just paging through it

20  quickly here -- when I look at what the scope of his potential

21  opinions can be at trial, they have to be fairly encompassed

22  within the opinions that he offered in his expert report.  And

23  I'm not seeing that he has an actual little -- I'm looking to

24  see if he had a summary of what his opinions were.

25          So to the extent it was just something that he opined

1   on at deposition, if it's not in his report, it's not part of

2   what he'll be able to say, so.

3         MR. MILLER:  I may be able to clear this up.

4         I'm not sure that this was something that was even in

5   the deposition.  I'm not sure.  But just to be clear,

6   Mr. Barnett is going to talk about the industry and provide

7   facts as to the industry from his expert perspective.

8         He is not going to seek to -- he never was going to

9   testify as to whether Fannie Mae legally was a CRA.  That

10  wasn't proper for --

11        THE COURT:  We don't care about that anymore, because

12  now we know at least for purposes of this case, until such

13  time as someone appeals and tells me I'm wrong, they are one.

14        MR. MILLER:  And he's also not going to testify as

15  to -- he's not going to label things as "reasonable."  All

16  right.  That's improper for an expert to do that.

17        THE COURT:  You just want him to come and kind of

18  give the jury some background information that they don't

19  otherwise have about this industry?

20        MR. MILLER:  It's the context.  It's the ecosystem of

21  the industry.  How it works.  You know, how reports are

22  provided.  Where the information comes from, et cetera.  How a

23  dispute process works.

24        All of that will be helpful for the jury to make the

25  determinations it needs to make.  But Mr. Hendricks is not

1    going to -- is not here to say, because that would be

2    improper -- I'm sorry -- Mr. Barnett, thank you -- is not here

3    to say, oh, this is -- you know, as a matter of law this is a

4    reasonable procedure.

5          He's going to give the jury facts from which they can

6    make the findings that they need to make to reach the open

7    issues in the case.

8          MS. GOLDLSMITH:  First of all, I don't think that's

9    what his report says he's going to do.  And secondly, I don't

10   believe that he has any specialized knowledge in that respect.

11         If you look at his qualifications, he's never been

12   offered as an expert before.  He's never offered testimony

13   before.  Of his 40 years of business experience, the primary

14   part of it is in aviation sales.

15         He has worked as a reseller for the last 15 years in

16   an upper-echelon management position specific to tenant

17   screening, which has absolutely no correlation whatsoever to

18   the credit reporting-related industry that he purports to talk

19   about.

20         And in looking at how the defendants have approached

21   their response, he hopes to offer testimony as to the

22   industry's perception of Fannie Mae.  And I don't believe that

23   he -- at least that's what their response says -- is that the

24   perception that Fannie Mae is not a consumer reporting agency,

25   therefore, why would we they have any procedures to comply

1    with the Fair Credit Reporting Act.

2         Again, I don't think any of that is in his report,

3    but he doesn't have any specialized qualifications or

4    experience to speak on behalf of how the industry would see

5    Fannie Mae or Fannie Mae's procedures in this regard.

6         He has no experience operating a reseller and the

7    dispute procedures and things like that.

8         THE COURT:  But does this case even involve the

9    dispute procedures?

10        I mean, I'm used to all of these lawsuits that we

11   have where someone sues the credit reporting agencies because

12   they sent the letter and they're claiming that the credit

13   reporting agency didn't do what was required to be done under

14   the statute to investigate whether or not the report had

15   something erroneous in it.

16        But I didn't think that had anything to do with this

17   case.

18        MS. GOLDLSMITH:  I think you're correct.  And I think

19   that's partly where the deposition testimony took a turn to

20   say, okay, what are you here to say?

21        And he did suggest in his deposition, well, you know,

22   no one has ever seen them as a credit reporting agency before.

23        And that's exactly where our motion is set.  You

24   know, the primary issue is you can't come in and say they are

25   or they aren't a CRA.  But to the extent you want to offer

1   these other extraneous opinions, we don't believe they're

2   relevant here and we don't believe he has any qualifications

3   to make those statements, let alone provide them as expert

4   opinions to the jury.

5           THE COURT:  So is your -- do you have somebody that's

6   going to explain to the jury how these -- how this information

7   is assembled and correlated so that it ends up in the Desktop

8   Underwriting --

9           MS. GOLDLSMITH:    No.  No.  Our expert is a renowned

10  expert.  He has been doing this kind of testimony for 20-plus

11  years to talk about how the Fair Credit Reporting Act is set

12  up to give the jury an understanding of:  How do you determine

13  what's reasonable and what's not with respect to procedures

14  inaccuracy?

15          Mr. Hendricks can talk about why we have the Fair

16  Credit Reporting Act, the impetus for putting in a provision

17  for maximum possible accuracy, to lay the context out for why

18  it's important to have those procedures.

19          He can also provide --

20          THE COURT:  So he is going to just kind of -- your

21  case is going to more or less start with the proposition that

22  there are credit reports and the credit reports have these

23  codes in them.

24          And Fannie Mae interprets Codes 8 and 9 as

25  "foreclosure," even though they may be something else.

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

1          MS. GOLDLSMITH:  I think -- I think that we're going

2    to start out with a broader proposition than that.  And

3    Mr. Hendricks is uniquely qualified to talk about --

4          When you talk about the Fair Credit Reporting Act,

5    you're talking about the embodiment of invasion of privacy

6    law.

7          THE COURT:  Well, this is much more detailed -- I

8    want to know how the jury is going to have just kind of some

9    general background into where the "8" and "9" came from.

10          MS. GOLDLSMITH:  We actually feel that the 8 and 9 is

11    a little bit of a red herring.  The 8 and 9 is an

12    underwriting -- it's a credit risk policy.

13          When it comes to deciding whether or not we're going

14    to call something a "foreclose" or not call something a

15    "foreclosure," we believe they have no policies or procedures

16    whatsoever to assure that the information they then report

17    about the Zabriskies was accurate.

18          So, certainly, there will be testimony, and

19    primarily, it's going to come from Fannie Mae itself as to why

20    they chose to select an 8 or a 9 and those kinds of things.

21          Mr. Hendricks is going to talk more in terms of the

22    importance of ensuring that if you're going to inject

23    information into the evaluation process when someone is going

24    to get a loan and they're going to be considered for this

25    loan, if you're going to inject information there, the

1   importance of the accuracy of information and the importance,

2   therefore, of maintaining and following reasonable procedures

3   to assure the maximum possible accuracy of that information.

4            So we don't want to give the impression that

5   Mr. Hendricks is here to talk about the 8 and the 9.

6            Does he have qualifications having testified dozens

7   of times in other cases, you know, interpreting credit reports

8   and things like that?  Yes.

9            But I think that the testimony from Experian saying

10  exactly what their "9" means is much more to that point than

11  we intended Mr. Hendricks' testimony to be.

12           THE COURT:  Okay, thank you.

13           Anything else on this, Mr. Miller?

14           MR. MILLER:  No.  Just a few things.

15           As far as Mr. Barnett's expertise, he has worked in

16  the industry as the head of a business division of the largest

17  tri-merge company in the country -- I guess that means in the

18  world -- but he had direct and indirect responsibilities for

19  credit reporting, including the reports that are directly

20  relevant to this case.

21           Now, he is not -- he was used as an expert in one

22  prior case.  He is not a professional expert.  I think that's

23  a good thing to have an industry expert rather than someone

24  who has never worked in the industry.

25           THE COURT:  Well, it shortens the cross-examination.

1          MR. MILLER:  Well, and that's a good thing too.

2    That's a good thing too.

3          Disputes will be relevant in the case.  There were

4    disputes filed by these plaintiffs.  They're going to be

5    relevant in the case.

6          Again, he is not going to testify as a fact witness.

7    He is not going to testify as a legal witness.  He is going to

8    give the jury needed context in which they can make the

9    determinations that they need to make.

10         One other thing I would just add.

11         I think much -- and we don't have to get into it now

12   and I'm not suggesting we do -- but much of what has been

13   described as Mr. Hendricks' testimony, both today and in the

14   opposition papers -- that's plaintiffs' expert on these

15   issues -- we think will be on the report.  But that's -- I'll

16   just note that because it was discussed today.

17         THE COURT:  Okay.  Well, I'm going to take this under

18   advisement since I had assumed and did not take a close look

19   at what other opinions he might have offered, that this was a

20   moot issue in light of the Court's ruling on summary judgment.

21         I don't believe that I have identified any other

22   motions in limine that are potentially moot in light of the

23   Court's ruling, except potentially part of Defendant's Motion

24   No. 1 to Exclude Evidence of Defendant's Financial Condition.

25         And I think that the response says, well, we're

1    not -- this isn't one of those situations where we're putting

2    in a net worth or something like that, the type of thing that

3    goes into a potential evaluation for punitive damages.

4              In fact, punitive damages have been eliminated from

5    the case also by the Court's ruling on summary judgment since

6    it would only have been available for a willful violation for

7    which no evidence on summary judgment was offered.

8              But the plaintiff in this case says, well, in

9    deciding what's reasonable and not reasonable for Fannie Mae

10   to do, if they're making a fortune licensing this software,

11   the fact that it might cost a little bit of money to be a

12   little bit more careful would certainly show -- weigh in the

13   analysis of the jury on "reasonableness."  And why is that not

14   a legitimate argument?

15             MS. STUTMAN:  Your Honor, Fannie Mae isn't arguing

16   here that it didn't change its procedures because it wasn't

17   able to afford it.

18             And so there was -- there are a lot of circumstances

19   in terms of Fannie Mae deciding how to create the algorithms

20   for the underlying program in light of the reporting, the

21   inconsistent use of the MOP codes in the industry.

22             So the position is not that, well, this was

23   impossible because Fannie Mae didn't have the money.  Then the

24   amount of profits they made doesn't tie into the

25   reasonableness of their procedures.

1           And to make statements like that is going to unfairly

2   prejudice Fannie Mae by focusing on the profits, which could

3   lead the jury to think, well, here is this company making so

4   much money, they had a, you know, higher burden to meet.

5           We don't see the connection between that unless

6   Fannie Mae were making the argument that they couldn't afford

7   it.

8           And they also -- the plaintiffs haven't identified,

9   for example, a specific procedure that Fannie Mae should have

10  done and that would have only cost, you know, $2,000.

11          THE COURT:  Ms. Goldsmith or Mr. Mengedoth.

12          MR. MENGEDOTH:  Yes, Your Honor.

13          I think you pick up exactly on our position with

14  regards to the 403 issue here is just the fact that it's a bad

15  fact for Fannie Mae that it reaped hundreds of millions of

16  dollars annually and having licensing the exact same DU

17  software that's at issue here.

18          But what we're looking at with the argument that was

19  just set forward by Ms. Stutman is that we have a burden to

20  show that it was unreasonable.

21          And it's actually Fannie Mae's burden to show that

22  they have reasonable procedures in place under applicable

23  Ninth Circuit law.  And what we -- so we contest that.

24          And it is relevant.  And it's not just the fact that

25  there is a bad fact that they were making this amount of money

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE    2-29-16

1    in relation to this program that had no concern for accuracy

2    of the truth of whether or not a foreclosure or a short sale

3    occurred should be something for the jury to weigh its

4    determination about --

5              THE COURT:  But are you offering something more than

6    that?

7              And I think that's the point that Ms. Kleine just

8    tried to make.  Are you offering something more than that?

9    Not just, well, look, they're making a fortune, they could

10   have been more careful; as opposed to it would have been an

11   insignificant expense to make some change to be more accurate

12   as to what these codes meant so that we're not labeling things

13   "foreclosures" and, therefore, eliminating the possibility of

14   them getting an approval under the DU system when they may

15   well have had something that does not preclude them from

16   having an approval under the DU system.

17             MR. MENGEDOTH:  Yes, Your Honor.  And we believe --

18   two responses to that.

19             Our expert Evan Hendricks would be getting into the

20   fact of what these -- because there is documentation about

21   what are in the matching algorithms within the DU system

22   itself.  What are in the manuals that indicate how Fannie Mae

23   handles 8's and 9's.

24             He has that unique industry experience in

25   understanding from three decades' worth of investigation

1    that's unique to himself for this industry.

2          So he can explain to a jury that that coding system

3    is simply -- it could wind up being very easily changed

4    without regard to -- or the primary obligation to maintain

5    procedures that are reasonably designed to assure the maximum

6    possible accuracy.

7          So in relation to that, the numbers there will be

8    testimony about from Fannie Mae, the numbers of people that

9    are working in the DU system, what they budget, for instance,

10   for employees, and what the costs are of those employees in

11   relation to the total system.

12         So that, we believe, is going to be an important

13   element to establish how it would be that it was unreasonable.

14         THE COURT:  It's ordered denying Federal National

15   Mortgage Association's Motion in Limine No. 1.

16         And in denying it, I am not suggesting that there may

17   not be appropriate objections to be made at trial to the scope

18   of the testimony that may be given with respect to the

19   financial issues related to Desktop Underwriting.

20         And we aren't going to be -- I'm not going to permit

21   the plaintiff to offer the evidence in such a way that it

22   basically says Fannie Mae is really, really rich and making a

23   whole bunch of money, therefore, the poor Zabriskies should

24   win.

25         But it appears to me that there is some relevance to

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

1    the issues of budgeting cost, the ease with which there could

2    have been a correction, and the fact that no correction was

3    made at least as it relates to the time that the Zabriskies

4    were applying for a mortgage.

5              I want to turn to Plaintiffs' Motion No. 4 that says

6    certain proposed exhibits have not been properly disclosed or

7    are otherwise inadmissible.

8              And I only want to talk about the first part, because

9    the "otherwise inadmissible" is not really the proper subject

10   for a motion in limine because they're either admissible or

11   they're not.

12             But "properly disclosed" is something that I can't

13   evaluate during trial based on an objection.  And so in this

14   case we are talking -- there's actually a dispute that Fannie

15   Mae says we gave you all of this.  The things that you're

16   complaining about were attachments to our motion to dismiss

17   and that some of the things that you're arguing about were

18   actually used by the plaintiffs as exhibits during

19   depositions.

20             What is the source of this confusion about whether

21   you do or do not have the documents that are listed on page 4?

22             MS. GOLDLSMITH:  On page 4 --

23             THE COURT:  I'm sorry.  I'm in the wrong section.

24   That's the "or otherwise inadmissible."

25             MS. GOLDLSMITH:  Yea.  I think there's two different

 1    documents identified on page 2.

 2            THE COURT:  Page 2.

 3            MS. GOLDLSMITH:  I think the first one may be a moot

 4    point.  Is the Licensing Agreement something that's going to

 5    be withdrawn in light of the ruling?

 6            THE COURT:  Amerisave License and Schedule for

 7    Desktop Underwriter.

 8            MR. MILLER:  Well, Your Honor, as to -- I don't think

 9    we can say at this point that that's going to be withdrawn.

10    That's the one you were referring to, Your Honor, that was

11    provided as part of the motion to dismiss and an exhibit in

12    the depositions.

13            The second one is a moot point.

14            THE COURT:  Oh, so Exhibit 502 --

15            MR. MILLER:  I don't know the number, but it is --

16            THE COURT:  Well, Credit Reporting Resource Guide.

17            MR. MILLER:  The only thing I would want to make

18    clear -- although the plaintiffs did say that we never

19    disclosed that -- it was disclosed during the expert

20    disclosures but it is a moot point.

21            THE COURT:  Okay.

22            MR. MILLER:  It is a moot point.  But I did want to

23    just correct that record.

24            THE COURT:  So there's no dispute -- the issue with

25    respect to the Credit Report Resource Guide from 2011 marked

1    as -- or listed in the Joint Proposed Pretrial Order as

2    Exhibit 502 is moot because it won't be offered.

3          MR. MILLER:  Right.  But the first one, which is the

4    agreement, Ms. Goldsmith may be right that in the event it is

5    not going to be used, but I don't think we can say right

6    now -- I just don't think we can say that right now.

7          MS. GOLDLSMITH:  Okay.  And our objection to that one

8    was that, yes, they did attach it to their motion to dismiss.

9          But in the 25,000 pages of materials that they

10   specifically produced as part of discovery, it was not

11   produced.  And, therefore, we took the exhibit from the motion

12   to dismiss and we marked it as an exhibit with their 30(b)(6)

13   witness and neither of their 30(b)(6) witnesses could offer

14   any testimony about that document.

15         So they have since revised this exhibit list.  I

16   believe we got their revised exhibit list the night before the

17   Joint Pretrial was due.  And they have now substituted that

18   with a version that was produced by Amerisave.

19         But we have -- prior to -- when we filed this motion,

20   it was not something that other than the motion to dismiss

21   response we had ever seen or been able to speak to any witness

22   whatsoever about that particular document; about its

23   authenticity, about its content.

24         And it is my understanding that the purpose of

25   producing that was to show that they were just a seller of

CV13-02260-PHX-SRB     PRETRIAL CONFERENCE   2-29-16

1   software.  So I think it probably is a moot point but that's

2   where we were coming from on this.

3          THE COURT:  Well, then let's not argue about it

4   anymore.  If it comes up at trial, I will rule then.

5          MS. GOLDLSMITH:  Okay.

6          MR. MILLER:  And, Your Honor, I'll respond to some of

7   the factual assertions that Ms. Goldsmith made then, but I

8   don't want my silence on that point to be misinterpreted .

9          THE COURT:  Plaintiffs' Motion in Limine No. 4 seeks

10  to exclude the tri-merge credit reports.

11         MS. GOLDLSMITH:  I think that's No. 2, Your Honor.

12         THE COURT:  What number did I say?

13         MS. GOLDLSMITH:  Four.

14         THE COURT:  Oh, I'm sorry.  Four was the last one.

15  This is No. 2.

16         Why don't I ask the defendant specifically, because

17  there's a lot of them, what tri-merge credit report or reports

18  do you think might be offered and why?

19         MS. STUTMAN:  The tri-merge reports that were listed

20  as exhibits are the tri-merge reports that are associated with

21  a particular DU findings.

22         There were eight DU findings in this case; and three

23  of them came out with an "Approve" recommendation and three of

24  them came out with a "Refer with Caution."

25         And I think this might have been part of the motion

1    for summary judgment briefing, but for the DU findings that

2    came out with an "Approve," they did not have the MOP Code 9

3    as the other ones did.

4            And so part of the purpose of introducing the

5    tri-merge reports is to explain how the DU interprets the data

6    and then generates the report with the recommendation based on

7    the presence of one of the MOP 8 or 9 Codes.

8            THE COURT:  Right.  But Fannie Mae has nothing

9    whatsoever to do with producing the tri-merge report, correct?

10           MS. STUTMAN:  Yes.  But it's in Fannie Mae -- it's

11   part of Fannie Mae's case file.

12           THE COURT:  I know.  So as I understand it, the

13   lender to whom the mortgage application is made, when they

14   initiate the qualification process using the DU software, they

15   ask for one of these tri-merge reports and there's more than

16   one place that does them?

17           MS. STUTMAN:  Yes.

18           THE COURT:  And so that gets uploaded into the

19   system.  And if the place they ordered it from used one of

20   these MOP codes that Fannie Mae system interprets as

21   "foreclosure" or -- then they don't have an approved code at

22   the end of the DU process.

23           But what is the relevance that some tri-merge reports

24   did have the code that was interpreted as a "foreclosure" and

25   some did not?

1              I mean, why would the jury -- isn't it just confusing

2      that --

3              MS. STUTMAN:  It's part of the reason that the DU

4      findings generated, you know, the reports saying that there

5      was a foreclosure was because that is how it interpreted the

6      MOP codes because the industry did not have a specific "short

7      sale" code.

8              So when they used a code like 8 or 9, it potentially

9      could have been a foreclosure.

10             And so in the absence of the specificity "this is a

11     short sale," the DU findings said it was a foreclosure so that

12     the lender would have to manually underwrite the file in order

13     for Fannie Mae to say that they would purchase it.

14             And so it goes to the reasonableness.  Because in the

15     absence of a clear statement that this was a short sale not a

16     foreclosure, it was consistent with Fannie Mae's credit risk

17     policy to avoid saying that that loan could be underwritten

18     without the additional representations by the lender.

19             MR. MARSHALL:  Your Honor, may I have just one

20     minute?  I just want to make sure one point didn't get lost.

21             MS. STUTMAN:  There's another reason as well.

22             The tri-merge reports, as you mentioned, the lender

23     is the one who essentially orders it through -- when the --

24     through the application process.

25             And so the -- it becomes also part of the lender's

1    file when they are reviewing the borrower in order to decide

2    whether to give the loan or not.

3              THE COURT:  But I thought we have already established

4    that the lenders that the plaintiff went to decides based on

5    the DU.

6              I mean, they don't -- if it's not approved under DU,

7    they don't give the loan.

8              MR. MILLER:  I'm sorry, Your Honor.  Your questions,

9    if I could just add, because they're beyond just the motion.

10             So when the tri-merge reports are the documents that,

11   as Your Honor said, that the DU --

12             THE COURT:  Okay.  We're not going to have two of us

13   talking about the same thing.

14             MR. MILLER:  I was just trying to address your

15   question.

16             THE COURT:  No.  There's four of you.  You should be

17   able to divide it as opposed to just double up.

18             MR. MILLER:  It just overlaps there.

19             MS. STUTMAN:  I mean, right.  And so I was, you know,

20   focused primarily on why they would be able to be

21   authenticated and why they would not be hearsay.

22             I'm sorry.  I lost the question.

23             THE COURT:  Well, my question is:  Isn't it just --

24   the issue in this case has to do with whether or not Fannie

25   Mae adopted reasonable procedures for reporting -- or for

1    interpreting the credit reports that fed into the Desktop

2    Underwriting and coming up with a conclusion that there was a

3    foreclosure, and therefore, a proceed with -- or a "Refer with

4    Caution."

5            Why would we spend a lot of time having the jury know

6    that there are all these tri-merge companies and some

7    tri-merge companies used this MOP code on the Zabriskies'

8    report and some didn't?

9            MS. STUTMAN:  Oh.  It goes to the causation question

10   as well.

11           So the lenders, when they denied the loan, they

12   filled out the Denial of Statement of Credit and they checked

13   off.  And on the Statement of Credit Denials, it says that

14   this was denied at least in part based on information from a

15   credit reporting agency, and then it refers to the credit

16   report that was associated with that file.

17           So we dispute in this case that the lenders made the

18   decisions based on what was present in the DU findings.

19           THE COURT:  Ms. Goldsmith.

20           MS. GOLDLSMITH:  I hear Your Honor focusing primarily

21   on relevance.  And I think you have narrowed in on the issue

22   that it is remarkably confusing to have all of these

23   tri-merges in.

24           And we have to understand what a reseller is.  The

25   reseller takes the data from Experian, Equifax, and

1   TransUnion, compiles it into a single report.  It is that raw

2   credit data that Fannie Mae then uploads, that they evaluate

3   to look at to then decide whether or not we can call this a

4   foreclosure or not.

5           The piece that they're missing is that the raw credit

6   data doesn't even come from the reseller.  The raw credit data

7   comes from Experian, Equifax, and TransUnion.  That's why in

8   our motion we talk about the fact that it's not only hearsay,

9   it's double hearsay.

10          Because even if you have some sort of 902 affidavit

11  from CoreLogic Credco saying, yes, this is the report that we

12  gave you, the information that they claim is the problem is

13  the "9."  It's the MOP Code 9.

14          That doesn't actually come from the reseller.  That

15  either came from Experian, Equifax or TransUnion.

16          Now, in this instance --

17          THE COURT:  But let me just clarify how it works.

18          The tri-merge then makes -- takes all three sources

19  of information and puts it together and makes one report out

20  of it, which is how we can explain that one tri-merge report

21  ignored the MOP code and another one didn't or interpreted it

22  differently.

23          So as I understood the facts, the tri-merge -- the

24  three that didn't show "foreclosure" when they went through

25  the DU underwriting were because that tri-merge company didn't

1    merge the 9 but merged a different code.

2            MS. GOLDLSMITH:  It's actually more complicated than

3    that --

4            THE COURT:  I'm sure it is.

5            MS. GOLDLSMITH:  -- because it is -- because if

6    they -- in doing any sort of tri-merge report, if the

7    information is not absolutely identical, then it has to be put

8    in duplicate tradelines.

9            Okay?  So in this instance, there was actually a "4"

10   being reported by TransUnion and Equifax.  It was a "9" being

11   reported by Experian.

12           That's not why -- it wasn't a merger of information

13   about the reseller.  The reseller, one in particular reseller,

14   said, hey, wait a minute, Fannie Mae is picking up this 9 and

15   calling it a foreclosure and these people can't get loans.

16   Let's zero it out.  And they put in a "U."

17           So on the ones that got the approval, you're still

18   going to see two sets of tradelines.  You're going to see the

19   ones that Equifax and TransUnion reported with the 4.  And

20   then you're going to see an "M-U."  Instead of an M-9, the MOP

21   Code 9, they put it in as "unrated."

22           So it's even more confusing than that.  So we have

23   offered the testimony of Experian to say if your argument is

24   that a 9 could be determined to be a foreclosure, and

25   therefore, your procedure to determine a 9 is, in fact, a

1    foreclosure is reasonable, well, let's go to the best evidence

2    that we have.  Let's talk to Experian as to what the 9 means.

3            And Experian has said pointblank, you know, a 9

4    doesn't mean foreclosure.  A 9 didn't ever mean a foreclosure.

5    It can mean a lot of things, but it can't mean foreclosure.

6            So that's exactly why we tried to get rid of these

7    tri-merges.  And it's strange to us that, I think, out of 19

8    or 17 different subpoenas, we don't have records from

9    CoreLogic or from Kroll Factual Data or any testimony from

10   those people that can explain, okay, well why did you put the

11   "U" and what were you thinking?

12           I mean, it goes beyond the surface of the documents.

13   And to try to put that in front of the jury to justify what

14   you're doing based on pure speculation and assumption as to

15   what that actually means, we feel is very confusing, not to

16   mention the fact that it is, in fact, hearsay.

17           We have the testimony of Experian to talk about the

18   9.  If that's -- if that's their point, the evidence is there,

19   and the tri-merges do nothing but muddy the water for the jury

20   as to, well, wait a minute, why --

21           Another thing is they don't all report them the same.

22   So it's difficult to follow which tradeline is the same

23   tradeline.  They're hugely confusing.  And without any

24   testimony from the resellers to not only authenticate but to

25   explain what's in those documents, I think the jury is going

1    to be completely misled.

2          THE COURT:  Ms. Kleine.

3          MS. STUTMAN:  May I respond?

4          I think the plaintiff is making it much more

5    confusing than it needs to be.  And I know that counsel

6    mentioned the reports by Experian.  But the report by Experian

7    is not what the DU findings interpreted.  DU findings only

8    interpreted the data from the tri-merge reports.

9          But as I said earlier, the fact that the lenders

10   looked at the tri-merge reports in deciding whether or not to

11   grant plaintiffs' applications for refinance is certainly

12   relevant to causation issue in this case and the tri-merge

13   reports should be admitted for that purpose alone.

14         With respect to hearsay, Fannie Mae doesn't intend to

15   offer the reports to prove that the statements made therein

16   were true.

17         It's not going to say that it should have been --

18   that a MOP 9 is the wrong code to use.

19         It's simply that was the code that was stated in the

20   report that the DU findings interpreted.

21         So it's not hearsay because it's not a statement

22   that's offered for the truth of the matter asserted therein.

23         THE COURT:  So how many of these tri-merge reports do

24   you think we're going to have to talk about?

25         MS. STUTMAN:  Yeah.  Maybe three.  I mean, we listed

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

1   all eight because we hadn't decided yet which ones we wanted

2   to present.  But we're not going to introduce them all.  It

3   would be, you know, what comes up as relevant with respect to

4   the lenders as we proceed.

5              THE COURT:  So are you going to have somebody explain

6   how the Experian report was reported as a "9" on some

7   tri-merges and as an "U" on others?

8              MS. STUTMAN:  I'm not sure.  I'm not sure.

9              MR. MILLER:  Your Honor, this relates to the Experian

10  motion.

11             THE COURT:  You just can't help yourself, can you?

12             MR. MILLER:  Well, it relates to a different motion

13  and trying to split this up.

14             You don't want to -- we can talk about it when we get

15  to the Experian motion then.

16             MS. STUTMAN:  The other thing too, we listed the

17  tri-merge reports as separate exhibits on our exhibit list.

18  We also listed two summary exhibits of the plaintiffs' debts

19  over the time period that they were applying for these

20  refinance loans and the sources of those summary exhibits are

21  the tri-merge reports.

22             But we aren't going to go through each tri-merge

23  report and list out all of the plaintiffs' debts.  So that was

24  another use of the credit reports.

25             THE COURT:  Well, I don't know what's going to happen

1    with your summary exhibit, but that's not the subject of a

2    motion in limine.

3           With respect to this, I'm going to have to await the

4    time of trial to determine if some information and the extent

5    to which the information about what's on the tri-merge report

6    can be admitted.

7           MS. STUTMAN:  Okay.  Thank you, Your Honor.

8           THE COURT:  The last plaintiffs' motion in limine is

9    No. 5 to exclude the opinion testimony of Cindy Denko with

10   respect to whether she's going to claim that the procedures

11   are reasonable.

12          And the response is very brief.  It says that she's

13   not going to say that.  That she is going to provide purely

14   factual testimony as to the procedures and not opine as to

15   their reasonableness.

16          So is this a "without opposition" granted because the

17   defense doesn't intend to offer such opinions?

18          MR. MILLER:  No.  And, of course, now it's me and I

19   don't stand up.

20          Your Honor, Cindy Denko is not offering an expert

21   opinion that says that under the FCRA these constitute

22   reasonable procedures.  She is going to describe the

23   procedures.  She's going to describe the context of the

24   procedures.  All of those sorts of things.  But she is not

25   going to be asked, well, then, do these constitute reasonable

1    procedures under the FCRA in your expert opinion.

2         No.  No.  They will decide that.  But she's going to

3    talk about the procedures but she's not offering an expert

4    opinion.

5         THE COURT:  So you agree with the motion in limine?

6    She's not going to offer them unopposed.

7         I want to turn to this motion regarding Mr. Smith.

8    And, frankly, Ms. Goldsmith, I just really am having a hard

9    time elevating the types of intangible damages that the

10   Zabriskies claim to have suffered because they couldn't get a

11   mortgage to the loss-of-enjoyment-of-life-type damages that

12   occur in a personal injury case where someone has suffered

13   some significant physical injury that has impaired them from

14   enjoying life as they did before the injury.

15         So even before we talk about whether or not this is

16   an appropriate subject for expert testimony ever, I just don't

17   see how it could possibly be in this case.

18         I mean, somebody, you know, was upset because they

19   didn't get a mortgage.  They were frustrated.  Maybe they had

20   a few sleepless nights.  But eventually everything came out

21   fine.  And it's over.

22         It's not like they're continuing to suffer because

23   they lost a limb or they had severe brain damage.

24         Whatever happened, happened, and it ended.

25         MS. GOLDLSMITH:  I think that's true and it's not

 1   true.

 2          I think partly it takes the bait that the defendants

 3   have laid out to suggest that loss-of-enjoyment-of-life

 4   damages are limited to cases of death and physical injury.

 5          That relates to the label put on it.  But really what

 6   Dr. Smith is offered to do is to help the jury put an economic

 7   figure on the noneconomic concept.

 8          THE COURT:  Let's just cut -- I'm not going to allow

 9   it.  Just not going to allow it in this case.

10          I don't know that I would never allow it in any case,

11   but definitely, not in this case.  This motion is granted.

12          This is the true gatekeeper function that I am

13   exercising after reviewing this information.  And Dr. Smith

14   will not be permitted to testify in this case about

15   loss-of-enjoyment-of-life damages.

16          MS. GOLDLSMITH:  Okay.  And I just want to be clear

17   for the record, he has been unopposed with respect to his

18   testimony as to economic damages and I want that to be clear

19   that your ruling has no impact whatsoever on his ability to

20   come in as an economist, correct?

21          THE COURT:  I don't think that there was any request

22   to exclude him explaining calculable amounts.

23          MS. GOLDLSMITH:  Okay.

24          MR. MILLER:  Your Honor, there was one portion that

25   might fall into that.  I'm not sure.  So I think we're in

 1   agreement with respect to his calculation.  He made a

 2   calculation determining the cost of mortgage.

 3        Part of the motion in limine, though, for Mr. Smith

 4   was a different, arguably, economic math calculation that he

 5   did, which was he took the number of hours that one of the

 6   plaintiffs spent on the phone with lenders and the like and

 7   applied a wage rate to that based on local --

 8        I think I'm getting this right.

 9        -- local wages for an administrative job.  And then

10   did a math calculation thereafter, kind of multiplying the two

11   together.  Something like $12,000 I think it was.

12        And there was a portion of the motion directed at

13   that, essentially saying it wouldn't be helpful to the jury

14   because a plaintiff in this case would not be able to recover

15   the value of lost hours based on kind of a putative or

16   hypothetical job that might have been done.

17        So not -- if there was time off of work --

18        THE COURT:  Right.  If there was time off of work --

19        MR. MILLER:  Yes.

20        THE COURT:  -- and they lost wages because they had

21   to spend all this time sitting in a mortgage lender's office

22   begging them for a mortgage or trying to explain they never

23   had a foreclosure, that's a recoverable damage.

24        MR. MILLER:  That's different.  Yea, that would be

25   different.

1          THE COURT:  But nobody is entitled to get paid for

2   what they do in their nonpaid time.  I mean, he can calculate

3   that all he wants, but I'm not aware that that's a legal

4   damage.

5          Argument, Ms. Goldsmith?  I mean, it's a great idea,

6   but it just doesn't -- it's not recoverable and --

7          MS. GOLDLSMITH:  We certainly have a different view,

8   both from a legal standpoint and a personal experience

9   standpoint, as far as what juries find to be compensable as

10  any actual damage for the grave imposition that --

11         THE COURT:  That's not an actual damage.  It's not a

12  loss.  It's not money they otherwise would have earned.

13         MS. GOLDLSMITH:  However, to tie it specifically to

14  money that they would have earned suggests that there needs to

15  be -- that noneconomic damages must be tied to economic

16  damages.  And that's not the law under the Fair Credit

17  Reporting Act.

18         THE COURT:  But if what Dr. Smith did was try to

19  calculate wages, theoretically, that would have been paid had

20  they hired somebody to spend all these hours, that -- he can't

21  testify as to that.

22         MS. GOLDLSMITH:  And I don't want to argue --

23         The Court is going to deny this -- to grant this

24  motion.  I get that.  I feel on Dr. Smith's behalf he doesn't

25  come in and offer testimony as to any specific damage.  He

1    offers a mechanism.

2            THE COURT:  Okay.  But that's not a legitimate --

3    that's not a legitimate mechanism for -- it's just not a

4    legitimate subject for expert testimony to attempt to use such

5    a calculation from an expert on an alleged noneconomic damage.

6            MS. GOLDLSMITH:  Okay.

7            THE COURT:  So a few minutes ago we were talking --

8    Ms. Goldsmith was talking about what she was going to ask

9    Experian about.  And the defendant says, well, we don't

10   think Experian should be able to -- it's a specific person,

11   Mary Methvin -- but apparently she is a representative of

12   Experian and you don't want me to let her testify at all?

13           MR. MILLER:  That's me.

14           All right.  So, Your Honor, two issues.

15           THE COURT:  You want to put in these crazy tri-merge

16   reports and have the jury understand them and you don't want

17   somebody who actually works for Experian to be able to explain

18   their report?

19           MR. MILLER:  Yea.  So a couple of things.

20           So Mary Methvin is a document custodian-type witness

21   or she was the representative to --

22           THE COURT:  There's a difference.  Was she a document

23   custodian or was she a 30(b)(6)?

24           MR. MILLER:  She was a 30(b)(6).  But her job is to

25   take subpoenas and find the relevant documents.  So she was

1    not testifying on personal knowledge.  She was testifying as

2    the representative as a 30(b)(6).

3            But here to respond to your question, here is why

4    this makes sense.

5            DU findings takes the tri-merge database.  It does

6    not --

7            And here I'm disagreeing with some of the factual

8    discussion from -- previously from Ms. Goldsmith.  They do not

9    take Experian, TransUnion, Equifax data that comes through the

10   tri-merge.  There is a report that the tri-merge company, that

11   reseller prepares.  It's their data.  All right.  It's their

12   data.  It comes from a proprietary analysis.

13           Now, it may be, as Ms. Goldsmith says, that the

14   difference reflects the proprietary shuffling.  It may be that

15   the difference reflects differences in the three reports that

16   came into the tri-merge company.  All right.  So you can't

17   know.

18           What Ms. Methvin is testifying about are documents

19   not that Fannie Mae saw, or not even that the lenders

20   necessarily saw, if I understand most of her testimony, these

21   are internal Experian documents, internal logs, consumer

22   reports, and credit reports that were provided by Experian to

23   the Zabriskies.

24           So these are not their documents --

25           THE COURT:  Not to the tri-merge?

1            MR. MILLER:  Not necessarily to the tri-merge and

2   not to --

3            THE COURT:  Well, you just qualified it as not

4   necessarily to the tri-merge.

5            MR. MILLER:  These reports were not provided.

6            Whether the data itself, some aspects of the data

7   went through, you just can't tell.  It may be, but you don't

8   know that.

9            Now, it was characterized that -- I think what

10  Ms. Goldsmith said was something along the lines of Experian

11  is going to testify that a "9" never means -- here is what a

12  "9" means and it never means anything else.

13           That wasn't her testimony.  Her testimony was limited

14  because she didn't have personal knowledge.  But all of these

15  documents -- I mean, if you're talking -- well, here we are

16  talking about confusion to the jury --

17           But what we were going to do with the tri-merge

18  reports is not confuse the jury, but these reports, which sure

19  look like reports, they look sort of -- there's lots of

20  numbers on them.  They look sort of fancy and official.  Never

21  provided to the tri-merge company.  Never provided to Fannie

22  Mae.  Not provided to the lenders.  That's the bulk of her

23  testimony.  Internal Experian documents.

24           And we just think those are neither here nor there.

25  I think plaintiffs are saying that on the tri-merge there's

1    Experian line and then there's an Equifax line and then

2    there's a TransUnion line.

3              There is not.  There is not.

4              I believe every single one of these reports for the

5    relevant tradelines simply lists -- there's an abbreviation

6    which I can't -- think it's EFX/EQX/TU.  They list all three.

7              THE COURT:  And with one result?

8              MR. MILLER:  There's always one result.  It's the

9    result reported by the tri-merge company.

10             And, again, whether the result is driven specifically

11   by the proprietary logic, it certainly is in part.  Whether

12   it's driven by the data coming in, it certainly is.  But which

13   is the source of which -- you know, trying to unscramble that

14   egg and say, oh, this came from this, this, here's -- you just

15   can't do it.

16             THE COURT:  Ms. Goldsmith.

17             MS. GOLDLSMITH:  First of all, that's not true.  You

18   cannot have a single tradeline on a tri-merge that has all

19   three designations unless the information was substantively

20   identical.  It just simply won't happen.

21             THE COURT:  So if all three reported a "9," then they

22   just have one line with a "9."

23             MS. GOLDLSMITH:  Yes.

24             THE COURT:  If there were different -- if the three

25   differed, then there would be three lines.

1          MS. GOLDLSMITH:  Three lines.  Yes.

2          And if two of them are substantially the same and one

3   of them is different, you'll see two lines.  The designations

4   indicate where the source of the information came from.

5          But more importantly with respect to this motion in

6   limine, Your Honor is correct.  This woman is not a records

7   custodian.  They put into play, there's a MOP Code 9.  It's

8   all because there's a "9."  "Nine" means "foreclosure."

9          The question of whether or not my clients actually

10  have a foreclosure is something that's in this case.  Because

11  part of my prima fascia case is I have to show that the

12  designation of "foreclosure" is inaccurate.  Okay?

13         And every arrow that points to where that foreclosure

14  came from by the defendants is the Experian MOP Code 9.

15         So we served a 30(b)(6) notice -- not just a subpoena

16  saying bring some documents -- a nice notice with definitions

17  and the whole works saying we want to talk about what's been

18  reported about our clients.

19         So, certainly, do we want to talk about internal

20  admin reports and DU logs and things like that about Experian?

21         I would agree that I don't believe that those have

22  any relevance here, except to the extent that Experian can

23  testify unequivocally as to what they have ever reported about

24  the plaintiffs.  And what Experian testifies to is that they

25  have never reported any indication of foreclosure.  Okay.

1          The second point is that it becomes a question of

2    reasonableness here.  Mr. Mengedoth referred earlier to the

3    burden of proof.  We believe the burden of proof switches to

4    them to show that what they did was reasonable.

5          But if they want to say that calling a 9 a

6    "foreclosure" is reasonable, that is something else that we

7    have talked to Experian about.  Experian says, well, yes, this

8    says 9, but 9 is a settled account.  9 is a chargeoff.  9 is

9    not a foreclosure.

10         Okay.  That is evidence that helps the jury determine

11   whether or not it's reasonable for Fannie Mae to consider a 9

12   a foreclosure.

13         The third point I want to make --

14         THE COURT:  Okay.  You don't need to.

15         It's ordered denying Defendant's Motion in Limine No.

16   4.

17         Fannie Mae's Motion in Limine No. 5 to exclude

18   evidence of DU findings regarding nonparties.

19         And, Ms. Goldsmith, you don't think that you're doing

20   this?

21         MS. GOLDLSMITH:  Well, Your Honor, like we allude to

22   in our response, I almost took their motion at first blush to

23   indicate that maybe we were going to try calling a witness or

24   something.

25         We haven't identified a witness.  We have no

 1   intentions of doing that.  We just don't know the breadth of

 2   this motion.  Certainly, there are indications in Fannie Mae's

 3   own documents that this was a much broader problem than just

 4   the Zabriskies.

 5          We feel that that does go to the reasonableness.  If

 6   you were considering the fact that tens of thousands, if not

 7   hundreds of thousands of people are being impacted by this,

 8   whether you've changed your policy or not changed your policy

 9   in light of that, we think does go to the reasonableness

10   question.

11          But we're not convinced that's what they moved, so we

12   put it in there to protect ourselves.  But, no, we don't plan

13   on bringing in pattern-and-practice witnesses, if that's what

14   they're assuming.

15          THE COURT:  So what is it that the defendant is

16   worried about?

17          MS. KLEINE:  Well, Your Honor, part of what the

18   defendant is worried about is exactly the kind of testimony

19   that Ms. Goldsmith was describing, which is unfounded

20   testimony regarding the allegedly thousands of people who are

21   just like the Zabriskies impacted.

22          And our point is --

23          THE COURT:  Okay.  Hold on.

24          There's no evidence of that.  But there might be some

25   evidence that the Zabriskies' problem with having a

1    foreclosure reported by Desktop Underwriting that didn't exist

2    might have been a problem that Fannie Mae knew about with

3    their Desktop Underwriting system before the Zabriskies and

4    didn't do anything about it.

5            And wouldn't that go to the question as to whether or

6    not they were reasonable?

7            MS. KLEINE:  Well, Your Honor, that is a question

8    that hasn't come up in this case because the evidence that

9    plaintiffs have always pointed to, namely, Congressional

10   testimony, inquiries by government agencies, and a particular

11   study the plaintiffs talked about, all are dated in 2013.

12   They all post-date the facts regarding the Zabriskies.

13           And so our point is is that in order to get in any

14   kind of evidence about the alleged breadth of this problem

15   that bears unreasonableness, they would need to essentially

16   show that there is this mountain of data out there that never

17   came to light prior to the Zabriskies' actual DU

18   determinations.

19           And in order to do that, you would need to actually

20   examine, well, was this actually a wrongful foreclosure

21   determination or did this person, in fact, have a foreclose?

22   Was there causation?  Is this person credible?

23           It's exactly the kind of mini-trial situation that

24   routinely gets excluded.

25           THE COURT:  There's no witness.  There's no person

1   that's going to come and testify and have a mini-trial about

2   whether they did or didn't have a foreclosure.

3           This has to do with whether or not there is evidence

4   that the plaintiff can offer that this problem had been

5   brought to the attention of Fannie Mae before the Zabriskies

6   had the problem and whether or not they undertook some

7   reasonable investigation as to whether or not their DU

8   underwriting program was reasonably interpreting the tri-merge

9   reports, specifically, as it relates to whether or not someone

10  had a foreclosure.

11          MS. KLEINE:  I think I understand your question.  And

12  I think part of the disconnect has been we're not aware of any

13  such evidence.

14          And so what we have been focused on is these

15  continued statements that thousands of people are impacted

16  without any underlying support for that evidence, which is,

17  you know, one, irrelevant; and two, obviously, is confusing

18  and could be prejudicial.

19          THE COURT:  So what is the evidence?

20          MS. GOLDLSMITH:  I think we have two sets of

21  evidence.

22          A significant portion of what the defendants have

23  produced to us are internal e-mail.  There are e-mail that

24  date back to 2010 when the policy to change the short sale

25  procedure from 7 years to 2 years, the waiting period, there

1   was some discussion of whether or not that would potentially

2   wrongly identify foreclosures and how that could impact people

3   and that's part of the evidence.

4          And Ms. Kleine is correct.  A significant portion of

5   the evidence is in 2013.  But this wasn't a one-day event for

6   our clients.  They started trying to get a loan in 2012 and

7   weren't approved for one until the third quarter or fourth

8   quarter of 2013.

9          So the real -- the real -- everything hit the fan in

10   February 2013ish.

11          And so certainly, those kinds of changes are still

12   relevant to the plaintiffs' efforts to try to get this loan in

13   May of 2013, June of 2013, and so on.

14          So I'm not sure why they're suggesting that it all

15   happened subsequent to the plaintiffs' events because they're

16   not.

17          MS. KLEINE:  So let's divide that up.

18          As to evidence that pre-dates the Zabriskies' DU

19   determinations that are actually at issue in this case, that

20   sounds like the kind of analysis that will have to be made on

21   a case-by-case basis during trial.

22          I don't think we're saying categorically if there's a

23   document that says Fannie new of exactly this issue that

24   impacted the Zabriskies allegedly, that that's categorically

25   inadmissible.  We would have to see it as it comes in.

1          As to information that post-dates the Zabriskies' DU

2    determinations, that is the subject of this motion in limine

3    and it should be permitted.

4          THE COURT:  I don't think that the plaintiff claims

5    that they can offer information that post-dated.

6          MS. GOLDLSMITH:  I don't believe that we have

7    identified anything on our exhibit list to suggest anything

8    outside of late 2013.

9          THE COURT:  Okay.  So this motion is denied.  But

10   with the understanding that whatever the plaintiff is planning

11   to offer on this subject is all before the Zabriskies finally

12   obtained their mortgage loan.

13         Okay.  That leaves one final motion in limine which

14   is Fannie Mae's motion to exclude Evan Hendricks, the

15   plaintiffs' expert on all things related to credit reporting.

16         And, again, I want to emphasize that Hendricks'

17   report, which I have been provided as an attachment to this

18   motion in limine, it's document 142-1, will be what defines

19   the scope of the opinions that he can offer at trial.

20         And he did provide a handy four-point summary of what

21   those opinions are; one of which is moot because I already

22   ruled -- well, one of which.

23         Number one is moot because I have already apparently

24   agreed with him.

25              So he wants to offer the opinion that the

1   identification procedures in the Desktop Underwriting system

2   perpetuate inaccuracies.

3           Prevented the plaintiffs in this case from

4   refinancing.

5           And this number four goes back to the subject that we

6   were just discussing, and that -- which is that Fannie Mae

7   continued this after they were on notice of the alleged

8   inaccuracies.

9           Why can't he say those three things?

10          MR. MILLER:  So can I work backwards and start with

11   the one you just mentioned?

12          THE COURT:  Yes.

13          MR. MILLER:  So his opinion -- again, I'm going to

14   put aside.  There are eight opinions listed in the opposition

15   and I'm going to ignore those and focus on the ones Your Honor

16   just mentioned.

17          So with respect to the one you just mentioned, which

18   is, hey, Fannie Mae was put on notice and they continued.

19          That is -- his report explains that.  And what he

20   says was in the fall of 2013, which was after the Zabriskies

21   had already had their last DU by a few months, Fannie Mae

22   adopted a new procedure that attempted to --

23          THE COURT:  Well, we're not going to talk about that.

24          MR. MILLER:  Okay.

25          THE COURT:  That's a subsequent remedial measure.

 1          MR. MILLER:  Okay.

 2          THE COURT:  That we're not --

 3          I mean, if, in fact, his report is limited to notice

 4     after -- in the fall of 2013 and what they did to remedy the

 5     problem then, that's not going to be admitted at this trial.

 6     That's clearly precluded by the rules of evidence.

 7          MR. MILLER:  No.  Just -- full disclosure.  He does

 8     mention something that happened not relevant to this issue.

 9     But there was a Wall Street -- or Washington Post article from

10     2009 totally unrelated to this issue.  And what he's saying

11     is, oh, Fannie Mae has a bad reputation for hurting consumers.

12     So we think that's out too.

13          So as to the second one, which was -- the heading is

14     Fannie Mae's -- correction -- arbitrary procedures prevented

15     plaintiffs from refinancing.

16          What he does is he shows the tradeline and then he

17     shows the -- an excerpt from the DU and then he talks about an

18     Amerisave document.

19          And we just don't understand why this expert -- and

20     I'll talk about who he is in a second -- should offer that

21     kind of -- all of those three things are going to be shown to

22     the jury, I'm sure, by plaintiffs.

23          And having an expert do it too, really -- what he's

24     really doing is he's arguing from the documents.  And we just

25     think that's not proper expert testimony.  It's not helpful

1    and it invades the province of the jury.  And it's really,

2    just, you know, notice to protect -- a person getting on the

3    stand and saying, hey, here's what I think about these

4    documents but there is no expertise involved in any of them.

5              Then there is the first opinion --

6              THE COURT:  Well, let me ask you this.  We talked

7    about this on summary judgment.

8              Isn't it beyond dispute that many mortgage companies

9    exclusively use the Desktop Underwriting system and they

10   never, ever go back and try to manually underwrite?  That

11   they're simply -- it's just too inefficient.  Costs too much

12   time.

13             But that's what they do.  They plug all the

14   information into Fannie Mae's system that they licensed.  And

15   if it comes out with "Approved," they probably give the

16   mortgage.  If it comes out with "Refer with Caution," they

17   say:  Go down the street and try somebody else.

18             But that's what they do for the most part.  You

19   really can't talk them into looking any closer at it than

20   that.

21             MR. MILLER:  So a few layers to that.

22             The first layer is I don't know whether there are

23   mortgage companies that exclusively use Fannie Mae.

24             THE COURT:  No.  Not that exclusively use Fannie Mae,

25   but that if they want to use Fannie Mae to be the backing of

1    their mortgage, to sell their mortgage, that they use DU and

2    not manual underwriting.  That they either get the green light

3    or they get that caution light.  And if it's the caution

4    light, they say no.

5              MR. MILLER:  Yes.  There are at least some mortgage

6    companies -- I think that's probably true -- that do not

7    manually underwrite.

8              I don't know whether it's a cost or time issue or

9    it's -- the issue is -- one important issue is if you use DU,

10   the loan can be delivered as a DU loan.

11             THE COURT:  Right.

12             MR. MILLER:  You get a certain representation of

13   warranty waiver.

14             THE COURT:  Right.

15             MR. MILLER:  So that where -- and it's really for

16   sort of straightforward, plain vanilla --

17             THE COURT:  But I'm going to causation here.

18             Because the plaintiff has to prove that it was the

19   inaccurate credit reporting of Fannie Mae that caused the

20   Zabriskies to be turned down.

21             Which is why I went back to:

22             Is it disputed that they get turned down by some

23   number of mortgage brokers and probably it's the ones they

24   went to because they couldn't -- that mortgage broker couldn't

25   sell it as a DU loan?

CV13-02260-PHX-SRB     PRETRIAL CONFERENCE   2-29-16

1          MR. MILLER:  So in this particular -- sorry.

2          THE COURT:  Because if the answer is "yes," then we

3    don't need Mr. Hendricks to say that these are the procedures

4    that caused plaintiffs from refinancing.

5          MR. MILLER:  So two things, Your Honor.

6          First, in this particular case -- and I think it's

7    correct to say that that statement -- that question is

8    answered with a "no."

9          That it was not -- there may be a case where, gee, it

10   was a denial, and therefore, it led -- but it isn't this case

11   because of the particular facts.

12         The second thing I would say is that with respect to

13   Mr. Hendricks, even if we accept him as a credit reporting

14   expert -- and we don't -- but even if we do, I think the

15   question that Your Honor asked relates to a mortgage expert

16   could answer that but not a credit reporting expert.

17         Because it's a question that talks about kind of the

18   behavior of the lenders on the mortgage side, not on the

19   credit reporting side, if that makes sense.

20         THE COURT:  Okay.  And No. 2?  Do you want to address

21   No. 2?

22         MR. MILLER:  Oh, yes, I'm sorry.

23         No. 2, which is the -- I'm sorry.  Let me make sure

24   I'm looking at the right one.

25         THE COURT:  That Fannie Mae's identification

1    procedure systematically perpetuate inaccuracies.

2         MR. MILLER:  Yes.  Again, this is about -- he just

3    has no expertise to offer on this.

4         When we look at his opinion, which begins at page 9,

5    it just really kind of repeats the evidence.  And so it's just

6    not clear exactly how he is going to talk about that.

7         What he's saying is that this -- I mean, looking at

8    the heading, "systematically perpetuate inaccuracies."

9         What he's saying is that there's a 9 and here there

10   was a foreclosure.  And the Zabriskies didn't have a

11   foreclosure, they had a short sale.

12        I think those are the three prongs of his analysis.

13        There's a 9 here.  There are other witnesses who will

14   show that.  The documents themselves will show that.

15        He snips an excerpt and puts it in his report from

16   one of the DU findings.  Okay.  Yeah.  It does say -- it says

17   what it says.  It's an incomplete snippet, but, you know,

18   that's not an admissibility issue, I don't think.

19        And then he says the plaintiffs' P&C bank accounts

20   were neither in foreclose nor involved with a deed in lieu of

21   foreclosure.  That's not a matter for systematic perpetuation.

22        I just don't think he's an expert in that.  But also,

23   it just doesn't add anything and certainly doesn't show

24   anything systematic.

25        THE COURT:  Ms. Goldsmith or Mr. Mengedoth.

1          MR. MENGEDOTH:  Yes.  Taking that in somewhat reverse

2     order from what the court had presented it, I would like to

3     first address the issue of causation because the Court hits

4     upon a key issue here and it is that Mr. Hendricks with his

5     three decades of experience in credit reporting and credit

6     reporting industry is able to put into --

7          THE COURT:  Well, couldn't you get causation by just

8     calling the mortgage brokers that said "no" and say:

9          Why didn't you approve him?

10          And they say:

11          Well, because DU said "Refer with Caution" and we

12     don't approve any of those people.

13          MR. MENGEDOTH:  Well, there certainly is an abundance

14     of evidence that already exists from inside Fannie Mae's

15     internal documents that indicate that it knew that a majority

16     of the lenders that see a "Refer with Caution" will not make

17     the loan.  So that is very true and it was in the summary

18     judgment briefing.

19          But what we anticipate the defendants are going to be

20     doing in this case is -- or the defendant is is that they're

21     going to point to adverse -- certain mandatory required

22     adverse action notices that are issued in connection with an

23     application for a mortgage loan.

24          And they'll point within those adverse action notices

25     that were issued by Amerisave and Nations Choice to suggest

CV13-02260-PHX-SRB   PRETRIAL CONFERENCE   2-29-16

```
1    that what is on there doesn't reflect that Fannie Mae was the
2    one that caused them to be denied their loan.
3              THE COURT:  I don't know what they are.
4              MR. MENGEDOTH:  An adverse action notice is required
5    under the federal Fair Credit Reporting Act and under the
6    Equal Credit Opportunity Act, Regulation B.
7              Essentially, any time an applicant makes an
8    application for credit and is either denied credit or given
9    credit on less favorable terms, the lending institution that
10   is covered by the Act has an obligation -- and in this case it
11   would be the mortgage lender or broker -- to inform the
12   borrower where was the source of the information upon which we
13   based our decision to give you no credit at all or credit on
14   less favorable terms.
15             THE COURT:  Okay.
16             MR. MENGEDOTH:  So what Mr. Hendricks will be
17   explaining is that's a function within the industry as a
18   whole.  When -- and it happens regardless --
19             THE COURT:  What did they say about why they didn't
20   give Zabriskies the loans?
21             MR. MENGEDOTH:  Well, on one of them it very clearly
22   checks the box that says:  Foreclosure or deed in lieu.
23             And so we don't believe that there's going to be as
24   much of an issue there.
25             But the inference that the defendant might draw is on
```

1    the second page it says:  What's the source of the information

2    upon which we obtained this incorrect information?

3           Well, in the industry -- because this is a

4    behind-the-scenes process, it's very secret and it's kept very

5    secret and out of the view of the public, the source of the

6    information is the "Refer with Caution."

7           We will be having testimony and documents that

8    indicate the mortgage broker telling our client, well, you

9    know, I'm not supposed to tell you this, but here you go

10   anyway, it's the DU findings report.

11          But then there's inconsistent information on the

12   adverse action notice that indicates -- and it says, well, the

13   source of the information is Experian.  It doesn't say Fannie

14   Mae wrote in the DU findings report, because that is not

15   within an industry standard to advise consumers about what the

16   source of the inaccuracy was.

17          And in this case it's not going -- we believe the

18   weight of the evidence is going to be presented to the jury.

19          But Mr. Hendricks is necessary to explain in the

20   context of these standardized forms that's not just issued in

21   the mortgage lending industry.  It's whether or not you apply

22   for credit for an auto loan, for a credit card.  It's a

23   requirement.

24          And one of the things that Fannie Mae did by not even

25   considering itself at all subject to the Fair Credit Reporting

1   Act is it took itself out of that system of accountability for

2   a consumer to wind up saying:  There's an inaccuracy.  Who do

3   I go to to dispute this inaccuracy with?

4          And we believe that functions into not just the hard

5   economic loss, but the wild goose chase that our clients went

6   on to try and ascertain who was the actual source of the false

7   information that was reporting about them.

8          So in the context of causation it's not just the hard

9   economic loss, but it's all of the tail-chasing that they did

10  for months and months and months.  So on causation, we believe

11  Mr. Hendricks is essential to explain what happens in the

12  consumer credit reporting agency -- or industry as a whole and

13  put into context what the meaning of these adverse action

14  notices are in what really -- who was to blame despite some of

15  the information that's on it.

16         The other thing is he needs to be able to explain to

17  a jury, look, this is a system that Fannie Mae created and

18  upon which the consumer credit industry and the big three, the

19  national repositories, Equifax, Experian, and TransUnion are

20  participants in and in a huge way.

21         And he can explain what does a typical credit report

22  look like?  What is going on in a credit report?  And what is

23  the kind of information that's provided in a consumer report?

24         And he can correlate that experience, that vast

25  experience, looking at thousands of consumer credit reports

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE   2-29-16

1   and evaluating the information on them and translate it for

2   purposes of what's on the DU finding report.  What's on here

3   that looks like a consumer report.  What is it that is in this

4   information.

5        And while it also supports Your Honor's conclusion

6   very definitely that those two things are virtually the same,

7   it also goes to the issue of reasonableness of the procedure.

8   Was it reasonable to disregard all of that standardized

9   information that's within the industry in creating these DU

10  finding reports?

11       And so we don't believe the first prong of this is

12  out.  We believe that Mr. Hendricks is very essential to come

13  to a conclusion -- or for the jury the ultimate conclusion and

14  opine, looking at what kinds of information within the

15  industry is typically required.

16       And in this case the information that was supplied

17  solely to the mortgage lenders and the brokers, what was it

18  that made it so it became a consumer report, that it was

19  unreasonable for Fannie Mae to close its eyes to the necessity

20  to provide the remedies that are available to consumers under

21  the Fair Credit Reporting Act?

22       THE COURT:  What about No. 4?  The defense says that

23  in his report what he refers -- what he cites as the

24  unreasonable procedures they continued with despite notice was

25  notice that happened post the time that these loans were

 1   made -- finally made.

 2           MR. MENGEDOTH:  And I would agree with you.

 3           He will not be called to testify to Fannie Mae's

 4   half-a-loaf of the subsequent remedial measures that didn't

 5   fix the problem anyway.

 6           He is there to -- he will be testifying as to what

 7   happened in March and April when Fannie Mae issues a DU

 8   clarification.  And in this DU clarification that Fannie Mae

 9   issues it says, hey, lending world, we are aware that we --

10   this has now come to our -- again, attention -- and it's a

11   very big deal and we're denying a lot of loans.

12           It's not us.  We've always had that same policy.

13   It's the -- the issue here is we're aware of the problem.  He

14   will be testifying as to that particular -- those particular

15   things that predate the information that Fannie Mae puts out

16   to the public as well as he's going to be assessing the

17   information that Fannie Mae knew internally about its policies

18   or its policy to treat a 9 as an 8.

19           THE COURT:  Okay.  It's ordered taking this matter

20   under advisement.

21           In the Joint Proposed Pretrial Order that was

22   submitted, the trial estimate was, I think, four or five days.

23           And is that -- I don't know if you've had a chance to

24   give that some more thought.  Has anybody reevaluated whether

25   that's still a reasonable estimate?

1          MS. GOLDLSMITH:  I think, Your Honor, plaintiffs

2     actually estimated five to eight days depending on whether we

3     had to try the question of whether or not they were a consumer

4     reporting agency.  I think that five --

5          THE COURT:  Oh, I see.  Yes.  Five to eight.  Four to

6     five.

7          MS. GOLDLSMITH:  I think that plaintiffs are of the

8     opinion that it's probably still going to take five.

9          THE COURT:  The "five" is an important number

10    compared to "four" because "five" means a second week because

11    we only have trial four days a week.

12         MS. GOLDLSMITH:  Well, as someone coming in from

13    Ohio, we can cram it in in four.  I'm all for it.

14         THE COURT:  What's wrong with Phoenix in February

15    when you're from Ohio?

16         MS. GOLDLSMITH:  Can you explain it to my soon-to-be

17    nine-year-old whose birthday I was going to be missing next

18    week.  It's a big deal to her.

19         THE COURT:  Well, he called me over the weekend --

20    she.  She -- yeah.  She called me over the weekend and said,

21    please, make sure my mom is not in trial in Arizona unless she

22    brings me --

23         MS. GOLDLSMITH:  Oh, that's been requested as well.

24         THE COURT:  I told you.  We talked.

25         MS. GOLDLSMITH:  Well.  She'll appreciate that.

1    I think we have a lot of testimony to get in.  I

2  think that certainly with the exclusion of Dr. Smith on

3  damages, I think there would have been extensive cross on

4  that.  I think that resolution of the tri-merge rulings, I

5  think if we have to put a lot of testimony on explaining some

6  of that, that lengthens it.

7    But I would be -- I would be hopeful that we could

8  complete it in four to five days.  We would be motivated to do

9  so.

10    MR. MARSHALL:  Your Honor, I agree.  I think five

11  days unless you want to start imposing time limits.  The fifth

12  day may be nothing more than closing statements, but I think

13  we need to make sure we have five.

14    THE COURT:  Well, and when people are saying "it's

15  probably five," then it's two weeks and we have to -- for

16  purposes of the jury, I have to assume that maybe that's six

17  days because they deliberate.

18    I know the lawyers always think, oh, we'll be done in

19  five days.  Well, there's more work after that.  The jury is

20  doing it.

21    So, yeah, we need to look at what's -- what is

22  available.  And as I said, the problem I have right now is in

23  this -- in the month of March, at least, I don't have five

24  days for sure because I only have four days in the fourth week

25  and not available in the short fifth week of March.

1          Then -- when am I gone in April?  Is that the very

2     end?

3        (Discussion had off the record.)

4          THE COURT:  There it is.  I was going to say she's

5     going through these calendars and they have all this stuff on

6     it.  It better not be that week.

7          Okay.  So it's the fourth week of April?

8          So it's possible that we could do something in April.

9     But it would have to be something that -- we would have to

10    start it no later than the 12th to make sure that we could go

11    into a second week.

12         Okay.  So on April 12th I have one other civil case

13    set for trial.  And I keep telling everybody that I'm positive

14    it's going to settle, but for some reason it hasn't yet.

15         Well, I mean, it really has a lot -- I think they

16    started out with like 25 defendants and now we're down to

17    three.  And I keep thinking there's only three left, how could

18    they not settle.  But they haven't yet.  I'm still optimistic.

19         But if that doesn't settle, I do have to try that

20    case on April 12th.  I really don't have any choice.  It's

21    quit a bit older than your case as well.

22         But we could set in conflict with the 12th, knowing

23    that if this other case settled, that that's the only civil

24    case we have on April 12th.

25         That would be my suggestion.  Because then things get

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

1    much iffier if we have to go beyond April because we have

2    civil and criminal things set.  And we just don't know this

3    far in advance what's going to happen with them.

4            MS. GOLDLSMITH:  I'm just so happy I'm going to be

5    home for my daughter's birthday.  You could set it on

6    Christmas.

7            MR. MARSHALL:  Your Honor, our trial schedules are

8    open.  The only wrinkle is that my client, who very much wants

9    to attend all days of trial, told us that those are the three

10   days -- there are three days, April 11th, 12th, and 13th that

11   he cannot come.

12           And so all I would ask is that I be given a chance to

13   talk to my client about that and make sure he understands the

14   situation and that he doesn't have any objection.

15           THE COURT:  Okay.

16           MR. MARSHALL:  And I can get back to the Court very

17   quickly on that.

18           THE COURT:  Well, let's tentatively reset for the

19   12th.  And then we can let you know as soon as we find out if

20   that other case is going to settle.  Because that will be our

21   best chance to have things go with plenty of time to conclude

22   it.

23           Anything else you need to discuss today --

24           Oh, there is one other thing I would like to discuss,

25   and that is, instead of my reading a joint statement of the

1   case, you know, a bland couple of paragraphs, I would like to

2   offer both sides the opportunity to do a mini-opening

3   statement not to exceed three minutes.

4          So that before we began any substantive questioning

5   of the jury, you would have an opportunity to explain the case

6   from your perspective.

7          Would you like to do that Ms. Goldsmith and

8   Mr. Mengedoth?

9          MS. GOLDLSMITH:  Yes, please.

10         MR. MENGEDOTH:  Yes, Your Honor.

11         MR. MARSHALL:  That would be great, Your Honor.  That

12  would be in lieu of a joint statement, correct?

13         THE COURT:  Correct.

14         MR. MARSHALL:  All right.

15         THE COURT:  Then I would suggest that we only need

16  eight jurors.  We don't have alternates.  If the trial is only

17  going to be five or six days, if we lost one or two, we would

18  still have enough for a verdict.  And I don't know that we

19  would lose one or two.

20         And if we have nine jurors, then you will have nine

21  that have to be unanimous for a verdict.  So I would suggest

22  eight.

23         Agreeable?

24         MS. GOLDLSMITH:  That's fine.

25         MR. MENGEDOTH:  Yes, Your Honor.

1          MR. MARSHALL:  Agreed, Your Honor.

2          THE COURT:  Each side gets three peremptory strikes.

3          It is my practice during voir dire to voir dire all

4   prospective jurors who are present using what we call the

5   struck-method rather than the strike-and-replace method of

6   jury selection.

7          So we will probably summons maybe 25 prospective

8   jurors and all 25 will answer all of the questions.  And the

9   one advantage to that is that if there are strikes for cause,

10  they can be held until after all of the voir dire is completed

11  and be made after the prospective jurors are excused from the

12  courtroom.

13         My practice also is to -- and the reason I asked for

14  you to submit proposed voir dire -- my practice is -- and I

15  have not reviewed your proposed voir dire at this time -- is

16  to ask all of the panelwide questions that call for yes-or-no

17  answers.

18         And when it's time for the lawyers to ask questions

19  on voir dire, those questions would not be questions of the

20  whole jury panel but followup questions, with the possible

21  exception -- and that's why I say I have not looked at them

22  yet -- there are occasionally a question or two that a lawyer

23  wants to ask of the whole jury panel that while I consider to

24  be an appropriate question to be asked, I don't consider it a

25  good question to be coming from me.

CV13-02260-PHX-SRB    PRETRIAL CONFERENCE  2-29-16

1         And if there are any such questions that are listed

2    on your proposed voir dire, I would let you know that I'm not

3    going to ask them but you can.

4         Other than that, I would limit you to asking

5    individual followup questions of prospective jurors.

6         Maureen will provide you with exhibit marking

7    instructions.  Also, we use a video display for our exhibits

8    during deliberations so that all the exhibits are loaded onto

9    a CD of some sort and the jurors view the exhibits on a big

10   screen TV so that they can -- and it's particularly good in a

11   document-intensive case where they can all be looking at the

12   document at the same time rather than talking about a document

13   they only have one copy of that they're passing around the

14   table.

15        That's all I can think of at this moment.

16        Ms. Goldsmith, is there anything else you wanted to

17   bring up this morning?

18        MS. GOLDLSMITH:  One thing that comes up is -- and I

19   don't know how this is going to impact with the change in

20   timing -- the defendants had raised an issue about one of

21   their witnesses in scheduling her.  They had approached us

22   about maybe potentially doing her by video conference.

23        THE COURT:  We're doing that tomorrow.  Some witness

24   broke a shoulder or an arm and can't travel and so we're doing

25   it first thing tomorrow morning.

CV13-02260-PHX-SRB     PRETRIAL CONFERENCE   2-29-16

1          MS. GOLDLSMITH:  Well, we didn't agree to that but.

2          THE COURT:  Well, you know, the defense was kind of

3    hard pressed to say "no" when it turned out the guy broke his

4    shoulder.

5          MS. GOLDLSMITH:  Yes.  And so we had wanted to raise

6    the issue with respect to the 30(b)(6) witnesses.  We do want

7    to compel their appearance live in our case-in-chief.  We have

8    agreed to talk about scheduling and I don't know if an April

9    time frame changes that at all.

10         THE COURT:  Well, I would suggest that since we're

11   changing the trial date that you look at that.

12         And then also, if it has to do with a particular day,

13   I am more than willing, even over the objection of the other

14   side, to take witnesses out of order.

15         MR. MILLER:  Yes.  Your Honor, it was a family

16   healthcare issue that's getting better over time.

17         MS. GOLDLSMITH:  Oh.  Good.

18         MR. MILLER:  And so that's why we were going to ask

19   to be a little flexible just to limit her travel as much as

20   possible, but thank you, Your Honor.

21         MS. GOLDLSMITH:  So it's apparently a moot point.

22         Anything else on the defense side?

23         MR. MARSHALL:  Three quick things, Your Honor.

24         Are we going to have another status conference about

25   five days before the trial to tidy up anything that may need

1    to be tidied up?

2         THE COURT:  I wasn't planning on it.  Is there

3    anything to tidy up?

4         MR. MARSHALL:  I don't think so, Your Honor.

5         There are a couple of housekeeping things that I

6    think would make the trial easier.

7         Your summary judgment rulings now moots and changes

8    a couple of the instructions and the verdict form, so we would

9    like an opportunity to get together with the plaintiffs and

10   redo a couple of those things and resubmit them.

11        I'm not talking about redoing everything, but

12   certainly we don't need a verdict form that talks about

13   whether Fannie Mae is a consumer reporting agency and we don't

14   need nor jury instructions that ask the jury to make that

15   factual determination, so just a few thing.

16        So we would like a schedule to submit those new

17   things.

18        THE COURT:  When would you suggest?

19        MR. MARSHALL:  Something that mimics the last

20   schedule, Your Honor, so perhaps five days before -- and

21   that's why I asked for a status conference, Your Honor,

22   because if there was going to be one, we could submit it five

23   days before the status conference before the trial, much like

24   the schedule that we are on now.

25        THE COURT:  Well, if there are any deletions or

1    supplements to the jury instructions previously submitted,

2    please submit your revisions, hopefully jointly, by Tuesday,

3    April 5th, a week before trial.

4          And unless I see something that requires us getting

5    together, I wouldn't schedule something to do that.

6          MR. MARSHALL:  That would be fine, Your Honor.

7          The last one is:  Do you want our mini-opening

8    statements in writing; and if so, when do you want them?

9          THE COURT:  No.

10         MR. MARSHALL:  All right.  Thank you, Your Honor.

11         THE COURT:  Just practice and make sure it's three

12    minutes.  Because if it's three minutes and ten seconds, that

13    last ten seconds you won't get a chance to say because I watch

14    the second hand going around.

15         MR. MENGEDOTH:  Your Honor, in terms of the jury

16    instructions as well as the verdict forms, we will certainly

17    be working cooperative with the defendants in light of your

18    ruling since there are anticipated changes to that.

19         We believe also, in light of the things that were

20    said here today, that it's reasonably anticipated that Fannie

21    Mae, as well as ourselves, will be withdrawing a number of our

22    exhibits.  So could we have that same date for exhibits and

23    objections thereto as well?

24         THE COURT:  Yes.

25         So my last question for all of you:  Is there any

CV13-02260-PHX-SRB     PRETRIAL CONFERENCE   2-29-16

```
 1    chance you're going to resolve this case short of trial?
 2           MR. MARSHALL:  Your Honor, we've tried really hard.
 3    We've tried really hard.
 4           THE COURT:  You don't want the Ninth Circuit to agree
 5    with me on my summary judgment ruling, do you?
 6           MR. MARSHALL:  I would like the Ninth Circuit to
 7    disagree, Your Honor.
 8           THE COURT:  I knew that.  I was just thinking you
 9    settle this case and then you don't have to worry about
10    whether they agree or disagree.
11           MS. GOLDLSMITH:  We certainly have been maintaining
12    conversations as recently as the last week.
13           I don't think it looks good, but we are always in
14    communication, so.
15           THE COURT:  I mean, I jokingly ask about the Ninth
16    Circuit, because obviously, there's going to be some case
17    where, regardless of the merits of trying to settle or that
18    Fannie Mae might say, well, this is the one we want to take
19    up, but apparently that's not the case.
20           You're willing to entertain settlement.  And
21    you're -- whether it's optimistic or not, it isn't a "we're
22    not going to settle because we have to appeal this ruling."
23           MR. MARSHALL:  I think we look at every case
24    independently, Judge, and as I've said, the door is always
25    open.  We've tried mightily but we're not there yet and we're
```

1    pretty far apart at this point.

2            THE COURT:  Well, now Dr. Smith is not testifying, so

3    maybe that changes things.

4            MR. MARSHALL:  We will find that out.

5            THE COURT:  Okay.  Thank you.

6            Court is in recess.

7        (Proceedings adjourned at 11:45 a.m.)

8                            * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                    C E R T I F I C A T E

 3

 4          I, ELIZABETH A. LEMKE, do hereby certify that I am

 5   duly appointed and qualified to act as Official Court Reporter

 6   for the United States District Court for the District of

 7   Arizona.

 8          I FURTHER CERTIFY that the foregoing pages constitute

 9   a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 5th day of March,

14   2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25
```