Paul B. Mengedoth (018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail: paul@mengedothlaw.com

Sylvia A. Goldsmith, Esq. (*Pro Hac Vice*)
**GOLDSMITH & ASSOCIATES, LLC**
Park West Building
20545 Center Ridge Road, Suite 120
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail: sgoldsmith@sgoldsmithlawoffice.com

*Attorneys for Plaintiffs Richard and Kristin Zabriskie*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Richard C. Zabriskie, *et al.* | ) |
| Plaintiffs, | ) CASE NO. 2:13-cv-02260-PHX-SRB |
| v. | ) |
| | ) PLAINTIFFS' MOTION FOR |
| | ) AWARD OF ATTORNEYS' FEES |
| | ) AND NON-TAXABLE |
| Federal National Mortgage Association, | ) LITIGATION EXPENSES |
| Defendant. | ) |

**PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND NON-TAXABLE LITIGATION EXPENSES**

Plaintiffs Richard and Kristin Zabriskie ("the Zabriskies" or "Plaintiffs"), through undersigned counsel, respectfully move for an award of their reasonable and necessary attorney's fees and non-taxable litigation expenses. Plaintiffs *Motion for Award of Attorneys' Fees And Non-Taxable Litigation Expenses* is supported by the below Memorandum of Points and Authorities and the following documents, all of which are attached and incorporated by reference: (1) the Declaration of Sylvia Goldsmith (Exhibit A) and Appendices 1-3; (2) the Declaration of Paul B. Mengedoth (Exhibit B) and Appendices 1-2; (3) the Declarations of attorneys Justin Baxter, Esq. James B. Fishman, Esq. John H. Goolsby, Esq. Susan M. Rotkis, Esq. Hyung S Choi, Esq. and Floyd W. Bybee, Esq. (Exhibit C); a Statement of Counsel required by Local Rule 54.2(d)(1) (Exhibit D), and Plaintiffs' proposed order.

## I.     INTRODUCTION

Plaintiffs' instant motion follows nearly three (3) years of vigorously contested litigation which culminated in five full trial days beginning on August 23, 2016. At the conclusion, Plaintiffs prevailed against Defendant Federal National Mortgage Association ("Fannie Mae") on their sole claim arising under the Fair Credit Reporting Act ("FCRA") – 15 U.S.C. §1681e(b). The jury unanimously found that Fannie Mae negligently violated the reasonable procedure mandates of the FCRA, and awarded Plaintiffs tens of thousands of dollars in actual damages to compensate them for Fannie Mae's violation of the law. To encourage consumers to act as private attorneys general in order to enforce the public policy goals of the FCRA, the Act provides that plaintiffs may recover their attorney's fees and costs. *See* 15 U.S.C. § 1681o(a)(2). *See also Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (5th Cir. 1982).

Plaintiffs request that this Court award them the full amount of the attorneys' fees and costs. The total amount of attorneys' fees sought by Plaintiffs represents the lodestar of Plaintiffs' counsel, based upon reasonably expended time and hourly rates. In addition, Plaintiffs seek a modest 1.5 upward adjustment on their loadstar, resulting

in a total judgment to be entered in Plaintiffs' favor for all reasonable attorneys' fees and non-taxable costs in the amount of $1,410,171.30.

## II. OVERVIEW OF LITIGATION.

This was an action for damages brought by a married couple against Fannie Mae for violations of the FCRA. The gravamen of Plaintiffs' claim was that Fannie Mae, a consumer reporting agency through the operation of its Desktop Underwriter system, failed to follow reasonable procedures to assure maximum possible accuracy of the information reported about Plaintiffs in multiple of its Desktop Underwriter Findings. Fannie Mae published the DU Findings in a report to mortgage lenders and which bears on the consumers' eligibility for mortgage loan financing in violation of 15 U.S.C. § 1681e(b). Here, Fannie Mae's failure to assure maximum possible accuracy caused damage to the Zabriskies and prevented them from refinancing their home.

Ultimately, recognizing the significant issues at stake, Fannie Mae litigated this case without any regard for economy of time and resources. And while Fannie Mae was free to embrace such a litigation strategy, it must now bear the responsibility for its Stalingrad defense. Fannie Mae's approach here is similar to an observation made by the Fifth Circuit Court of Appeals in a case brought under a related federal fee-shifting consumer statute, the Truth-In-Lending Act, in which significant time was also expended by plaintiff's counsel as a result of defendant's stalwart defense:

> [A]lthough defendants are not required to yield an inch or pay a dime not due, they may by militant resistance increase the exertions required of their opponents and thus, if unsuccessful, be required to bear that cost.

*See, e.g., McGowan v. King, Inc.*, 661 F.2d 48, 51 (5th Cir. 1981).

After fighting vigorously at every turn and ultimately losing, Fannie Mae must now bear the same cost as the defendant in *McGowan*. Plaintiffs were successful in their groundbreaking motion for partial summary judgment and again before a unanimous eight-person jury at trial. Thus, Plaintiffs should be awarded all of their attorneys' and their staff's actual time and reimburse their non-taxable litigation

expenses they incurred in prosecuting this groundbreaking consumer case against Fannie Mae.

### III. MEMORANDUM OF POINTS AND AUTHORITIES.

#### A. PLAINTIFFS ARE ENTITLED TO THEIR ATTORNEY FEES UNDER THE FCRA.

The FCRA provides that in "the case of any successful action to enforce any liability under this section," the consumer shall recover "the costs of the action together with reasonable attorney's fees as determined by the court." 15 U.S.C. § 1681o(a)(2). The purpose of awarding attorney fees under the FCRA is to encourage enforcement of the statute by consumers, acting as "private attorneys general." *See*, *Bryant*, *supra*.

#### B. LODESTAR/MULTIPLIER APPROACH.

The Ninth Circuit has adopted a lodestar/multiplier approach for assessing the amount of reasonable attorney fees. *D'Emanuele v. Montgomery Ward & Co., Inc*., 904 F.2d 1379, 1383 (9th Cir. 1990), *citing Hensley v. Eckerhart*, 461 U.S. 424, 433, 434 n.9, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). The lodestar/multiplier analysis has two parts. The Court first calculates the lodestar amount by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate. *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996). This methodology results in a "presumptively reasonable" fee award. *Id*. The Court may consider the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr v. Screen Guild Extras, Inc*., 526 F.2d 67, 70 (9th Cir. 1975) *Hanlon*, 150 F.3d at 1029; *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir.

2006). After determining the lodestar amount, the court assesses whether to adjust the lodestar upward or downward based on the *Kerr* factors that are "not already subsumed in the initial calculation of the lodestar." *Morales*, 96 F.3d at 363-64.

Additionally, Arizona's local rules also contain a list of the following non-exhaustive factors closely tracking *Kerr*: (1) the time and labor required of counsel; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by counsel because of the acceptance of the action; (5) the customary fee charged in matters of the type involved; (6) whether the fee contract between the attorney and the client is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) The amount of money, or value of the rights involved, and the results obtained; (9) the experience, reputation and ability of counsel; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship between the attorney and the client; (12) awards in similar actions; and (13) any other matters deemed appropriate under the circumstances. *See* L.R.Civ. 54.2(A)-(M).

*1. The Hourly Rates of Plaintiffs' Counsel Are Reasonable*

Goldsmith & Associates, LLC and Mengedoth Law PLLC and their respective staff have devoted in excess of 2,427.48 hours to this litigation, and have a total lodestar after reductions for exercise in billing judgment to date of $900,502.25. *See* Goldsmith Decl., ¶¶ 28-30; Mengedoth Decl. ¶¶ 16-17. All such amounts were reasonable and necessary to prosecute the Zabriskies' claims against Fannie Mae. *See id.*

In assessing the reasonableness of an attorney's hourly rate, courts consider whether the claimed rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

Paul Mengedoth. Paul Mengedoth's standard hourly rate is $425.00. *See* Mengedoth Dec. ¶ 13. In September of 2014, Judge Martin of the Bankruptcy Court in this District approved Mr. Mengedoth at his then hourly rate of $400.00 per hour on a

1  contingent matter when he was appointed as special counsel to the Chapter 7 trustee to
2  prosecute prepetition claims of a consumer debtor under federal and state law consumer
3  protection laws. *Id.* at ¶ 14 (citing *In re: Philip Lee Owens and Tricia Nichole Stotts*,
4  2:14-bk-10932-BKM).  In October of 2012, Judge Ditsworth further awarded Mr.
5  Mengedoth his then hourly rate of $375.00 per hour to defend a collection suit against
6  consumers in Maricopa County Superior Court. *The Pain Management Company P.C.*
7  *et al. v. Preese*, CV 2009-990619 (J. Ditsworth). *See id.*

8       Sylvia Goldsmith.  Sylvia Goldsmith's hourly rate is $450.00.  Goldsmith Decl.
9  ¶ 25.  In 2013, following a two-day bench trial on a significantly less complicated
10 FCRA case, Judge Mazzant of the Eastern District of Texas specifically recognized Ms.
11 Goldsmith as an expert in the field of FCRA litigation. *See*, *e.g.*,
12 *Haberman v. PNC Mortg. Co.*, 915 F. Supp. 2d 800 (ED Tex. 2013).  Judge Mazzant
13 approved Ms. Goldsmith at her then hourly rate of $350.00 per hour, and awarded every
14 portion of her time as requested without reduction.  Ms. Goldsmith's current hourly rate
15 of $450.00 per hour was set after consultation with colleagues and experts familiar with
16 the current prevailing market conditions and hourly rates for attorneys with the same
17 national-recognition, experience level and knowledge as Ms. Goldsmith.  *See*
18 Goldsmith Decl. at ¶ 25.  This rate is at, or in fact *below*, the standard billing rate
19 charged by similar FCRA attorneys.  *See*, *e.g.*, Fishman Decl. ¶ 7; Rotkis Decl. ¶ 25.

20      Attorneys with an emphasis on representing consumers in consumer protection
21 litigation, and FCRA claims in particular, and who practice both nationally and in this
22 jurisdiction support that the respective standard hourly rates for Ms. Goldsmith and Mr.
23 Mengedoth are reasonable.  *See* Ex. C, Baxter Decl. ¶¶ 7-10, Fishman Decl. ¶¶ 5-8;
24 Goolsby Decl. ¶¶ ; Rotkis Decl. ¶¶ 7-25; Choi Decl. ¶¶ 4-7; Bybee Decl. ¶¶ 3-8.

25      Furthermore, the United States Consumer Law Attorney Fee Survey Report
26 (2013-14)(Rev. May 22, 2015) is a helpful guide.  *See* Ex. B, Mengedoth Decl. ¶15,
27 Appx. 1.  The Survey indicates attorneys representing consumers in consumer
28 protection claims in this jurisdiction range in hourly rates from a median of $375.00 per

hour to $475.00 per hour, with a median of 21.5 years in legal practice. *See id*. at p. 48. The median paralegal rate is $125.00 per hour. *See id.* Ms. Goldsmith and Mr. Mengedoth have been in private practice nearly that same amount of time.

It is also important to note that a court will also apply each biller's current rates for all hours of work performed, regardless of when the work was performed, as a means of compensating for the delay in payment. *See In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994)   Accordingly, Plaintiffs' counsels' respective *present* hourly rates should be applied regardless what it may have been at the inception or throughout the many years this case has been successfully prosecuted.

Plaintiffs' attorneys are highly regarded members of the bar who are experienced in the area of consumer FCRA cases, and practice and/or instruct nationally on matters involving the FCRA. *See* Goldsmith Decl. ¶¶ 2-11; Mengedoth Dec. ¶¶ 2-5,7-9. Their respective customary rates, which were used in calculating the lodestar here, are in line with those approved by courts in this District and elsewhere.  As acknowledged by attorneys practicing consumer protection litigation on behalf of consumers in FCRA cases locally and nationally, both are recognized for their exceptional skill and ability in prosecuting cases such as this.  *See* Ex. C, Baxter Decl. ¶¶ 1-5, 8-9, Fishman Decl. ¶¶ 5-8; Goolsby Decl. ¶¶ 3-5; Rotkis Decl. ¶¶ 7-25; Choi Decl. ¶¶ 4-7; Bybee Decl. ¶¶ 3-8. Plaintiffs' counsels' and their firm's hourly rates are, therefore, reasonable.

*2. The Number of Hours Billed is Reasonable.*

Both firms made every effort to prevent the duplication of work or inefficiencies that might have resulted from having two separate firms working on this litigation. For example, meetings among Ms. Goldsmith and her staff and Mr. Mengedoth and his staff were kept to a minimum, were generally based on agendas, and were focused on strategy decisions and the assignment of tasks. Moreover, assignments were made for specific tasks and activities so that it was clear which firms and personnel had primary responsibility over each task.

Plaintiffs' counsels' hours spent successfully prosecuting this case to verdict are particularly reasonable given Fannie Mae's vigorous defense of this action, which necessitated, *inter alia*, extensive discovery practice between the parties and with multiple third parties, multiple litigated motions, employing multiple experts, eliminating Fannie Mae's purported expert, trial preparation, and a trial lasting five full days over the course of two weeks.

Moreover, under the circumstances of this case, the monetary relief obtained for the Zabriskies; the fact that plaintiffs' counsel had to litigate this case for more than three years against Fannie Mae's vigorous defense in order to obtain such relief; the contingent nature of the fee; the significant risks assumed by plaintiffs' counsel in representing the Zabriskies' in this case; the complexity of the issues involved; and the skill and effort demonstrated by Ms. Goldsmith and Mr. Mengedoth in successfully litigating this action on behalf of the Zabriskies—a modest upward adjustment of 1.5 of their loadstar is warranted.

The lodestar fee is $900,502.25 based upon 2,427.48 hours at the rates described below:

|                   | Hours   | Rate     | Lodestar     |
|-------------------|---------|----------|--------------|
| Sylvia Goldsmith  | 925.93  | $450.00  | $416,668.50  |
| Paul Mengedoth    | 812.15  | $425.00  | $345,163.75  |
| Nick Walton       | 410.4   | $225     | $ 92,340.00  |
| Geoff McCarrell   | 77.2    | $300     | $ 23,160.00  |
| ML Paralegal      | 59.8    | $150.00  | $  8,970.00  |
| G&A Paralegal     | 142     | $100.00  | $ 14,200.00  |
| TOTAL             | 2,427.48|          | $900,502.25  |

*3. A Modest Upward Adjustment to Loadstar is Reasonable and Warranted.*

Plaintiffs' attorneys' foregoing professional hourly rates should be adjusted upward by 1.5, resulting in a total adjusted loadstar of $1,350,753.30. Courts regularly approve fee awards resulting in upward multipliers which are significantly higher than the 1.5 upward adjustment Plaintiffs request. *See, e.g., Craft v. County of San*

*Bernardino,* 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (approving 25% fee award in a common fund case yielding a multiplier of 5.2 and stating that "there is ample authority for such awards resulting in multipliers in this range or higher"); *Steiner v. Am. Broad. Co.,* 248 Fed. Appx. 780, 783 (9th Cir. Cal. 2007) (upholding 25% fee award yielding multiplier of 6.85, finding that it "falls well within the range of multipliers that courts have allowed"); *Van Vranken v. Atlantic Richfield Co*., 901 F. Supp. 294, 298-99 (N.D. Cal. 1995) (multiplier of 3.6 was "well within the acceptable range for fee awards in complicated class action litigation" and stating that "[m]ultipliers in the 3-4 range are common"); *see also Vizcaino*, 290 F.3d at 1051 and Appendix (affirming 28% fee award where multiplier equaled 3.65; and citing cases approving multipliers in common fund cases averaging 3.32 and going as high as 19.6 ); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (approving multiplier of 3.5); *In re Safety Components, Inc. Sec. Litig*., 166 F. Supp. 2d 72, 104 (D N.J. 2001) (approving multiplier of 2.81 and citing cases approving multipliers from 2.04 to 3.6);  *see also Ketchum v. Moses,* 24 Cal. 4th 1122, 1137 (2001)(approving fee enhancement of 2.0 in non-class case where contingent nature of the case and excellence of representation of counsel merited upward adjustment).  Here, applying each of the *Kerr* factors below, a modest 1.5 upward adjustment from Plaintiffs' counsels' loadstar is reasonable and warranted.

### D. THE *KERR* FACTORS.

#### 1. The Time and Labor Required.

An important consideration in evaluating the reasonableness of the time expended by Plaintiffs' counsel is the manner in which Fannie Mae approached this case.  This informs both the first and second factors under the *Kerr* analysis, *i.e.*, *the time and labor required in the litigation, and the novelty and complexity of the case*.  A court can take into consideration the complexity of the case, determined by "examining the difficulty counsel faced in establishing proof and in meeting the litigation strategy

of defendants." *See*, *e.g.*, *Becker v. ARCO Chem. Co.*, 15 F. Supp. 2d 621, 632 (E.D. Pa. 1998).

Here, Fannie Mae vehemently fought this lawsuit on both the macro and micro level with seemingly endless man-power and financial resources. *See* Goldsmith Decl. at ¶ 17. Fannie Mae's overarching defense centered on the argument that the FCRA should not and does not apply to Fannie Mae. *Id.* at ¶ 15. This defense resulted in Plaintiffs defending against significant dispositive motion practice, and both fact and expert discovery dedicated specifically to proving the elements of the definitions of "consumer reporting agency" and "consumer report," issues that are not traditionally seen in typical FCRA litigation.

The fact discovery in this regard was tremendous and intensive, centering on massive amounts of documents largely generated from computerized data. Fannie Mae produced in excess of 20,000 pages of *its own* documents in response to Plaintiffs' formal discovery requests, and disclosed more than 6,500 pages of documents responsive to subpoenas Fannie Mae issued to eighteen (18) third-parties. *See* Goldsmith Decl. at ¶ 17. Plaintiffs themselves subpoenaed more than 1000 pages and from one (1) additional third party. *Id.* Through their unique experience, Plaintiffs' attorneys were able to read through these massive materials without outside assistance, but it was a laborious task to interpret and understand all such documents.

Making this process more difficult was the fact that Fannie Mae prohibits mortgage lenders from disclosing DU Findings reports to consumers so there was sparse information readily available to Plaintiffs outside the litigation arena as to how this system works. Moreover, Fannie Mae's own internal records did not square with the publicly issued comments about the source of the inaccuracy of the information, what Fannie Mae relayed to regulators, and what regulators at the Consumer Financial Protection Bureau accepted at face value.

Prosecution of the Plaintiffs' case required the completion of nine (9) depositions, including multiple corporate representatives designated by Fannie Mae in

1 response to Plaintiffs' Notice of Rule 30(b)(6) Deposition regarding the function, operation, and interrelationship of Fannie Mae's underwriting policies to its complete lack of procedures to assure the accuracy of the information Fannie Mae reported about consumers such as the Zabriskies.  *See* Goldsmith Decl. at ¶ 19.

Even despite the tens of thousands of pages of documentation and deposition testimony produced here, and even after partial summary judgment was entered in Plaintiffs' favor, Fannie Mae still pressed forward with its refusal to take any responsibility here, insisting at trial that Fannie Mae never reported anything inaccurate about Plaintiffs (even though Plaintiffs admittedly never had a foreclosure and yet no less than five Desktop Underwriter Findings reports claim that they did).  *See* Goldsmith Decl. at ¶ 22.  Every ounce of Plaintiffs' efforts throughout this litigation was needed to combat the endless excuses offered by Fannie Mae from the original motion to dismiss to the ultimate verdict obtained earlier this month.

### 2. **The Novelty and Difficulty of the Questions.**

The novelty and difficulty of the issues presented in this case are clear. Plaintiffs' counsel are aware of no cases (other than their own) in which consumers brought claims against Fannie Mae regarding the operation of its DU system alleging Fannie Mae's DU Findings are consumer reports, Fannie Mae is a consumer reporting agency, and inaccurate information Fannie Mae furnished about consumers in DU Findings reports violates the FCRA.  In fact, the only other analogous prior case had been against Freddie Mac and the furnishing of reports through its LP system had been dismissed by a Pennsylvania trial court.  And while Fannie Mae unsuccessfully relied upon such prior authority in its motion to dismiss, the difficulty overcoming such obstacle early in the litigation was instrumental to Plaintiffs' later success at trial.

To definitively establish that Fannie Mae fell within the scope of the FCRA, Plaintiffs' counsel also filed a motion for partial summary judgment against Fannie Mae, which tactical decision is uncommon in typical FCRA litigation. And doing so was extraordinarily difficult.  Plaintiffs' counsel filed a multitude of record evidence

under seal they gathered in formal discovery which Fannie Mae had designated as confidential pursuant to a pre-trial protective order to keep secret from the public. Such evidence established beyond doubt that Fannie Mae's confidential, propriety DU system reviewed and analyzed consumer credit data bearing on consumers' creditworthiness, Fannie Mae furnished its DU reports to third-parties, and Fannie Mae profited each year to the tune of hundreds of millions of dollars – the net effect of which was to keep deserving consumers such as the Zabriskies out of a recovering housing market and our struggling national economy because Fannie Mae chose to falsely report they had a foreclosure.

### 3      **The Skill Required.**

Plaintiffs' attorneys have demonstrated that they have specialized skill in litigating FCRA cases, unique knowledge of the consumer reporting and mortgage lending industries, and presenting the key issues to the jury. In addition to the necessity of Plaintiffs' counsel understanding the complex provisions of the FCRA, Plaintiffs' counsel required prior working knowledge of Fannie Mae's system of transmission of data among multiple participants in the mortgage lending industry to appreciate the errors reporting about consumers in Fannie Mae's proprietary, confidential, behind-the-scenes DU system. Plaintiffs' counsel also needed working knowledge of multiple other types of consumer and credit reporting agencies' policies and procedures governing accuracy from litigating in prior FCRA cases, as well as the various types of damages caused to consumers by FCRA violations. Plaintiffs' counsel further needed to know which documents to seek, including compilations of stored data, and unique internal credit industry documents. In addition to Plaintiffs' counsel needing to have the ability to interpret and understand the significance of these many records, it was essential to bring that skill and knowledge to bear to demonstrate the falsity of Fannie Mae's defense that others up credit data chain were to blame for false information Fannie Mae reported about the Zabriskies.

If the number of lawyers willing to litigate against the three largest national credit bureaus throughout the nation is a small one, the number of lawyers with experience prosecuting and presenting FCRA cases to a jury is a fraction of that number. Less than a handful of lawyers in Arizona litigate FCRA cases against credit reporting agencies and furnishers of credit information (one of whom represented plaintiffs here). And nationally, there are perhaps a dozen lawyers with trial experience in individual FCRA cases that have taken an FCRA case to a jury verdict. Certainly, few consumer protection lawyers locally or nationally would litigate an individual FCRA case against a government sponsored entity where it not already established such entity's activities fell within the scope of the civil liability provisions of the FCRA. *See* Ex. C, Goolsby Decl. ¶ 7; Rotkis Decl. ¶¶ 15a., 16, 17; Choi Decl. ¶ 6; Bybee ¶ 9.

Fannie Mae itself clearly recognizes the specific and complex nature of FCRA practice. Fannie Mae retained no fewer than three lawyers as its national counsel from Morrison & Forrester located in New York and San Francisco and two separate local litigation counsel located in Phoenix prior to trial. At trial, Fannie Mae had four lawyers (Messiers. Marshall, Miller, Meeks, and Ms. Kleine), all of whom sat at Fannie Mae's table throughout trial to argue and assist in presenting Fannie Mae's case to the jury. And an additional Fannie Mae attorney (Mr. Patterson) was also present in court during all full days of trial and presumably also aided in Fannie Mae's defense.

### 4. **The Preclusion of Other Employment by the Attorney.**

Both Plaintiffs' attorneys' firms were precluded from working on other cases during the time they were working on this case. Goldsmith Decl. ¶ 24; Mengedoth Decl. ¶ 11. Additionally, bringing cases under the FCRA precludes Plaintiffs' counsel from representing similarly situated or affected businesses, which may pay lucrative hourly fees win or lose.

### 5. **The Customary Fee.**

The customary fee in FCRA cases is a contingent fee based on a percentage of the total recovery, or the amount of fees awarded by the court under the fee-shifting

section of the FCRA. The FCRA includes a fee-shifting provision in order to level the playing field for consumers who are at a disadvantage to corporate defendants such as Fannie Mae which have virtually unlimited resources to litigate. Thus, court-awarded attorney fees in such cases are a significant part of the customary fee.

Further, the "opportunity costs" associated with prosecuting this case are significant. Plaintiffs' counsel have had to turn down opportunities to work on other cases in order to devote the appropriate amount of time, resources, and energy necessary to handle this complex and demanding matter. Plaintiffs' counsels' devotion to this case in lieu of other opportunities further supports the requested fee award here.

### 6. **Whether the Fee Is Fixed or Contingent.**

Plaintiffs' attorneys accepted Plaintiffs' case on a contingent fee basis. Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work. *See Washington Public Power*, 19 F.3d at 1299 ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose."); *Vizcaino*, 290 F.3d at 1051 (courts reward successful class counsel in contingency case "by paying them a premium over their normal hourly rates"). *See also* Rotkis Decl. ¶ 15e

Plaintiffs' counsel prosecuted this case on a purely contingent basis, agreeing to advance all necessary expenses and that they would only receive a fee if there was a recovery. Plaintiffs' counsels' outlay of time and money in this case has been considerable; in all, plaintiffs' counsel and their staffs have spent approximately 2,427.48 hours investigating, analyzing, researching, litigating, and reaching a favorable resolution of this case to a jury verdict, and have incurred well over $59,418.07 in necessary non-taxable litigation expenses. Plaintiffs' counsel expended these resources despite the very real risk that they may never be compensated at all. In

fact, the risk assumed was considerably magnified in this case, given the complexity of the issues raised and the numerous formidable defenses that Fannie Mae advanced. Plaintiffs' counsels' "substantial outlay, when there is a risk that that none of it will be recovered, further supports the award of the requested fees" here. *Omnivision*, 559 F. Supp. 2d at 1047.

Unlike Fannie Mae's multiple attorneys from multiple firms spanning from San Francisco to New York who are guaranteed payment despite the judgment in plaintiffs' favor, Plaintiffs' counsel took a great risk to represent plaintiff. When the fee is contingent, the fee award should compensate counsel for the risk of receiving no compensation. See, e.g., *Blum v. Stenson*, 465 U.S. 886, 903, 104 S. Ct. 1541, 79 L. Fd. 2d 891 (1984) (Brennan, J., concurring); *Fabri v. United Techs Int'l, Inc.*, 193 F. Supp. 2d 480, 486 (D. Conn. 2002). *Accord Griffin v. Tri-County Metropolitan Transportation District of Oregon*, 112 Or. App. 575, 585, 831 P.2d 42 (1992) ("[C]ounsel who successfully undertake the cases for a contingency fee are generally compensated at rates greatly exceeding standard billing rates for general legal services."). Moreover, the fee award should permit counsel "to earn an income that would be competitive with colleagues who get paid win or lose." *Bayless v. Irv Leopold Imports, Inc.*, 659 F. Supp. 942, 944 (D. Or. 1987), citing *Blum*, 465 U.S. at 903.

### 7. Time Limitations Imposed by the Client or the Circumstances.

This factor is not applicable here

### 8. The Amount Involved and the Results Obtained.

Plaintiffs' attorneys are unaware of a single jury verdict in any FCRA case being entered against government sponsored entity such as Fannie Mae in relation to the reporting of false information about any consumer. The tens of thousands of dollars the jury awarded the Zabriskies is only slightly less than plaintiffs presented as their economic loss discounted to present value over a thirteen month period between refinancing in July of 2012 to July of 2013. The Supreme Court has instructed that "the most critical factor" governing the reasonableness of a fee award "is the degree of

success obtained." *Hensley*, 461 U.S. at 436. In cases when "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 435, 103 S.Ct. 1933.

### E. Counsels' Non-Taxable Litigation Expenses Are Reasonable and Should Be Reimbursed.

To date, Goldsmith & Associates and Mengedoth Law PLLC have incurred a total of $59,418.07 in common and customary litigation expenses for which they seek reimbursement. *See* Goldsmith Decl., ¶ 30, Appx. 3; Mengedoth Decl. ¶¶16-17, Appx. 2. Such common expenses were incurred by the both firms, and consist of: the cost of providing related administrative costs (postage, mailing, courier fees); expert costs, mediation costs, and travel and lodging costs for attorneys, their staff and Plaintiffs' experts. All of these common litigation expenses were reasonably necessary for the continued prosecution of this litigation, and were incurred by both firms for the benefit of the Zabriskies with no guarantee that they would be reimbursed. *See id.* They should be reimbursed in full as well in a final judgment.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the court grant their motion award Plaintiffs all their reasonable attorneys' fees with a 1.5 upward adjustment and non-taxable costs in the total amount of $1,410,171.30.

DATED: September 15, 2016.              Respectfully Submitted,

                                        */s/ Paul B. Mengedoth*
                                        Paul B. Mengedoth (018507)
                                        **MENGEDOTH LAW PLLC**
                                        20909 N. 90th Place, Suite 211
                                        Scottsdale, AZ 85255
                                        Tel: (480) 778-9100
                                        Fax: (480) 778-9101

1  E-mail:  paul@mengedothlaw.com
2
3
4  Sylvia A Goldsmith (*Pro Hac Vice*)
   **GOLDSMITH & ASSOCIATES, LLC**
5  Park West Building
   20545 Center Ridge Rd., Suite 120
6  Rocky River, OH 44116
7  Telephone: (440) 934-3025
   Facsimile: (440) 934-3026
8  E-mail: goldsmith@goldsmithlawyers.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  E-mail:  paul@mengedothlaw.com

2

3

4  Sylvia A Goldsmith (*Pro Hac Vice*)
   **GOLDSMITH & ASSOCIATES, LLC**

5  Park West Building
   20545 Center Ridge Rd., Suite 120

6  Rocky River, OH 44116

7  Telephone: (440) 934-3025
   Facsimile: (440) 934-3026

8  E-mail: goldsmith@goldsmithlawyers.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing *Plaintiffs' Motion For Award Of Attorneys' Fees And Non-Taxable Expenses* is being filed electronically with the United States District Court for the District of Arizona, on this 15th day of September, 2016. Notice of this filing will be transmitted to counsel of record by operation of the Court's electronic filing system.

/s/ Paul B. Mengedoth

Paul B. Mengedoth
**MENGEDOTH LAW PLLC**